Nos. 19-1301, 19-1490

# United States Court of Appeals for the Federal Circuit

EMERSON ELECTRIC CO.,
Appellant,

v.

SIPCO, LLC,
Cross-Appellant.

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00359

## BRIEF OF APPELLANT

James R. Batchelder
James L. Davis, Jr.
Daniel W. Richards
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
Phone: (650) 617-4000

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

Steven Pepe
ROPES & GRAY LLP
1211 6th Avenue
New York, NY 10036
Phone: (212) 596-9000

*Counsel for Emerson Electric Co.*

FORM 9. Certificate of Interest

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Emerson Electric Co.    v.  SIPCO, LLP

Case No. 19-1301

**CERTIFICATE OF INTEREST**

Counsel for the:
☐ (petitioner) ■ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Emerson Electric Co.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Emerson Electric Co. | Fisher-Rosemount Systems, Inc. | None |
| | Rosemount Inc. | |
| | Emerson Process Management LLLP | |
| | | |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Kathryn Hong (former Ropes & Gray LLP)

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

See Attachment.

| 8/9/2019 | /s/ Douglas Hallward-Driemeier |
|---|---|
| Date | Signature of counsel |
| Please Note: All questions must be answered | Douglas Hallward-Driemeier |
| | Printed name of counsel |
| cc: _____ | |

**Reset Fields**

## Attachment to Certificate of Interest

**The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).**

*Emerson Electric Co. et al. v. SIPCO LLC et al.*, No. 1:15-cv-319 (N.D. Ga.) ("SIPCO I") involves U.S. Patent No. 6,437,692. Related litigation *Sipco, LLC et al. v. Emerson Electric Co. et al.*, No. 6:15-cv-907 (E.D. Tex.) was transferred to the Northern District of Georgia, opened as *SIPCO, LLC v. Emerson Electric Co.*, No. 1:16-cv-02690 (N.D. Ga.), and consolidated with SIPCO I.

The following cases may be affected by this court's decision:

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1364 (Fed. Cir.) (appealed from IPR2016-00984) involves related U.S. Patent No. 8,754,780 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1856 (Fed. Cir.) (appealed from IPR2016-01895) involves related U.S. Patent No. 7,697,492 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1986 (Fed. Cir.) (appealed from IPR2017-00001) involves related U.S. Patent No. 7,468,661 and is currently before this Court.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2015-01973 (PTAB) involves related U.S. Patent No. 8,013,732 (on remand from Case No. 17-1866 (Fed. Cir.)).

*SIPCO, LLC v. RAB Lighting Inc.*, No. 2-18-cv-08962 (D.N.J.) involves related U.S. Patent Nos. 7,468,661, 6,914,893, 7,103,511, 7,263,073, 8,924,587.

*Certain Wireless Mesh Networking Products and Related Components Thereof*, Investigation No. 337-TA-1131 (USITC) involves related U.S. patent Nos. 7,103,511, 6,914,893, 8,964,708.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vi

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES ..................................................... ix

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE................................................................2

      A.    Prior Art.............................................................................8

           1.    Cunningham .............................................................8

           2.    Mason.....................................................................14

           3.    McGowan...............................................................16

      B.    The Challenged '692 Patent ............................................17

      C.    Procedural History...........................................................19

           1.    Petition ..................................................................19

           2.    Institution Decisions ..............................................20

           3.    Final Written Decision............................................21

           4.    Request for Rehearing.............................................24

SUMMARY OF THE ARGUMENT .....................................................25

STANDARD OF REVIEW ..................................................................32

ARGUMENT ....................................................................................33

I.     THE BOARD'S FINDING THAT THE GROUND 2 CLAIMS ARE NOT
      OBVIOUS OVER CUNNINGHAM, MASON, AND MCGOWAN WAS
      BASED ON A CLEARLY MISTAKEN READING OF CUNNINGHAM'S
      EXPLICIT DISCLOSURES AND THEREFORE LACKS SUBSTANTIAL
      EVIDENCE ...............................................................................33

      A.    The Board's Conclusion that Cunningham Fails to Disclose the
           "Control Signal" Limitations is Not Supported by Substantial
           Evidence .......................................................................35

**Table of Contents**
**(continued)**

1.  Cunningham's express disclosure of a computer sending "controlling information" to a device adjustment module to adjust a device meets the "control signal" limitations..............35

2.  The Board made a critical error in misreading Cunningham to require the device adjustment module—not the host module—to issue control signals.............................................................43

3.  The Board exacerbated its misreading of Cunningham by limiting Cunningham's disclosure of "controlling information" to "varying utility prices"..........................................................46

4.  The Board's errors were further compounded by the Board's disregard of Cunningham's '978 Provisional, incorporated by reference into Cunningham......................................................49

B.  The Board's Conclusion that Cunningham Fails to Disclose the "Translating" Limitations Is Not Supported by Substantial Evidence .........................................................................................54

1.  Cunningham in view of the express disclosures in Mason and McGowan renders the "translating" limitations obvious..........54

2.  The Board failed to fully engage Emerson's evidence regarding the "translating" limitations, because of its erroneous belief that Cunningham's "controlling information" was limited to "utility prices," which the Board thought could not be translated into an RF and then analog signal........................................................59

II.  THE BOARD VIOLATED THE APA AND DUE PROCESS WHEN IT PROHIBITED EMERSON FROM PRESENTING ANY EVIDENCE AFTER THE BOARD'S INITIAL FINDINGS IN ITS INSTITUTION DECISION....................................................................................61

CONCLUSION ......................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anacor Pharm. v. Iancu*,
  889 F.3d 1372 (Fed. Cir. 2018) ........................................................63

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ........................................................32

*Dell v. Acceleron*,
  884 F.3d 1364 (Fed. Cir. 2018) ........................................................64

*Ericsson Inc. v. Intellectual Ventures I, LLC*,
  890 F.3d 1336 (Fed. Cir. 2018) ........................................7, 33, 45, 48

*Ericsson Inc. v. Intellectual Ventures I LLC*,
  901 F.3d 1374 (Fed. Cir. 2018) ........................................................53

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................32

*Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm.*,
  825 F.3d 1360 (Fed. Cir. 2016) ........................................................63

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ........................................................33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983).............................................................................33

*Power Integrations, Inc. v. Lee*,
  797 F.3d 1318 (Fed. Cir. 2015) ........................................................32

*SAS Institute, Inc. v. ComplementSoft, LLC*,
  825 F.3d 1341 (Fed. Cir. 2016) ........................................................64

*SAS Institute, Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)..............................................................*passim*

*Shinn Fu Company of America, Inc. v. Tire Hanger Corp.*,
  701 F. App'x 942 (Fed. Cir. 2017) ..............................................33, 61

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) .......................................................... 49

*Veritas Techs. LLC v. Veeam Software Corp.*,
   835 F.3d 1406 (Fed. Cir. 2016) ..........................................................33

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*,
   Case Nos. 2018-2125, 2018-2151, 2019 WL 2723163 (Fed. Cir.
   July 1, 2019)....................................................................................50

**Statutes**

5 U.S.C. § 554(c) ...................................................................................53

5 U.S.C. § 706 .......................................................................................32

35 U.S.C. § 315(e) ................................................................................64

# TABLE OF ABBREVIATIONS

## *Parties*

| | |
|---|---|
| Emerson | Appellant Emerson Electric Co. |
| Petitioner | Appellant Emerson Electric Co. |
| SIPCO | Cross-Appellant SIPCO, LLC |
| Patent Owner; PO | Cross-Appellant SIPCO, LLC |

## *Patents and Publications*

| | |
|---|---|
| '692 patent | U.S. Patent No. 6,437,692 |
| '978 Provisional | U.S. Provisional Application No. 60/058,978 |
| Cunningham | U.S. Patent No. 6,124,806 |
| Mason | U.S. Patent No. 6,100,817 |
| McGowan | John J. McGowan, *Direct Digital Control: A Guide to Distributed Building Automation*, 1995 |

## *Defined Terms*

| | |
|---|---|
| AIA | Leahy-Smith America Invents Act |
| APA | Administrative Procedures Act |
| Board; PTAB | Patent Trial and Appeal Board |
| Challenged Ground 2 Claims | Claims 24-31, 42, 43, 46-49, 51-54, and 60-64 of U.S. Patent No. 6,437,692 |
| Challenged Ground 3 Claims | Claims 32, 34, 37-38, 55-57, and 59 of U.S. Patent No. 6,437,692 |
| DI | Decision to Institute |
| FWD | Final Written Decision |
| POSITA | Person of Ordinary Skill in the Art |
| IPR | *Inter Partes* Review |
| POPR | Patent Owner's Preliminary Response |
| DAM | Device Adjustment Module |
| DCM | Data Collection Module |
| ECM | Energy Control Module |
| NCC | Williams Network Control Center |
| SIM | Sensor Interface Module |
| TIM | Telemetry Interface Module |

## STATEMENT OF RELATED CASES

Emerson's counsel is unaware of any related proceedings within the meaning of Federal Circuit Rule 47.5(a). Pursuant to Federal Circuit Rule 47.5(b), Emerson states that the following cases may be directly affected by this court's decision in the pending appeal:

*Emerson Electric Co. et al. v. SIPCO LLC et al.*, No. 1:15-cv-319 (N.D. Ga.) ("*SIPCO I*") involves U.S. Patent No. 6,437,692.

*Sipco, LLC et al. v. Emerson Electric Co. et al.*, No. 6:15-cv-907 (E.D. Tex.) was transferred to the Northern District of Georgia, opened as *SIPCO, LLC v. Emerson Electric Co.*, No. 1:16-cv-02690 (N.D. Ga.), and consolidated with *SIPCO I*.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1856 (Fed. Cir.) (appealed from IPR2016-01895) involves related U.S. Patent No. 7,697,492 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1635 (Fed. Cir.) (appealed from CBM2016-00095) involves related U.S. Patent No. 8,908,842 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1364 (Fed. Cir.) (appealed from IPR2016-00984) involves related U.S. Patent No. 8,754,780 and is currently before this Court.

*Certain Wireless Mesh Networking Products and Related Components Thereof*, 337-TA-1131 (ITC), involves related U.S. Patent Nos. 6,914,893, 7,103,511, and 8,964,708.

*SIPCO, LLC v. RAB Lighting Inc.*, 2:18cv08962 (DNJ), involves related U.S. Patent Nos. 6,836,737, 6,914,893, 7,103,511, 7,263,073, 7,486,661, and 8,924,587.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2017-00359 (PTAB) involves related U.S. Patent No. 6,437,692.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2017-00216 (PTAB) involves related U.S. Patent No. 8,013,732.

*SIPCO, LLC v. Aeon Labs LLC*, No. 3:18cv05713 (N.D. Cal.) involves related U.S. Patent Nos. 6,836,737, 8,924,588, 8,964,708, and 9,430,936.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2019-00545 (PTAB), involves related U.S. Patent No. 8,964,708.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2019-00547 (PTAB), involves related U.S. Patent No. 8,964,708.

*SIPCO, LLC v. Radio Thermostat Co. of Am., Inc.*, No. 5-19-cv-02510 (N.D. Cal.), involves related U.S. Patent Nos. 8,013,732, 8,964,708, and 9,430,936.

*SIPCO, LLC v. SynapSense Corp.*, No. 1-19-cv-01052 (E.D. Del.), involves related U.S. Patent Nos. 6,914,893 and 8,964,708.

*SIPCO, LLC v. Abode Sys., Inc.*, No. 1-19-cv-01051 (E.D. Del.), involves related U.S. Patent Nos. 8,924,587, 8,924,588, and 9,430,936.

*SIPCO, LLC v. Fibar USA LLC*, No. 1-19-cv-04563 (N.D. Ill.), involves related U.S. Patent Nos. 8,924,588, 8,964,708, and 9,430,936.

*SIPCO, LLC v. ABB Inc.*, No. 1-19-cv-01365 (E.D. Del.), involves related U.S. Patent Nos. 6,914,893, 7,103,511, 8,964,708, and 9,430,936.

*SIPCO, LLC v. Vertiv Grp. Corp.*, No. 1-19-cv-01369 (E.D. Del.), involves related U.S. Patent Nos. 6,914,893, 7,103,511, and 8,964,708.

*SIPCO, LLC v. BRK Brands, Inc.*, No. 1-19-cv-04981 (N.D. Ill.), involves related U.S. Patent Nos. 8,964,708 and 9,430,936.

*SIPCO LLC v. Jasco Products Company LLC*, No. 5-19-cv-00709 (W.D. Okla.), involves related U.S. Patent Nos. 6,836,737, 8,964,708, and 9,430,936.

*Ex parte* reexamination No. 90/014,177 (PTAB), involves U.S. Patent No. 6,437,692.

*Ex parte* reexamination No. 90/014,178 (PTAB), involves U.S. Patent No. 6,437,692.

## STATEMENT OF JURISDICTION

The U.S. Patent and Trademark Office ("PTO") had jurisdiction over the Petition for *Inter Partes* Review ("IPR") filed by Appellant Emerson under 35 U.S.C. §311 and §6(a) of the Leahy-Smith America Invents Act ("AIA"). The Patent Trial and Appeal Board ("Board"/"PTAB") issued a Final Written Decision ("FWD") on November 28, 2018. Emerson Electric Co. filed a timely Notice of Appeal on December 10, 2018. The appeal was stayed pending the Board's resolution of appellee SIPCO LLC's Petition for Rehearing, concerning other issues. The Board issued an order denying the Petition for Rehearing on April 12, 2019. SIPCO filed a timely Notice of Cross-Appeal on January 29, 2019. This Court has jurisdiction to review the FWD under 28 U.S.C. §1295(a)(4)(A) and §6(a) of the AIA as codified at 35 U.S.C. §319.

## STATEMENT OF THE ISSUES

I.    Whether the Board's finding of patentability of the Ground 2 Claims over the combination of Cunningham, Mason, and McGowan lacked substantial evidence, where the Board held that Cunningham failed to disclose sending a "control signal" to a remote device (such as a thermostat) notwithstanding that Cunningham expressly discloses a computer sending "controlling information" to a "Device Adjustment Module" to adjust a device (*e.g.*, a thermostat), and where the Board failed to consider the express disclosures of Mason and McGowan regarding the translation of signals as required by the claims.

II.    Whether the Board's order prohibiting Emerson from presenting any evidence following the Board's belated institution (in light of *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018)) on originally non-instituted Ground 2 Claims violated the rights of Petitioner Emerson Electric Co. ("Emerson") under the Administrative Procedures Act and Due Process Clause.

## STATEMENT OF THE CASE

The Board correctly held that claims 32, 34, 37-38, 55-57, and 59 (the "Ground 3 Claims") of U.S. Patent No. 6,437,692 ("the '692 patent") are anticipated by and/or obvious over Cunningham.[1]  Appx51.  The Board committed reversible error, however, in failing to recognize that Cunningham (in view of

---

[1] '692 patent claim 36, which was challenged in Ground 3, was found not unpatentable.  Appx39-40.

Mason and McGowan) also renders obvious claims 24-31, 42, 43, 46-49, 51-54, and 60-64 (the "Ground 2 Claims"). Appx51.

The '692 patent is directed to a computerized system for monitoring, reporting on, and controlling remote devices. The '692 patent lays out and claims a basic architecture for such a system, comprising sensors and actuators that communicate via RF with a local gateway, which communicates with a computer on a network. The gateway translates the sensor data from RF to a network transfer protocol (*e.g.*, TCP/IP) before sending the translated data to the computer. The computer generates a control signal in response to the received sensor data and sends that control signal back to the gateway to be translated back to RF and sent to the actuator's transceiver. The control signal is then converted to an analog signal to be applied to adjust the remote device.

Before the '692 patent, Cunningham had already disclosed a "system that monitors and controls remote devices" using the same basic architecture as claimed by the '692 patent. Cunningham had already disclosed "sensor interface modules" ("SIMs") attached to remotely monitored devices (*e.g.*, for monitoring energy usage of a temperature control system). Cunningham's SIMs have two-way communication, which allow them to act also as "device adjustment modules" ("DAMs") that can adjust the remotely monitored device. As later claimed by the '692 patent, Cunningham disclosed that data collected by the SIMs is sent via RF

to a "data collection module" ("DCM") (a gateway), which sends the data via TCP/IP to a "host module" (a computer) over the Internet. In response to the sensor data, the host module generates "controlling information," that is sent back through the DCM to the DAM to adjust the remote device: "The device adjustment module transmits information to the system and receives controlling information from system update transmissions." Cunningham and the provisional application to which it traces, which Cunningham incorporates by reference, specifically disclose that the described system can be used to control a heating and air conditioning system, just as the '692 patent later claimed. (Cunningham, alone and/or in view of Mason and McGowan also disclose translating, processing and applying the signals to an actuator as claimed by the '692 patent, all of which steps were well known in the art.)

One critical error, with cascading consequences, led the Board to the flawed conclusion that the Ground 2 Claims were not obvious over Cunningham in view of Mason and McGowan. The Board erroneously found that the device adjustment module did not receive a "control signal" despite: (1) the plain language of Cunningham's disclosure that "[t]he device adjustment module transmits information to the system and receives *controlling information* from system update transmissions" (Appx1068(47:8-10));[2] (2) other example disclosures of control

_____

[2] All emphasis added unless otherwise noted.

-4-

signals for "monitoring and control of lights, security monitoring devices, utility disconnect actions, utility outage reporting, or other control functions" (Appx1059-1060(29:63-31:2)), and (3) Cunningham's incorporated provisional's disclosure of the same control signals from a network control center to "control HVAC and lighting based on defined cost parameters and energy usage across the entire system" (Appx1434-1435).

The Board fundamentally misread Cunningham's teaching that "[d]evice adjustment modules *are used to* monitor and *control* the operation of various devices and applications according to varying utility prices and the device consumption information," Appx1067(46:64-67), as indicating that the device adjustment module itself *generates* the control signal, which in turn meant (the Board believed) that the "control signal" was not created by the computer and sent through the network, as required by the Ground 2 Claims, *see* Appx28.   This misunderstanding led the Board to disregard Cunningham's express disclosure that "[t]he device adjustment module ... *receives controlling information from* system update transmissions," which confirms that the device adjustment module is being "used to ... control" the remote device via "controlling information" sent by (and received from) the host module/computer on the network.   Appx1067(46:64-67). Operating from the flawed premise that the control signal was being generated by the DAM, rather than the central computer, the Board erroneously believed that

"read in context"—*i.e.*, in the context of the Board's incorrect understanding—"Cunningham's use of the word 'controlling information' refers back to 'varying utility prices.'" Appx24, Appx28-29. That double confusion resulted in the Board's otherwise inexplicable conclusion that Cunningham's express disclosure of the system sending "controlling information" to "adjust" a remote device, such as a thermostat, failed to disclose sending a "control signal." *Id.*

The Board's initial misreading of Cunningham's disclosures concerning the device adjustment module was further compounded by the Board's disregard of the express disclosures in the U.S. Provisional Application No. 60/058,978 ("'978 Provisional"), to which Cunningham claims priority and which Cunningham incorporates by reference. The '978 Provisional confirms the proper reading of Cunningham, because the provisional application expressly describes the system operating with a central computer that gathers and processes information from the remote sensors and then sends out a signal that "*control[s]* HVAC and lighting *based on* defined cost parameters and energy usage *across the entire system*" (Appx1434-1435)—*i.e.*, to adjust the remote devices, precisely as the '692 patent later claimed. The Board, operating from the premise of its misunderstanding of what Cunningham describes, disregarded the '978 Provisional's disclosures on the mistaken ground that they concerned a different embodiment for which Emerson had failed to offer a motivation to combine. *See* Appx29-33.

Although the Board's findings regarding the prior art's disclosures are reviewed deferentially, where, as here, the Board simply misses a key disclosure of a reference, this Court will not hesitate to correct the Board's error. *See*, *e.g.*, *Ericsson Inc. v. Intellectual Ventures I, LLC,* 890 F.3d 1336, 1344-46, 1348 (Fed. Cir. 2018).

Although the Board's ruling concerning the Ground 2 Claims should be reversed solely considering the evidentiary record on appeal, the Board was also wrong to preclude Emerson from submitting any evidence along with its briefing after the Board belatedly instituted on the Ground 2 Claims. The Board initially instituted on the Ground 3 Claims only, and denied institution of the Ground 2 Claims based on its misunderstanding, discussed above, of Cunningham and the '978 Provisional. After the Supreme Court's decision in *SAS Institute*, 138 S. Ct. 1348, the Board issued a modified institution decision granting institution for the Ground 2 Claims and granting the parties briefing on the newly instituted grounds. The Board denied, however, Emerson's request to submit rebuttal evidence along with its briefing on the newly instituted grounds. By contrast, Emerson had been permitted (in keeping with this Court's precedent) to submit rebuttal evidence with its reply brief on the originally instituted grounds. By denying Emerson its right to be heard, the Board deprived Emerson of its procedural rights under the Administrative Procedures Act ("APA") and Due Process Clause. This separate

error would require vacatur and remand to the Board, even if the existing record did not already establish that Cunningham, in light of Mason and McGowan, renders obvious the Ground 2 Claims of the '692 patent.

## A.    Prior Art

### 1.    *Cunningham*

U.S. Patent No. 6,124,806 to Cunningham (Appx1002-1068) was filed on September 11, 1998 and issued on September 26, 2000, making it prior art under at least § 102(e). Cunningham incorporates by reference its related U.S. Provisional Application Nos. 60/058,978 ("'978 Provisional"), filed Sep. 12, 1997, and 60/094,057, filed Jul. 24, 1998 (*e.g.*, Appx1430-1436). Appx1045(1:1-10).

Cunningham discloses a "wide-area remote telemetry system which monitors and controls remote devices by means of an information control system." Appx1002-1068(Abstract). Both Cunningham and its '978 Provisional disclose that the described system can be used to control, for example, a heating and air conditioning system and/or a lighting system. Appx1059-1060(29:63-31:2); Appx1067-1068(46:62-47:10); Appx1434.

Figure 1 of Cunningham depicts the architecture of Cunningham's system, which includes sensor interface modules ("SIMs")/device adjustment modules ("DAMs"), which communicate wirelessly with a data collection module ("DCM"), which communicates using Internet (TCP/IP) protocol with a host

module/computer ("HM"). Cunningham's '987 Provisional teaches the same elements. Figure 1 is reproduced below with color annotations added to reflect the flow of information and names or acronyms used in Cunningham and its '987 Provisional:



Appx1003(Fig. 1) (color annotations added).

Cunningham's system includes a plurality of dispersed "sensor interface modules" ("SIMs") which "act as data gathering equipment." Appx1047(6:9-11). Cunningham's SIMs are also referred to as "Telemetry Interface Modules" ("TIMs") in both Cunningham and in the '978 Provisional. Appx1048(7:30) ("The Sensor Interface Module (TIM)"), Appx1025(Fig. 30), Appx1044(Fig. 49) ("Telemetry Interface Module"); Appx1434 ("The sensing devices which

communicate to the Gateway are called Telemetry Interface Modules (TIMs)"). SIMs are attached to "remotely monitored devices" such as "gas, electric and water meters and other types of monitored equipment." Appx1048(7:32-34); 46:62-47:30. SIMs can also be "adapted to any number of systems to be monitored, including but not limited to: electrical systems, gas systems, water systems, security systems, temperature control systems, vending machines, and remotely monitored devices of any sort." Appx1048(7:34-39).

"[T]wo-way sensor interface modules" have two-way communication (*i.e.*, they can send sensor data to the system through the DCM and also receive "controlling information" from the system through the DCM), which allows them to act also as "device adjustment modules" ("DAMs") that can adjust the remotely monitored device. Appx1067-1068(46:62-47:30), Appx1046(4:58-62), Appx1048(7:19-24), Appx1067-1068(45:64-68). For example, the "two-way communication" allows the SIMs/DAMs to both monitor remote devices and receive "controlling information" from the host module to control *e.g.*, a thermostat, "lights, security monitoring devices, utility disconnect actions, utility outage reporting, or other control functions." Appx1059-1060(29:54-31:2), Appx1067-1068(46:62-47:10). The '978 Provisional discloses "Energy Control Modules" ("ECMs"), which correspond to DAMs in Cunningham, as both are located on the premises and control HVAC or lighting systems through

communication with the gateway (DCM/WinGate) over the local wireless network. Appx1434-1435; Appx1067-1068(46:62-47:10).

The SIMs collect data such as "energy usage" and encode and transmit the data to the DCM using "known, low-power, radio-frequency transmissions." *See, e.g.*, Appx1047-1048(6:11-18, 7:30-44), Appx1051(13:29-25), Appx1059-1060(29:64-31:2), Appx1068(47:3-8). The DCM is referred to as "WinGate" in both Cunningham and the '978 Provisional. Appx1065(41:45-47) ("Root Data Collection Module (DCM)" and "WinGate 8"); Appx1434 ("Williams Information Gateway—WinGate"). The DCM "will gather the information from [the SIMs] or other inputs wired directly and transmit the information to the host module" ("HM")/system using "Internet protocol (TCP/IP) signals." Appx1046(4:58-62), Appx1067(45:64-68) ("The [DCM] will send and receiv[e] information to and from the host module as an Internet protocol (TCP/IP) signal."), Appx1002(Abstract), Appx1048(7:19-24), Appx1044(Fig. 49). The host module is also referred to as a "control center[s]" in Cunningham and the "Williams Network Control Center" ("control center"/"NCC") in the '978 Provisional. Appx1066(44:14-19) ("The *host module* 122 is a centrally or regionally located *control center* or centers which is used to monitor and control all the information exchange required by the monitoring system"); Appx1435.

The DCMs can also be used as a "data repeater module" when used in remote areas. Appx1061(33:16-25). In these situations the DCMs may "receive information from both sensor interface modules and from other data collection modules and transmit this information towards a data collection module which is connected to the host module through a network system." Appx1061(33:18–23).

The host module responds to the data it receives from the SIMs/DAMs through the DCM by generating and sending "controlling information" back through the DCM to the SIMs/DAMs. Appx1003(Fig. 1), Appx1067-1068(45:64-68, 47:8-10) ("The device adjustment module transmits information to the system and receives controlling information from system update transmissions."). For example, when a SIM/DAM is used to control a thermostat, the SIM/DAM "transmits information [*e.g.,* device consumption information] to the system [the 'host module']," and, based on "varying utility prices and the device consumption information," the host module generates and sends "controlling information [in] system update transmissions" to the DAM, which the host module uses to control the thermostat. Appx1067-1068(46:62-47:10). In this way, the DAM "monitors the energy usage by the air conditioning and heating systems controlled by the thermostat and can adjust the operation usage to stay below increased billing increment costs for energy supply and usage." Appx1068(47:3-7).

Cunningham's '978 Provisional provides an example implementation of Cunningham's DAM embodiment. *See* Appx1434-1435. Like Cunningham, the '978 Provisional discloses that the Williams Telemetry Service ("WTS") "is intended for utilities, energy suppliers, product distribution companies and national corporations who want to better manage availability, cost and usage of their energy products." Appx1434. Also, like in Cunningham, WTS applications include: "Automated Meter Reading Services" used for "on-demand readings" and "disconnect actions," as well as: "Energy Management Services." Appx1434; Appx1045(1:15-18, 2:23-26), Appx1059(30:66-31:2), Appx1067(46:29-42). These applications are run by a processing center called the "Williams Network Control Center" ("control center"/"NCC") (which corresponds to Cunningham's "host module."). Appx1435 ("Williams' Network Control Center ... The NCC [control center] will support a wide variety of data processing applications ... Energy Management Services – Routines to reduce the amount of energy used by monitoring and controlling HVAC and lighting usage at customer locations").

The "control center"/"host module" "control[s] HVAC and lighting based on defined cost parameters and energy usage across the entire system." Appx1434-1435. To do this, the control center runs "[r]outines to reduce the amount of energy used by monitoring and controlling HVAC and lighting usage at customer locations." Appx1435. "[B]ased on" the "cost parameters and energy usage" that

-13-

the control center collects from "across the entire system," the control center responds by transmitting "control" signals "to Energy Control Modules ['ECMs'/Cunningham's DAMs] to control HVAC and lighting."  Appx1434-1435.  The '978 Provisional discloses that WinGate (Cunningham's DCM) "supports full two-way communication between the premise[sic] and ... control center."  Appx1434; *see also* Appx1435.  Thus, the "control" signals are thus sent from the control center to the WinGate, and then through the WinGate to the ECMs over the wireless network.

### 2.    *Mason*

U.S. Patent No. 6,100,817 to Mason ("Mason") was filed on March 17, 1998 and issued on August 8, 2000, making it prior art under at least § 102(e).  Appx987-1001.  Mason discloses an "automatic meter reading (AMR) system" that includes "a plurality of utility meters 12A, 12B, 12C, ... 12D (for metering electricity, gas or water)."  Appx991(1:5-6), Appx993(5:32-34).  Figure 1 of Mason is reproduced below:



*FIG. 1*

Appx998(Fig. 1).

"Each of the meters has a corresponding CEBUS RF module for receiving RF communications from a node, or collector, 18, or sending RF communications to the node, and also for communication with a CEBUS local area network (LAN) within the residence or business with which the meter is associated." Appx993(5:35-41). The "node 18 preferably includes a wide area network (WAN) interface, a digital controller, and a CEBUS RF module," and is "coupled [with] AMR server 20." Appx993(5:41-43, 6:28-29). TCP/IP protocol is used for

"communications among the server 20 (Fig. 1) and the node/collector units 18." Appx993(6:3-7). Node 18 translates a control signal from TCP/IP into a RF signal (CEBUS RF protocol signal) to transmit to the appropriate meter. Appx993(5:32-41, 6:1-13), Appx990(Fig. 3).

3.   *McGowan*

McGowan is a book titled "Direct Digital Control: A Guide To Distributed Building Automation" published in 1995, making it prior art under at least § 102(b) (Appx1069-1073). McGowan discloses a closed-loop control system in which a "sensing element feeds back information to the controller," which in turn processes that information and sends appropriate signals to devices for corrective actions. Appx1171. McGowan discloses digital-to-analog conversion when the device to be controlled—for example, HVAC equipment—is analog. Appx1172. McGowan explains that when data that a digital controller receives from a sensor is in analog form, an analog to digital converter is required. Appx1172. After the controller processes the converted data, a digital signal is transmitted to a digital to analog converter. Appx1172, Appx1171(Fig. 10-3), Appx1172(Fig. 10-4). Thereafter, an actuator can understand the analog signal and perform the desired response. Appx1172, Appx1176.

## B.    The Challenged '692 Patent

Despite the existence of the aforementioned prior art disclosing, *inter alia*, systems for monitoring and controlling remote devices in a wireless network from a computer on an Internet network, including where the transceivers are low-power radio frequency transceivers, SIPCO filed the application claiming these features that resulted in the '692 patent that is the subject of this appeal. The '692 patent was filed November 12, 1999, and issued August 20, 2002. Appx53 ([22], [45]). It claims priority to multiple related applications, the earliest of which was filed August 2, 1999. Appx53 ([60], [63]).

The '692 patent "generally relates to remotely operated systems, and more particularly to a computerized system for monitoring, reporting on, and controlling remote systems," such as for "manufacturing processes, inventory systems, emergency control systems, and the like." Appx72(1:25-35). It does so "by transferring information signals through a wide area network (WAN) and using software applications hosted on a connected server to appropriately process the information." Appx72(1:28-31).

Figure 2 of the '692 patent illustrates a block diagram of an embodiment of the alleged invention and is reproduced below with color annotations. Figure 2 with color annotations is reproduced below:



**FIG. 2**

Appx55(Fig. 2) (color annotations added). Figure 2 shows a plurality of sensors/actuators 212, 214, 216, 222, and 224 integrated with transceivers, which are preferably low power radio frequency transceivers. Appx74(5:45-53). Standalone transceivers 211, 213, 215, and 221 can receive and transmit signals between the integrated transceivers and local gateways 210 and 220.

Appx74(5:54-66).   The stand-alone transceivers are dispersed sufficiently to provide adequate coverage in, for example, an industrial plant.  Appx74(6:63-66). "Local gateways 210 and 220 analyze the transmissions received, convert the transmissions into TCP/IP format and further communicate the remote data signal transmissions via WAN 230."   Appx74(6:20-23).   Thus, the gateways "may communicate information, service requests, control signals, etc. to remote sensor/actuator transceiver combinations 212, 214, 216, 222, and 224 from server 260, laptop computer 240, and workstation 250 across WAN 230."  Appx74(6:25-29).  Gateways 210 and 220 are connected to the various computers 240, 250, and 260 via the WAN.

## C.    Procedural History

### 1.    *Petition*

Emerson filed the Petition, supported by the declaration of Mr. Kinney, challenging claims 1, 3-8, 11-14, 24-32, 34, 36-38, 42-43, 46-49, 51-57, 59, and 60-64 of the '692 patent on the following grounds:

| Ground | Challenged Claims | Basis | References |
|---|---|---|---|
| 1 | 1, 3-8, and 11-14 | § 103 | Mason and Cunningham |
| 2 | 24-31, 42, 43, 46-49, 51-54, and 60-64 | § 103 | Cunningham, McGowan, and Mason |
| 3 | 32, 34, 36-38, 55-57, and 59 | §§ 102/103 | Cunningham |

2.    *Institution Decisions*

On June 1, 2017, the Board issued its first Decision to Institute ("DI"), instituting trial on claims 32, 34, 36-38, 55-57, and 59 as likely anticipated and/or rendered obvious over Cunningham (Ground 3).  Appx260-281.  The Board read Cunningham's disclosure that the DAMs "are used to monitor and control the operation of various devices" and "receive[] controlling information from system update transmissions" as indicating that the DAM generates the control signals, as opposed to the host module on the network, and on that basis, declined to institute on the Petition's challenge to claims 24-31, 42, 43, 46-49, 51-54, and 60-64 as obvious over the combination of Cunningham, McGowan, and Mason in Ground 2.  Appx275-277.  The Board also declined institution as to claims 1, 3-8, and 11-14 over Mason and Cunningham in Ground 1.  A hearing was held Jan. 24, 2018.  Appx553-595.

Belatedly, in response to the Supreme Court decision in *SAS Institute*, 138 S. Ct. 1348, the Board modified the DI to institute review of all claims and grounds.  Appx597.  To streamline proceedings, Emerson requested additional briefing on Ground 2 only, and specifically claims 24-26 and 30, which remain asserted in a related district court litigation.  Appx605.  While the Board granted additional briefing on Ground 2 and amended the scheduling order, the Board prohibited Emerson from presenting any rebuttal evidence on the originally non-instituted

Ground 2, in contrast to the initially instituted Ground 3 Claims, for which rebuttal evidence had been allowed.  Appx608.  Supplemental oral argument was held on Sept. 6, 2018.  Appx718-759.

### 3.    *Final Written Decision*

The Board issued its FWD on Nov. 28, 2018. Appx1-52. The Board held that the Ground 3 Claims (claims 32, 34, 37-38, 55-57, and 59) are unpatentable as anticipated by, or obvious over, Cunningham, and supported those conclusions with substantial evidence. Appx33-51.  With respect to the Ground 2 Claims, the Board found that Petitioner did not establish the Ground 2 Claims are obvious, based on the same misunderstanding of Cunningham and Cunningham's '978 Provisional that the Board relied on in its first Decision to Institute (Paper 7).  (The Board also found that Petitioner did not establish claims 1, 3-8, and 11-14, and 36 are unpatentable.  Those claims are not at issue in this appeal.)

With respect to the Ground 2 prior art, the Board adopted the same reading of Cunningham it had relied on in originally declining institution.  The Board read the following sentence in Cunningham "Device adjustment modules [DAMs] are used to monitor and control the operation of various devices and applications according to varying utility prices and the device consumption information" to require the DAM generate control signals, notwithstanding that Cunningham goes on to say that the DAM "receiv[es]" the controlling information in the form of

"system updates," which clarifies that the system is exercising "control" and "us[ing]" the DAM to do so. Appx1068(47:8-10). Based on this understanding of Cunningham, the Board found that "it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham" and, thus, failed to meet the claims. Appx24-29. Acting on its misunderstanding that Cunningham's DAM is generating the control signal, the Board found that "read in context"—*i.e.*, the context of the Board's incorrect understanding of where the control signal is generated—"Cunningham's use of the word 'controlling information' refers back to 'varying utility prices," Appx24, Appx28-29, rather than the controlling information being based on (and not limited to) utility prices and device consumption information. The Board declined to consider Cunningham's explicit reference to other applications involving control signals generated by the computer in response to sensor data—including "control of lights, ... utility disconnect actions, ... or other control functions." *See* Appx1059-1060(29:63-31:2).

The Board also discounted the disclosures of the '978 Provisional, which is incorporated by reference into Cunningham, which further confirm that the "controlling information" in Cunningham is generated by the host module in response to the sensor data and is sent from the host module through the gateway to the DAM to adjust the device. Appx1434-1435. While the '978 Provisional

provides an example implementation of Cunningham's DAM embodiment, the Board treated it as a separate embodiment due to its misunderstanding of Cunningham's disclosure about the device adjustment module. Because the Board had read the DAM disclosure as involving the DAM itself generating a control signal based on utility prices, it consequently regarded the '978 Provisional's disclosures of the control center generating control information as a different embodiment for which Emerson was required to provide a motivation to combine. *See* Appx28-33. By contrast, in its analysis of Ground 3, the Board considered the disclosures of the '978 Provisional as evidence of what "Cunningham discloses" because the '978 Provisional is "incorporated by reference into Cunningham." Appx41.

Based on its reading of Cunningham, its refusal to consider Cunningham's disclosure of other applications involving control signals Appx1059-1060(29:63-31:2), and its discounting of the disclosure of the '978 Provisional, the Board further concluded that "Petitioner has not explained how 'utility prices' can be 'translated' 'from a network transfer protocol into a RF control signal' and then 'an RF control signal into an analog signal' that can be applied to an actuator.'" Appx27-28. That conclusion did not address Emerson's full obviousness arguments concerning the "translating" limitations, based on Cunningham, Mason,

and McGowan, because the Board had concluded, based on its belief that "utility prices" were not translated, that the limitation could not be met.  Appx151-154.

### 4.    *Request for Rehearing*

On December 27, 2018, SIPCO filed a Request for Rehearing of a portion of the FWD holding claims 32 and 55 of the '692 patent unpatentable and requesting the Board rule on its Motion to Terminate Ex Parte Reexaminations.  The Board denied SIPCO's Motion to Terminate two *ex parte* reexaminations filed by Emerson (*Ex parte* reexamination 90/014,177; *Ex parte* reexamination 90/014,178) on March 21, 2019.  Appx886-905.  On April 12, 2019, the Board issued its Decision Denying Patent Owner's Request for Rehearing.  Appx906-913.

## SUMMARY OF THE ARGUMENT

The Board's conclusion that the Ground 2 Claims are not obvious over Cunningham in view of Mason and McGowan rests on a fundamental error followed by a cascade of related errors. At the most basic level, the Board's error consisted of misreading Cunningham's explicit disclosure that the device adjustment module "receiv[es]" from the system "controlling information" used to "adjust" the remote device as failing to disclose a "control signal." Relatedly, the Board mistakenly assumed that the referenced "controlling information" was limited to unprocessed "utility prices," rather than "control[] information" that can be based on such prices and usage information to control, *e.g.*, a thermostat. Cunningham also teaches other control signals sent to the device adjustment module including, "control of lights, … utility disconnect actions, … or other control functions." Because the Board had misread Cunningham, it further erred in treating Cunningham's incorporated '978 Provisional, which likewise discloses the host module/computer generating and sending control information, as a distinct "embodiment" for which Emerson needed to provide a motivation to combine.

While the evidence in the administrative record is sufficient to demonstrate the Board's error, the Board made its own job unnecessarily harder by prohibiting Emerson, in violation of its procedural rights under the APA and Due Process Clause, from submitting rebuttal evidence addressed to the Ground 2 Claims, on

which the Board had initially denied institution. To the extent the Court does not find the evidentiary record sufficient to reverse outright, it should at least vacate and remand with directions for the Board to allow Emerson to submit rebuttal evidence regarding the Ground 2 Claims.

**I.** The Ground 2 Claims of the '692 patent are directed to remotely collecting sensor data and sending that data to a computer that generates control signals in response to the sensor data, which signals are then sent out to control an actuator. *See, e.g.*, Appx72(2:54-57). The Ground 2 Claims include limitations requiring processing sensor data into a RF signal, transmitting the RF signal via a relatively low-power RF transceiver to a gateway, translating the data from RF to a network transfer protocol (*e.g.*, TCP/IP), and sending the translated data to a computer on a network. In response to receipt of the sensor data, the computer generates a control signal and sends the control signal via network transfer protocol (*e.g.*, TCP/IP) to the gateway. The Ground 2 Claims then require translating the control signal to RF, transmitting the control signal, translating the received RF control signal to an analog signal, and applying the analog signal to an actuator.

Cunningham in view of Mason and McGowan renders the Ground 2 Claims obvious. Cunningham discloses a "system that monitors and controls remote devices" with the same architecture claimed by the '692 patent. As the Board

-26-

correctly found, Cunningham teaches remotely collecting data from at least one sensor, processing the data into a RF signal, transmitting the RF signal via a relatively low-power RF transceiver to a gateway, translating the data in the RF signal into a network transfer protocol, and sending the translated data to a computer. Appx46, Appx14-15, Appx17-18, Appx35-36, Appx43-46.

Contrary to the Board's erroneous decision, however, Cunningham also discloses the remaining "control signal" and "translating" limitations of the Ground 2 Claims. In particular, Cunningham discloses "[t]he device adjustment module [DAM] transmits information to the system and *receives controlling information from* system update transmissions." Appx1068(47:8-10); Appx150; Appx944(¶62). In the example of the DAM attached to a thermostat, the DAM sends device consumption information to the host module and the host module determines how the thermostat should be adjusted based on the device consumption information and varying utility prices. The host module then generates and sends "controlling information [in] system update transmissions" to the DAM to adjust the thermostat. Appx1068(47:8-10); Appx150; Appx944(¶62). Although Cunningham primarily discusses the example of adjusting a thermostat in light of consumption and utility prices, it also discloses other applications, including "monitoring and control of lights, security monitoring devices, utility disconnect actions, utility outage reporting, or other control functions," which also

involve control signals generated by the computer in response to data from at least one sensor.  Appx1059-1060(29:63-31:2); Appx151; Appx656-657.

Cunningham's '978 Provisional, which Cunningham incorporates by reference, further confirms that Cunningham discloses the system/host module generating the control signal that is sent to adjust the remote device.  The '978 Provisional provides an example implementation of Cunningham's embodiment where the "Network Control Center" ("control center"/"NCC") (which corresponds to Cunningham's "host module") "*control[s]* HVAC and lighting *based on* defined cost parameters and energy usage *across the entire system*."  Appx1434-1435.  Thus, the control center/host module sends the control signals based on energy usage across the entire system to local Energy Control Modules ("ECMs") (which correspond to Cunningham's DAMs).   The Provisional's disclosure parallels the critical disclosures in Cunningham: "Device adjustment modules are used to monitor and control the operation of various devices and applications according to varying utility prices and the device consumption information. … The *device adjustment module* transmits information to the system and *receives controlling information from system update transmissions*."  Appx1067-1068(46:64-47:10).

The Board misread this statement in Cunningham to require that *the DAM generate* control signals and, on that basis, erred in concluding Cunningham's

disclosure of "controlling information" sent from the network system/host module to the DAM is not a "control signal." *See* Appx28 (Board emphasizing "and control"). Cunningham's disclosure, however, provides that the DAMs "are *used* to … control" and that they are used in this way by "*receiv[ing] controlling information*" from the system/host module. Appx1067(46:64-67). In other words, the system/host module "*use[s]*" the DAM to control a device by sending the DAM "*controlling information*"—the claimed "control signal." *See* Appx1067-1068(46:64-47:10).

Acting on its misunderstanding that Cunningham's DAM is generating the controlling information, the Board found that "read in context"—*i.e.*, the context of the Board's incorrect understanding of where the control signal is generated— "Cunningham's use of the word 'controlling information' refers back to 'varying utility prices," Appx24, Appx28-29, rather than the controlling information being based on (not limited to) utility prices and energy consumption information. Thus, despite Cunningham's explicit disclosure of receiving "controlling information" to "adjust" the remote device Appx1067-1068(46:62-47:10), and explicit reference to other applications involving control signals generated by the computer in response to sensor data—including "control of lights, … utility disconnect actions, … or other control functions," Appx1059-1060(29:63-31:2)—the Board found that Cunningham failed to disclose a "control signal."

The Board's discounting of the '978 Provisional's disclosures was likewise the consequence of its initial misreading of Cunningham's disclosure about the device adjustment module. Because the Board had erroneously read the DAM disclosure as involving the DAM itself generating a control signal based on utility prices, it mistakenly regarded the '978 Provisional's disclosures of the control center generating control information as a different embodiment for which Emerson was required to provide a motivation to combine. *See* Appx28-33. Further, the Board's FWD is inconsistent between its analysis of Ground 2, where it discounted the disclosures of Cunningham's '978 Provisional, and its analysis of Ground 3, where it relied on the '978 Provisional as part of what Cunningham "discloses." *Compare* Appx 28-33 *with* Appx41.

These misunderstandings of Cunningham and its '978 Provisional led to the Board's erroneous conclusions that (1) Cunningham's "controlling information" is not a "control signal," (2) the control signal in Cunningham is generated at the device adjustment module rather than at the host module on the network, and (3) Emerson had not shown how "utility prices" could be translated and applied to an actuator.

Although these errors are reviewed under a deferential substantial evidence standard, where, as here, the Board simply misses a key disclosure of a reference, this Court must correct the error. Here, once the Board's fundamental misreading

of Cunningham's express disclosure is corrected, the only available conclusion is that Cunningham, in light of the disclosures of Mason and McGowan, render obvious the Ground 2 claims.  The Board's contrary finding should be reversed.

**II.** Even if the Court does not believe reversal was warranted, it would have to vacate and remand the Final Written Decision in light of the Board's erroneous refusal to allow Emerson to submit any evidence following institution on the Ground 2 Claims.  The Board initially instituted on the Ground 3 Claims only and denied institution of the Ground 2 Claims, based on the same misunderstanding of Cunningham and Cunningham's '978 Provisional discussed above.  After the Supreme Court's decision in *SAS Institute*, 138 S. Ct. 1348, the Board issued a modified institution decision granting institution for the Ground 2 Claims. Although the Board granted the parties leave to brief the belatedly instituted grounds, the Board denied Emerson's request to submit rebuttal evidence along with its post-institution briefing on the newly instituted grounds.    (By contrast, consistent with this Court's precedent, Emerson was allowed to submit rebuttal evidence on the initially instituted Ground 3 Claims.) The Board's procedural ruling deprived Emerson of its procedural rights to be heard and present its case, in violation of the APA and Due Process Clause.  Had the Board allowed Emerson to submit the rebuttal evidence, the Board would almost certainly not have repeated its erroneous reading of Cunningham's disclosures.

Thus, even if reversal were not appropriate, the Court would need to vacate and remand to the Board to receive and consider Petitioner's further evidence establishing that the prior art renders obvious the Ground 2 claims of the '692 patent.

## STANDARD OF REVIEW

This Court reviews the Board's factual findings as to whether a limitation is disclosed by the prior art for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1319 (Fed. Cir. 2000). The Board's conclusion on obviousness is a legal conclusion based on underlying factual findings. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015). This Court reviews the Board's legal conclusion of obviousness *de novo* and the Board's underlying factual findings for substantial evidence. *Id.*; *Gartside*, 203 F.3d at 1316; 5 U.S.C. § 706.

"[S]ubstantial evidence review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312. This Court has "expressly held that the Board's opinion must explicate its factual conclusions, enabling [it] to verify readily whether those conclusions are indeed supported by 'substantial evidence' contained within the record." *Id.* at 1314; *see also Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015) (The Board must "fully and particularly set out the bases upon which it reached that decision."). As this Court

has held "[t]o contradict a reference," even "an unsupported opinion is not substantial evidence." *Ericsson*, 890 F.3d at 1346.

In addition, this Court may set aside the Board's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." *Veritas Techs. LLC v. Veeam Software Corp.*, 835 F.3d 1406, 1413 (Fed. Cir. 2016). Where the Board errs in ignoring the manner in which Petitioner proposed its obviousness combination, such failure is considered by this Court to be arbitrary and capricious. *See Shinn Fu Company of America, Inc. v. Tire Hanger Corp.*, 701 F. App'x 942, 946 (Fed. Cir. 2017) ("The Board erred by ignoring the manner in which [Petitioner] proposed its obviousness combinations .... Under our standard of review, the Board's failure here was arbitrary and capricious"); *In re Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem ....").

## ARGUMENT

### I.    The Board's Finding that the Ground 2 Claims Are Not Obvious Over Cunningham, Mason, and McGowan Was Based on a Clearly Mistaken Reading of Cunningham's Explicit Disclosures and Therefore Lacks Substantial Evidence

Cunningham, like the '692 patent, teaches a wide-area remote telemetry system, in which devices and applications are remotely monitored and controlled.

*See, e.g.*, Appx1002(Abstract).  Cunningham discloses that a device adjustment module ("DAM") attached to a device (*e.g.*, a thermostat) transmits sensor data to the network system/host module (claimed "computer"), and adjusts the device based on "controlling information" (claimed "control signal") received from the network system/host module.  This is exactly what the '692 Ground 2 Claims require.  In addition, Cunningham alone and/or in view of Mason and McGowan discloses translating the control signal from TCP/IP to RF and from RF to an analog signal to apply to the actuator—all of which were well known steps in the art.

In its Final Written Decision, the Board made one central error—misreading Cunningham's disclosure of device adjustment modules "used to ... control" devices, where the device adjustment module "receives controlling information from system update transmissions," as requiring the device adjustment module itself to generate the control signal.  This error spawned further related errors in the Board's analysis, which led to its erroneous finding that the Ground 2 Claims are not obvious over Cunningham, Mason, and McGowan.  In addition, the Board erred in failing to consider the express disclosures of Mason and McGowan regarding the "translating" and "applying" limitations.

The Board's decision is not supported by substantial evidence and should be reversed.

A.  **The Board's Conclusion that Cunningham Fails to Disclose the "Control Signal" Limitations is Not Supported by Substantial Evidence**

1.  *Cunningham's express disclosure of a computer sending "controlling information" to a device adjustment module to adjust a device meets the "control signal" limitations*

The Board erred in finding Cunningham's explicit disclosure of "controlling information" sent from a computer to a device adjustment module to "adjust" the operation of a device fails to meet the "control signal" limitations of the Ground 2 Claims.  Each of the independent claims in the Ground 2 Claims includes a limitation to a computer on a network generating a control signal in response to data originating from a sensor on the other side of a gateway.  Appx81-83(20:50-54, 22:20-24, 23:3-7, 24:35-39); Appx23.  For example, representative independent Claim 24 recites "sending the translated data to a computer, wherein the computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal; sending the control signal via the network to the gateway."  Appx81(20:50-54).

The Board correctly found that Cunningham meets the "sending the translated data to a computer" portion of the "control signal" limitation.  As the Board explained, "Petitioner correctly points out that the data collection module [("DCM") (claimed "gateway")] receives information from sensor interface modules [("SIMs") (claimed "sensors")] and sends it to a host module [("HM")

(claimed "computer")] over the Internet, which it must do in the form of a TCP/IP signal."       Appx36    (citing    Appx1048(7:19-21),    Appx1059(29:63-30:65), Appx1067(45:60-67));  Appx150;  Appx944(¶61).    An  annotated  figure  of Cunningham's  Figure  1  is  below,  showing  the  translated  sensor  data  sent  to  the host module in magenta:



Appx1003(Fig. 1) (color annotations added).

Contrary to the Board's erroneous decision, Cunningham also discloses the limitation of "wherein the computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal."  As set forth in the Petition and supported by the testimony of Mr. Kinney, Cunningham  teaches  that  SIMs  have  two-way  communication—they  can communicate sensor data to the system and receive control signals from the system—which allows them to act as "device adjustment modules" ("DAMs").

Appx144, Appx149-151, Appx943-945(¶¶59, 62, 64).    Cunningham explains,

"device adjustment modules *are used to* monitor and *control* the operation of

various devices and applications."  Appx1067(46:64-65).  For example, a device

adjustment module is used to control a thermostat by "transmit[ting] information

[*e.g.,* device consumption information] to the system [the 'host module'/claimed

'computer'] and receiv[ing] controlling information from system update

transmissions" to adjust the thermostat.  Appx1067-1068(46:62-47:10); Appx150,

Appx944(¶62).

Cunningham discloses that the "device adjustment modules" are used by the

host module to adjust the operation of various devices and applications.

Appx1067(46:64-67) ("Device adjustment modules are *used to* monitor and control

the operation of various devices and applications according to varying utility prices

and the device consumption information.").  Cunningham provides "[a]n example

of a device control module is a module to control a Johnson Control™ thermostat

by attaching a device control module with a power system, processor with

associated firmware, and a radio."    Appx1067-1068(46:67-47:3);  Appx150;

Appx944(¶62).  The DAM "monitors the energy usage by the air conditioning and

heating systems controlled by the thermostat and can adjust the operation usage to

stay below increased billing increment costs for energy supply and usage."

Appx1068(47:3-7); Appx150; Appx944(¶62).

Importantly, to control/adjust the operation of the thermostat based on varying utility prices and the device consumption information, "[t]he device adjustment module [DAM] *transmits information to the system* and *receives controlling information from system update transmissions*." Appx1068(47:8-10); Appx150; Appx944(¶62). In the example of the DAM attached to a thermostat, the DAM sends device consumption information to the host module and the host module determines how the thermostat should be adjusted based on the device consumption information and varying utility prices. The host module then generates and sends "controlling information [in] system update transmissions" to use the DAM to adjust the thermostat. Appx1067(47:8-10); Appx150; Appx944(¶62). Although Cunningham discusses the example of adjusting a thermostat in light of consumption and utility prices, it also discloses other "two-way transmission" applications, including "monitoring and control of lights, security monitoring devices, utility disconnect actions, utility outage reporting, or other control functions," which also involve control signals (*e.g.*, "control of lights, … utility disconnect actions, … or other control functions") generated by the computer in response to data from at least one sensor (*e.g.*, "monitoring … of lights, … utility outage reporting"). Appx1059-1060(29:63-31:2); Appx151; Appx656-657. These applications require "two-way transmission" between the SIM/DAM and the DCM. Appx1059-1060(29:63-31:2). The sensor information

is sent from the SIM/DAM to the DCM, which "send[s] and receiv[es] information to and from the host module."  Appx1067(45:64-68), Appx1046(4:58-62).  The DAM thus "transmits information to the system and receives controlling information from system update transmissions."  Appx1046(47:8-10).

Cunningham thus also discloses the "sending the control signal via the network to the gateway" portion of the "control signal" limitations.  As explained in the Petition and supported by the testimony of Mr. Kinney, the host module transmits signals to the data collection module ("DCM") (the claimed "gateway") over the Internet as an Internet protocol (TCP/IP) signal.  Appx1067(45:60-46:2) ("The host module will be assigned an address for transmitting and receiving the data collection module signals.  The data collection module will send and receiv[e] information to and from the host module as an Internet protocol (TCP/IP) signal."); Appx151; Appx945(¶64).  Accordingly, the "controlling information" sent from the host module is sent via the Internet network to the data collection module, which corresponds to the claimed "gateway."

As explained in the Petition and supported by the testimony of Mr. Kinney, the disclosure in Cunningham's '978 Provisional is incorporated by reference into Cunningham (Appx1045(1:6-8)) and further confirms that the "controlling information" is generated by the host module in response to the sensor data and is sent from the host module through the gateway to the DAM to adjust the device.

Appx1434-1435;  Appx150-151;  Appx944-945(¶63).    The '978 Provisional

provides an example implementation of Cunningham's DAM embodiment at

Appx1434-1435.   In particular, the '978 Provisional discloses that the Williams

Telemetry Service ("WTS") "is intended for utilities, energy suppliers, product

distribution companies and national corporations who want to better manage

availability, cost and usage of their energy products."   Appx1434.   WTS

applications include: "Automated Meter Reading Services" used for "on-demand

readings" and "disconnect actions," as well as: "Energy Management Services."

*Id.*   These applications are run by a processing center called the "Williams

Network Control Center" ("control center"/"NCC"), which corresponds to

Cunningham's host module (the claimed "computer"), which is also referred to as

a "control center" (Appx1066(44:14-19)).   Appx1435; Appx150-151; Appx944-

945(¶63).   Indeed, the Board when addressing the Ground 3 claims relied on these

same "energy management operations" in the '978 Provisional as being part of

Cunningham's disclosures—and not a separate embodiment.   Appx41; Appx160.

Cunningham's Fig. 1 below has been annotated with the corresponding features in

the Provisional for ease of reference:



Appx1003(Fig. 1) (color annotations added); *see also* Appx1044(Fig. 49) (showing corresponding "Network Operating Center," "Telemetry Gateway," and "Telemetry Interface Modules"); Appx129-130, Appx151-152, Appx161-162.

Data is collected from sensing devices called "Telemetry Interface Modules" (TIMs) (Cunningham's SIMs—also called DAMs and TIMs) using a "Williams Information Gateway—WinGate" (Cunningham's DCM—also called "WinGate"), which "accumulates data generated by the sensing and control devices" over a "wireless network." Appx1434; Appx150-151; Appx622-623. The '978 Provisional discloses that "WinGate supports full two-way communication between the premise[sic] and ... control center via the Williams Telemetry

-41-

Network," just as Cunningham's DCMs support full two-way communication between the premises and the host module.    Appx1434; Appx1055(21:19-23), Appx1059-1060(29:63-31:2); Appx150-151, Appx157; Appx623.

The '978 Provisional discloses that the control center "*control[s]* HVAC and lighting *based on* defined cost parameters and energy usage *across the entire system*."  Appx1434-1435.  To do this, the control center runs "[r]outines to reduce the amount of energy used by monitoring and *controlling HVAC and lighting usage at customer locations*."  Appx1435.  "[B]ased on" the "cost parameters and energy usage" that the control center collects from "across the entire system," the control center responds by transmitting "control" signals "to Energy Control Modules ['ECMs'/Cunningham's DAMs] to control HVAC and lighting." Appx1434-1435.  The "control" signals are thus sent from the control center to the WinGate, and then through the WinGate to the ECMs over the wireless network.

Notably, it cannot be the ECMs (Cunningham's DAMs) that generate the control signal to control HVAC or lighting because the '978 Provisional discloses that HVAC and lighting are controlled "*based on* defined cost parameters and energy usage *across the entire system*," which only the control center has, not the ECM at an individual customer location.  Appx1434-1435.  Accordingly, the '978 Provisional further confirms that Cunningham's host module generates a control signal in response to data from the sensors "across the entire system," and sends

-42-

that "controlling information [in] system update transmissions" to the DAM to adjust the operation of the device (*e.g.*, change the thermostat or turn on or off the lights). Appx1068(47:8-10); Appx150; Appx944(¶62).

> 2.    *The Board made a critical error in misreading Cunningham to require the device adjustment module—not the host module—to issue control signals*

The Board fundamentally misread Cunningham's teaching that "[d]evice adjustment modules *are used to* monitor and *control* the operation of various devices and applications according to varying utility prices and the device consumption information," Appx1067(46:64-67), as indicating that the device adjustment module itself *generates* the control signal. *See* Appx28-29. This misreading of Cunningham led to the Board's incorrect finding that "it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham." Appx28-29.

The Board's misreading of Cunningham's DAM embodiment at Appx1067-1068(46:62-47:10) fails to account for Cunningham's express disclosures that "device adjustment modules are *used* to ... control" and "[t]he device adjustment module ... *receives controlling information from* system update transmissions," which confirm that the device adjustment module is being "used" by the host module "to ... control" the remote device via "controlling information" sent by (and received from) the host module/computer on the network. Appx1067(46:64-

-43-

67).  Specifically, the DAMs "monitor ... the operation of various devices and applications" (*e.g.*, "energy usage by the air conditioning and heating systems"), "transmit[] information" to the system/host module, and "receive[] controlling information" back from the system/host module to adjust/control the device (*e.g.*, a thermostat).  Appx1067-1068(46:64-47:10).  Thus, contrary to the Board's finding, the host module on the network issues the control signals.

The Board incorrectly assumed that to adjust/control a device, the DAM must generate the control signal itself rather than receive a control signal from the host module and translate such "controlling information" to an analog signal to control/adjust the device (*e.g.*, a thermostat).  Appx28-29.  The Board based its entire analysis on Cunningham's statement that DAMs "are used to 'monitor *and control*' the operation of various devices," inferring that this means the control signal must be produced in the DAM itself.  *Id.*  But this ignores that Cunningham specifies the DAM is "used to" control, just as it is "used to" monitor.  Appx1066(44:14-19).  It is the host module that "use[s]" the DAM in those ways, which is why the DAM must send the monitored data to the host module over the system and receive back "controlling information" in the form of a "system update."  Appx1068(47:8-10).  Rather than imply that the DAM generates the control signal, Cunningham discloses the opposite.

As discussed above, *see* Section I.A.1, this reading of Cunningham is further confirmed by 1) other disclosures in Cunningham that refer to control signals sent from a central location such as "utility disconnect actions" (Appx1059-1060(29:63-31:2), Appx1046(4:58-62)); and 2) the '978 Provisional, which makes clear that the control signal to control/adjust the device is generated at the host module/control center on the network. The host module/control center sends control signals to the ECMs/DAMs to control HVAC and lighting "based on defined cost parameters and *energy usage across the entire system*," Appx1434-1435; Appx624-625, *i.e.*, based on system-wide information that only the control center (not the local ECMs) has.

This case is similar to *Ericsson*, where this Court found the Board's statement that the prior art reference failed to disclose a claim limitation to frequency hopping was "contrary to the evidence" because the prior art reference explicitly disclosed "frequency hopping standards such as [GSM]." 890 F.3d at 1344-46, 1348 (reversing the Board's finding that the claim was not unpatentable). The same is true here. The Board's finding that "it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham," Appx29, simply cannot be reconciled with Cunningham's explicit disclosure that "controlling information" is sent from the host module to and "receiv[ed]" by the DAM. Appx1067-1068(46:62-47:10).

-45-

3. *The Board exacerbated its misreading of Cunningham by limiting Cunningham's disclosure of "controlling information" to "varying utility prices"*

The Board's incorrect finding that "controlling information" sent in Cunningham is limited to "varying utility prices," is just another aspect of its misreading of Cunningham as requiring the device adjustment module—not the host module—to generate control signals. With this flawed understanding that the device adjustment module generates the control signal rather than the host module, the Board found that "read in context"—*i.e.*, the context of the Board's incorrect understanding of where the control signal is generated—"Cunningham's use of the word 'controlling information' refers back to 'varying utility prices.'" Appx25, Appx28-29. As confirmed by other disclosures in the '978 Provisional and in Cunningham that refer to commands from a central location such as "utility disconnect actions," *see* Appx1059-1060(29:64-31:2), the correct reading of Cunningham's disclosure is that the varying utility prices (from across the system) is one input (along with device consumption information) upon which the "controlling information" that the device adjustment module "receiv[es]" from the host module can be based.

Specifically, the Board misread the following excerpt in Cunningham titled "Device Adjustment Modules":

> *Device adjustment modules* are *used to* monitor *and control the operation* of various devices and applications *according to varying utility prices and the*

*device consumption information.* An example of a device control module is a module to control a Johnson Control™ thermostat by attaching a device control module with a power system, processor with associated firmware, and a radio. The module monitors the energy usage by the air conditioning and heating systems controlled by the thermostat and *can adjust the operation usage* to stay below increased billing increment costs for energy supply and usage. *A two-way sensor interface module would be utilized. The device adjustment module transmits information to the system and <u>receives controlling information from system update transmissions.</u>*

Appx1067-1068(46:64-47:10); Appx24. This disclosure in Cunningham simply does not equate "controlling information" with "varying utility prices," as the Board incorrectly found. *See* Appx24. This excerpt explains how the DAMs operate—they monitor "various devices and applications" (*e.g.*, "energy usage by the air conditioning and heating systems") and "transmit[] information" to the system/host module. They also "receive[] controlling information" back from the system/host module and then "adjust"/"control" the device (*e.g.*, a thermostat). Appx1067-1068(46:64-47:10). The Board's reading is not supported by Cunningham's disclosure, which, again, is further confirmed upon review of the '978 Provisional.

The '978 Provisional confirms that the "controlling information" sent from system/host module is not limited to raw "utility prices" as the Board incorrectly found. Rather, as detailed above, the '978 Provisional explains that the control center runs "[r]outines to reduce the amount of energy used by monitoring and controlling HVAC and lighting usage at customer locations," by sending

"communications to Energy Control Modules to control HVAC and lighting based on defined cost parameters and energy usage across the entire system." Appx1434-1435. Thus, the "controlling information" sent from the system/host module is not limited to the raw utility prices/cost parameters, but is instead a control signal "based on" *both* utility prices/cost parameters "and" energy usage gathered from across the entire system.

Like in *Ericsson* where the Board's statement that the disclosure of the prior art lacked a limitation to frequency hopping when the reference explicitly disclosed frequency hopping was found to be "contrary to the evidence," the Board's subsidiary conclusion here that "'controlling information' refers back to 'varying utility prices'" (Appx24) is contradicted by the explicit disclosures of Cunningham and its incorporated '978 Provisional and is, thus, directly contrary to the evidence. 890 F.3d at 1344-46, 1348; Appx1059-1060(29:64-31:2), Appx1067-1068(46:62-47:10); Appx1434-1435.[3]

---

[3] Emerson notes that no claim construction is needed for the term "control signal." The Board effectively construed "control signal" to require "directly controlling a device," Appx25-27, which the Board found Cunningham's "controlling information" did not meet, because it equated "controlling information" with "utility prices" that had to be further processed before yielding a signal that could "directly control" the device. Appx24-28. As noted in the text, Cunningham's "controlling information" is not limited to "utility prices," but rather is information derived from such prices *and* consumption data, and is used, as expressly disclosed by Cunningham and the Provisional to "control" the HVAC. Thus, while the Board's addition of the term "directly" improperly imports a limitation from the

-48-

4.    *The Board's errors were further compounded by the Board's disregard of Cunningham's '978 Provisional, incorporated by reference into Cunningham*

The Board erred in improperly disregarding the disclosures of the '978 Provisional based on its incorrect assumption that the '978 Provisional discloses a different embodiment from Cunningham's DAM embodiment.  The Board found Emerson's reliance on the '978 Provisional to be combining multiple embodiments from a single reference and faulted Petitioner for either (1) "not explain[ing], in the Petition, how the Provisional's alleged control signals would meet the other limitations of the claim," or (2) "not explain[ing] why or how the DAM would use the alleged control signals from the 'routines'" that "allegedly send control signals from the network that can directly control a device such as an HVAC."  Appx32-33.

The '978 Provisional at Appx1434-1435, however, teaches the *same* embodiment as Cunningham's DAM embodiment, and was cited by Emerson in the Petition to provide "further evidence" (Appx150-151) that the DAM embodiment in Cunningham and the '978 Provisional incorporated by reference into Cunningham, renders the Ground 2 Claims obvious.  *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) ("When a document is 'incorporated by reference' into a host document, such as a patent, the

specification into the claims, it is not necessary for the Court to reach the claim construction issue here.

referenced document becomes effectively part of the host document as if it were explicitly contained therein"). Tellingly, when analyzing Ground 3, the Board properly looked to the '978 Provisional's disclosures of "energy management operations" because it "is incorporated by reference into Cunningham" to confirm that Cunningham discloses the limitations of claim 38. Appx41. Because the '978 Provisional at Appx1434-1435 is the same embodiment as Cunningham's DAM embodiment, there was no need for Emerson to show how the '978 Provisional meets all of the other claim limitations or to explain how or why a combination between the '978 Provisional and Cunningham would have been made. Indeed, once it's "determined that the provisional application is part of [the] nonprovisional disclosure," and thus "treated as a single reference," it is only "[t]o the extent that different embodiments ... need to be combined" that it is necessary to "determine whether it would have been obvious." *Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*, Case Nos. 2018-2125, 2018-2151, 2019 WL 2723163, at *4-5 (Fed. Cir. July 1, 2019).

The '978 Provisional at Appx1434-1435, which is incorporated by reference into Cunningham, discloses the same embodiment as the DAM embodiment disclosed in Cunningham. Appx1045(1:6-11), Appx1067-1068(46:62-47:10); Appx1434-1435; Appx150. The structure between the DAM embodiment in Cunningham and the disclosure at Appx1434-1435 of the '978 Provisional is the

same.  Some of the acronyms between the two were changed between the '978

Provisional and the Cunningham utility patent (which uses more generic names),

but, notably, some remained the same.  As explained in the Petition, the Williams

Network Control Center ("control center"/"NCC") in the '978 Provisional

corresponds to the claimed "computer"/Cunningham's "host module."  Appx150-

151, Appx126; Appx1066(44:14-19) ("The *host module* 122 is a centrally or

regionally located *control center* or centers which is used to monitor and control all

the information exchange required by the monitoring system").  In addition, the

"Telemetry Interface Modules" ("TIMs") in the '978 Provisional correspond to

Cunningham's "SIMs" (the claimed "sensors").  Appx1048(7:30) ("The Sensor

Interface Module (TIM)"), Appx1025(Fig. 30), Appx1044(Fig. 49) ("Telemetry

Interface Module"); Appx129-130, Appx151-152, Appx161.  The "Williams

Information Gateway—WinGate" in the '978 Provisional corresponds to

Cunningham's Data Collection Module ("DCM") (the claimed "gateway").

Appx1065(41:45-47) ("Root Data Collection Module (DCM)" and "WinGate 8").

The "Energy Control Modules" ("ECMs") of the '978 Provisional correspond to

Cunningham's "Device Adjustment Modules" ("DAMs"), as both are located on

the premises and control HVAC or lighting systems through communication with

the gateway over the local wireless network.  Appx1434-1435; Appx1067-

1068(46:62-47:10).

In addition, just as Cunningham describes its DAM embodiment as being used to "monitor and control the operation of various devices and applications according to varying utility prices and the device consumption information" (Appx1067(46:62-67)), the '978 Provisional describes its "Energy Management Services" as "[m]onitoring and control of energy using equipment. Full time communications to Energy Control Modules [ECMs/DAMs] to control HVAC and lighting based on defined cost parameters and energy usage across the entire system" (Appx1434). Accordingly, both describe the ECM/DAM as being used to "control" the device (such as a thermostat) based on utility prices/cost parameters and, as discussed above, the '978 Provisional confirms that the control signals for the ECM/DAM to adjust/control the device is generated by the control center/host module (the claimed "computer"). Cunningham is not inconsistent because it describes the DAM as "receiving" the "controlling information" via a "system update," *i.e.*, from the host module (or control center in the '978 Provisional's terminology).

Furthermore, the Board improperly failed to consider Emerson's explanations as to how the '978 Provisional discloses the same embodiment as that relied upon in Cunningham. *See* Appx32 (n.9). First, contrary to the Board's statement that such explanations are "not found in the Petition," Emerson included in its Petition that the '978 Provisional's control center and Cunningham's host

module both correspond to the claimed computer, thus, also indicating how the '978 Provisional discloses the same embodiment as that relied upon in Cunningham. Appx150-151. Second, as previously mentioned, the Board properly looked to the '978 Provisional's disclosures of "energy management operations" when analyzing Ground 3 because the provisional "is incorporated by reference into Cunningham." Appx41. Third, Emerson is entitled to present arguments to (1) respond to the Board's misinterpretation of Cunningham and the Board's failure to consider the '978 Provisional in its initial DI, and (2) rebut arguments made by SIPCO in its Response to Petitioner's Brief Regarding Newly-Instituted Grounds, where, as here, Emerson's explanation of how the embodiment of the '978 Provisional cited in the Petition corresponds with the disclosure in Cunningham cited in the Petition and simply "expands the same argument made in [the] Petition." *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1380-81 (Fed. Cir. 2018) (vacating and remanding to consider Ericsson's argument in reply that "expands the same argument made in its Petition: that Reed discloses that its S-blocks (i.e., 'packets') are further encoded into packet blocks through interleaving"); 5 U.S.C. § 554(c).

Because Cunningham and the '978 Provisional are describing the same embodiment, the Board erred in disregarding the disclosures of the '978

Provisional on the ground that Emerson was required to provide a motivation to combine the embodiment.

\*　　　\*　　　\*

Accordingly, for at least the foregoing reasons, the Board's conclusion that Cunningham fails to disclose the "control signal" limitations in the Ground 2 Claims is not supported by substantial evidence and should be reversed.

**B.**　**The Board's Conclusion that Cunningham Fails to Disclose the "Translating" Limitations Is Not Supported by Substantial Evidence**

1.　*Cunningham in view of the express disclosures in Mason and McGowan renders the "translating" limitations obvious*

As set forth in the Petition and supported by the testimony of Mr. Kinney, Cunningham or Cunningham in view of Mason renders obvious the limitation of "translating the control signal from a network transfer protocol into a RF control signal"; and Cunningham in view of McGowan renders obvious the limitations of "translating the received RF control signal into an analog signal; and applying the analog signal to an actuator to effect the desired system response." *See* Appx149-156; Appx940-947(¶¶51-68). The Board's conclusion that Cunningham fails to disclose these limitations is incorrect because (1) it relies on an incorrect understanding of Cunningham's disclosure—limiting Cunningham's "controlling information" to "utility prices," and (2) fails to take into account Emerson's proposed prior art combination for Ground 2, which is not limited to Cunningham.

Accordingly, the Board's finding that these "translating" limitations are not met is not supported by substantial evidence and the Board's conclusion that the Ground 2 Claims are not unpatentable should be reversed.

SIPCO did not dispute in the case below that, at minimum, Cunningham alone and in further view of Mason meets the limitation of "translating the control signal from a network transfer protocol into a RF control signal." Appx152-154; Appx946-947(¶¶66-68). As discussed above in Sections A.1 and I.A.1, Cunningham's host module transmits signals to the DCM (the claimed "gateway") over the Internet as an Internet protocol (TCP/IP) signal. Appx1067(45:60-46:2); Appx151-152; Appx945(¶64). Because Cunningham discloses the communication between the DCM and the DAM/SIM is wireless (Appx1047(6:11-19), Appx1051(14:1-5)), a POSITA would have understood that the DCM translates the control signal from the host module (which is a TCP/IP signal) into a RF signal to be sent to the DAM/SIM. *See, e.g.*, Appx1067(45:60-67) ("The [DCM] will send and receiv[e] information to and from the host module as an Internet protocol (TCP/IP) signal"), Fig. 30; Appx945-946(¶65); Appx151-152.

Furthermore, because communications between a DCM and the host module are affirmatively disclosed as using TCP/IP protocol, information being passed from the host module to a DAM/SIM would either need to be translated by the DCM, or the DAM/SIM would need to be able to communicate using TCP/IP. *Id.*

As Mr. Kinney explained, "[a] [POSITA] would be motivated to conduct translation at the [DCM], because it is less costly to translate information at a centrally-located [DCM], than it is to enable TCP/IP communication at the [DAM/SIM]." Appx946-947(¶67); Appx152. Mr. Kinney provided that there are "[a]t least three reasons for this cost variance:

> 1.   Since enabling TCP/IP at the [DAMs/SIMs] would effectively expose a large number of [DAMs/SIMs] to the wide area network, it would require those [DAMs/SIMs] to be assigned IP addresses.
> 2. The protocol for assigning and revoking the IP addresses to the [DAMs/SIMs] would have to be added to the [DCM].
> 3. Adding the TCP/IP headers onto the [DAMs/SIMs] packets would add at least 40 bytes which would reduce the number of [DAMs/SIMs] that a [DCM] could handle.

Appx946-947(¶67); Appx152.

Furthermore, the Petition supported by the testimony of Mr. Kinney also explained that "[a]lternatively, Mason discloses that a gateway (node 18) translates a control signal from a network transfer protocol (TCP/IP) into a RF control signal (CEBUS RF protocol signal), which is thereafter transmitted to the appropriate meter." Appx153; Appx993(5:32-41, 6:1-13), Appx990(Fig. 3); Appx947(¶68). Mr. Kinney explained that "[a] [POSITA] would be motivated to incorporate these Mason teachings into Cunningham's system to perform the operations of ['translating the control signal from a network transfer protocol into a RF control signal' and 'transmitting the RF control signal'], because [for the same reasons provided above] it is less costly to translate information at a centrally-located data

collection module, than it is to require TCP/IP communication at the sensor interface modules."  Appx945-947(¶¶65-68); Appx1211-1212 (stating that the desirability of using gateways is that existing systems could be easily modified to allow communications).

The proposed combination also meets the limitation of "translating the received RF control signal into an analog signal; and applying the analog signal to an actuator to effect the desired system response" based on the express disclosures of McGowan.  As set forth in the Petition and supported by the testimony of Mr. Kinney, the DAM "receives controlling information" in the RF control signal and causes an actuator to effect the desired system response, such as controlling a thermostat to "adjust the operation usage" of an "air conditioning and heating system" using the "controlling information."  Appx1067-1068(46:62-47:10); Appx154; Appx948(¶70).  As discussed above, this could include, for example, "control[ling] a ... thermostat," or "control of lights, ... utility disconnect actions, ... or other control functions" as taught in Cunningham and in the '978 Provisional incorporated by reference in Cunningham.  Appx1059-1060(29:63-31:2); Appx1067-1068(46:62-47:10), Appx1434-1435("controlling HVAC and lighting usage at customer locations"); Appx624-625; Appx655-657.

As explained in the Petition, and undisputed by SIPCO in the case below, it would have been obvious to apply McGowan's teaching of translating the received

controlling information into an analog signal and applying that analog signal to an actuator to effect the desired response.   Appx154-156; Appx948-950(¶¶70-73). McGowan teaches a closed-loop system where a controller processes digital data and sends the digital signal to a digital to analog converter.   Appx1171-1172, Appx1171(Fig. 10-3), Appx1172(Fig. 10-4).    Thereafter, an actuator can understand the analog signal and perform the desired response.   Appx1172, Appx1176.   A POSITA would have been motivated to incorporate McGowan's teachings of translating the received controlling information into an analog signal and applying that analog signal to an actuator to effect the desired response because, as explained by Mr. Kinney, "Cunningham contemplates controlling actuators that are typically considered to be controlled using analog signals." Appx949(¶72);   Appx155;   Appx1067-1068(46:62-47:10).    For   example, Cunningham discloses that a DAM can be used to control a thermostat. Appx1067-1068(46:62-47:10); Appx949(¶72); Appx155.  A POSITA would have understood that, at the time of the invention, a thermostat signal is commonly analog, which McGowan confirms.  Appx1172; Appx945-947(¶¶65-68).  Thus, "a POSITA would [have] recognize[d] that in order to properly control an analog thermostat, digital-to-analog conversion is needed before a control signal can be applied to the thermostat."  Appx949(¶72); Appx1171-1172; Appx155-156.

The disclosures of Cunningham, Mason, and McGowan with respect to the "translating" elements would so clearly have rendered obvious those limitations of the '692 patent that SIPCO did not genuinely contest that assertion in the case below. And the Board did not directly address them, much less cast doubt on those disclosures. Rather, as explained below, the Board prematurely truncated its consideration of the translating limitations, because it erroneously believed that only "utility prices" were being conveyed to the DAM in Cunningham's disclosure. Once that error is set aside, there is no serious question that Cunningham, in light of Mason and McGowan, would render those limitations obvious.

  2. *The Board failed to fully engage Emerson's evidence regarding the "translating" limitations, because of its erroneous belief that Cunningham's "controlling information" was limited to "utility prices," which the Board thought could not be translated into an RF and then analog signal*

The Board's misreading of Cunningham discussed in Sections I.A.2 – I.A.4—first requiring the DAM generate the control signals (as opposed to the host module generating the control signal to use the DAM to adjust a device), which led to its incorrect finding limiting Cunningham's disclosure of "controlling information" to "varying utility prices"—also led to its incorrect finding that "Petitioner has not explained how 'utility prices' can be 'translated' 'from a network transfer protocol into a RF control signal' and then 'an RF control signal

into an analog signal' that can be applied ultimately to an actuator." Appx27-28. The Board further stated, based on that erroneous premise, that "[w]e find that this could not be done because a 'utility price' does not indicate any action to be taken by the actuator." Appx28.

First, as discussed in Section I.A.3 above, Cunningham's "controlling information" sent from the host module to the DAM is not limited to "varying utility prices," as the Board incorrectly found. Rather, as explained in Section I.A.1 above, the "controlling information" is a control signal "based on defined cost parameters [(*e.g.*, utility prices)] and energy usage across the entire system," which allows the DAMs to be used to adjust a device (*e.g.*, a thermostat). Accordingly, the Board erred in finding that Emerson failed to explain how "utility prices" could be translated "from a network transfer protocol into an RF control signal" and then "an RF control signal into an analog signal" that can be applied ultimately to an actuator.

Second, as set forth above, Emerson explained in the Petition how Cunningham or Cunningham in view of Mason renders obvious the limitation of "translating the control signal from a network transfer protocol into a RF control signal," and how Cunningham in view of McGowan renders obvious the limitations of "translating the received RF control signal into an analog signal; and applying the analog signal to an actuator to effect the desired system response."

*See* Appx149-156; Appx940-950(¶¶51-73).    Emerson explained in the Petition how the translation of the control signal "from a network transfer protocol into a RF control signal," and the translation from a "RF control signal into an analog signal" to be "appl[ied] ... to an actuator to effect the desired system response" was rendered obvious by Cunningham in view of Mason and McGowan.    Appx151-156; Appx945-950 (¶¶65-73).    The Board erred in failing to consider Emerson's obviousness arguments based on Cunningham, Mason, and McGowan.    *See Shinn Fu Company*, 701 F. App'x at 945-46 (vacating and remanding where Board erred by "ignoring the manner in which Shinn Fu proposed its obviousness combinations .... [b]ecause the Board did not provide any analysis with regard to the manner in which Shinn Fu proposed its key obviousness combination, we have no meaningful way to review the Board's patentability determination in light of Shinn Fu's arguments").

Accordingly, the Board's conclusion that Cunningham fails to disclose the "translating" limitations is not supported by substantial evidence and should be reversed, or at minimum, vacated and remanded for the Board to analyze Emerson's obviousness arguments based on Cunningham, Mason, and McGowan.

## II.    The Board Violated the APA and Due Process When It Prohibited Emerson from Presenting Any Evidence After the Board's Initial Findings in Its Institution Decision

Contrary to the notice and opportunity-to-be-heard requirements of the APA

and of Due Process, the Board refused to allow the introduction of evidence on the very issues it found dispositive in its Final Written Decision. The Board initially instituted on the Ground 3 Claims only and denied institution of the Ground 2 Claims, based on the same misreading of Cunningham and Cunningham's '978 Provisional discussed above. Appx275-277. On May 2, 2018, after the Supreme Court's decision in *SAS Institute*, 138 S. Ct. 1348, the Board issued a modified Decision to Institute granting institution on the Ground 2 Claims. Appx596-598. Subsequent to the modified Decision to Institute, the Board granted the parties briefing on the newly instituted grounds, but denied Emerson's request to submit evidence with the additional briefing. Appx608.

As a matter of Due Process, Emerson should have been permitted to submit evidence in response to the decision to institute's preliminary findings, the Preliminary Patent Owner Response ("POPR") arguments adopted therein, and SIPCO's arguments in its post-institution brief. Appx238-239; Appx276-277; Appx629. In particular, Emerson should have been permitted to submit evidence regarding Cunningham's disclosure of generating a control signal and the disclosure of the '978 Provisional. These materials had already been discussed in the Petition, but Emerson's rebuttal evidence could have helped the Board understand the correct relationship between those parts of Cunningham. Moreover, the denial of Emerson's right to present this evidence was critical, as

those issues were dispositive to the Board's Final Written Decision. As this Court has held, "petitioner in an *inter partes* review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner, or if it is used 'to document the knowledge that skilled artisans would bring to bear in reading the prior art.'" *Anacor Pharm. v. Iancu*, 889 F.3d 1372, 1380-81 (Fed. Cir. 2018) (citation omitted). As this Court has previously noted, "the introduction of new evidence in the course of the trial is to be expected in *inter partes* review trial proceedings and, as long as the opposing party is given notice of the evidence and an opportunity to respond to it, the introduction of such evidence is perfectly permissible." *Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm.*, 825 F.3d 1360, 1366-67, 1369 (Fed. Cir. 2016). "The purpose of the trial in an *inter partes* review proceeding is to give the parties an opportunity to build a record by introducing evidence—not simply to weigh evidence of which the Board is already aware." *Id.* Of course, here, the Board did allow Emerson to submit rebuttal evidence for the claims on which the Board had initially instituted review. Rebuttal evidence was only barred for those claims as to which the Board had at first declined to institute review, in contravention of the statute as explained in the Supreme Court's decision in *SAS Institute*. Emerson should not be deprived of its rights simply because the Board initially erred.

-63-

Emerson bore the burden of proof and should have been permitted to fully respond, particularly given the "estoppel effects that trigger ... [when] the Board issues a final written decision." *SAS Institute, Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016); 35 U.S.C. § 315(e).  Unlike *Dell v. Acceleron*, 884 F.3d 1364, 1369 (Fed. Cir. 2018), which addressed whether the Board needed to consider new evidence on remand, in this case Emerson was denied the opportunity to present evidence at the beginning of trial on the Ground 2 Claims. Had the Board allowed Emerson to submit the requested rebuttal evidence, the Board would almost certainly not have repeated its erroneous reading of Cunningham's disclosures.

The Board abused its discretion in denying Emerson the opportunity to present evidence post-institution regarding the Ground 2 Claims.  Thus, even if reversal is not appropriate, the Court should to vacate and remand to the Board to allow Emerson to present evidence in response to the institution decision's preliminary findings, the POPR arguments adopted therein, and SIPCO's arguments in its post-institution brief.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Emerson respectfully requests that this Court reverse or, at minimum, vacate and remand, the decision of the Board finding the Ground 2 Claims not unpatentable.

Respectfully submitted,

*/s/ Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone:  (202) 508-4600

James R. Batchelder
James L. Davis, Jr.
Daniel W. Richards
ROPES & GRAY LLP
University Avenue, 6th Floor
East Palo Alto, CA 94303
Phone: (650) 617-4000

Steven Pepe
ROPES & GRAY LLP
1211 6th Avenue
New York, NY 10036
Phone: (212) 596-9000

*Counsel for Emerson Electric Co.*

Dated:  August 9, 2019

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper No. 58
Entered: November 28, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

EMERSON ELECTRIC CO.,
Petitioner,

v.

SIPCO, LLC,
Patent Owner.

————————

Case IPR2017-00359
Patent 6,437,692 B1

————————

Before BRYAN F. MOORE, ROBERT J. WEINSCHENK, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)*

Trials@uspto.gov                                    Paper No. 58
571-272-7822                      Entered:  November 28, 2018

## I.    INTRODUCTION

### A.    Procedural History

Petitioner, Emerson Electric Co., filed a Petition to institute an *inter partes* review of claims 1, 3–8, 11–14, 24–32, 34, 36–38, 42, 43, 46–49, 51–57, and 59–64 (the "challenged claims") of U.S. Patent No. 6,437,692 B1 ("the '692 patent") pursuant to 35 U.S.C. § 311(a).  Paper 2, "Pet."  The Petition presented the following three grounds of unpatentability:

| Ground | References | Basis[1] | Claims |
|---|---|---|---|
| 1 | Mason,  Jr. et al. (Ex. 1003)[2] and Cunningham et al. (Ex. 1004)[3] | § 103(a) | 1, 3–8, and 11–14 |
| 2 | Cunningham, McGowan (Ex. 1005),[4] and Mason | § 103(a) | 24–31, 42, 43, 46–49, 51–54, 60–64 |
| 3 | Cunningham | § 102(e) / § 103(a) | 32, 34, 36–38, 55–57, 59 |

Pet. 20–21.  Patent Owner, Sipco, LLC, filed a Preliminary Response pursuant to 35 U.S.C. § 313.  Paper 6, "Prelim. Resp."

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, which was enacted September 16, 2011, made amendments to 35 U.S.C. §§ 102 and 103.  AIA § 3(b)–(c).  Those amendments became effective eighteen months later on March 16, 2013.  *Id*. at § 3(n).  Because the application from which the '692 patent issued was filed before March 16, 2013, any citations herein to 35 U.S.C. §§ 102 and 103 are to their pre-AIA versions.
[2] U.S. Patent No. 6,100,817, issued Aug. 8, 2000.
[3] U.S. Patent No. 6,124,806, issued Sept. 26, 2000.
[4] John J. McGowan, *Direct Digital Control: A Guide to Distributed Building Automation*, 1995.

2

IPR2017-00359
Patent 6,437,692 B1

In a June 1, 2017, Institution Decision, we determined that Petitioner
had a reasonable likelihood of prevailing only on Ground 3 but not Grounds
1 and 2.  Paper 7, ("Inst. Dec.").  Accordingly, we instituted an *inter partes*
review on Ground 3 only pursuant to 37 C.F.R. § 42.108.  Inst. Dec. 21.

Patent Owner filed a Patent Owner Response (Paper 18, "PO Resp.")
to which Petitioner filed a Reply (Paper 24, "Reply").  Patent Owner also
filed Observations on Cross-Examination.  Paper 29.  Petitioner filed a
Response to the Observations.  Paper 32.  Both parties requested a hearing
for oral argument (Papers 30 and 31), and a hearing was held January 24,
2018.  *See* Paper 38 ("Tr.").

Subsequent to the Supreme Court's decision in *SAS Institute, Inc. v.
Iancu*, 138 S. Ct. 1348 (2018), we issued an Order on May 2, 2018,
modifying our Institution Decision to institute review of all claims and all
grounds and instructed the parties to confer regarding any need for further
briefing and changes to the schedule for trial. Paper 39 ("SAS Order").
Responsive to our instructions, a conference call was held in which
Petitioner requested additional briefing on the newly added claims and
grounds and Patent Owner opposed.  Paper 41.  Based on the arguments
made during the call, we granted additional briefing and amended the
scheduling order.  *Id.*  Specifically, we authorized Patent Owner to file a
Supplemental Response addressing the newly instituted claims (claims
previously denied review for lack of a reasonable likelihood of prevailing),
and authorized Petitioner to file a Supplemental Reply addressing issues
raised by Patent Owner's Supplemental Response.  *Id.*  Petitioner filed its
Supplemental Brief which was directed to ground 2 claims 24-26 and 30,
(Paper 44, "Supp. Br.") and Patent Owner filed its Supplemental Response

3

IPR2017-00359
Patent 6,437,692 B1

(Paper 47, "Supp. Response"), and Petitioner filed its Supplemental Reply (Paper 48, "Supp. Reply").[5] Due to the additional briefing, the panel requested and was granted an extension of the one-year pendency date for six months until Dec. 1, 2018. Papers 42, 43.

As we allowed in the conference call, Petitioner requested, and received, authorization for a supplemental hearing to address arguments regarding newly added claims and grounds not addressed in the original hearing. Papers 49, 50.

The supplemental oral argument was conducted on September 6, 2018, and a transcript of that hearing is of record. Paper 57 ("Supp. Tr.")

As discussed below, Petitioner has shown by a preponderance of the evidence that claims 32, 34, 37–38, 55–57, and 59 are unpatentable but has not shown by a preponderance of the evidence that any other challenged claims are unpatentable.

## B.     The '692 Patent

The '692 patent was filed November 12, 1999, and issued August 20, 2002. Ex. 1001, at [22], [45]. It claims priority to multiple related applications, the earliest of which was filed August 2, 1999. *Id*. at [60], [63].

---

[5] Petitioner argued in the phone conference that it should be allowed to introduce new evidence with the additional briefing. Paper 41, 2. We denied that request. *Id*. Petitioner, in its supplemental brief, continues this position but does not present new argument except to distinguish a case cited by the panel. Supp. Br. 10. We maintain our position that Petitioner is not allowed to introduce additional evidence for the reasons in our Order in Paper 41 and the additional reasons cited by Patent Owner in its supplemental response. Paper 41, 3–4; Supp. Resp. 2.

4

IPR2017-00359
Patent 6,437,692 B1

The '692 patent "generally relates to remotely operated systems, and more particularly to a computerized system for monitoring, reporting on, and controlling remote systems" such as for "manufacturing processes, inventory systems, and emergency control systems, and the like." *Id.* at 1:25–28, 33–35. It does so "by transferring information signals through a wide area network (WAN) and using software applications hosted on a connected server to appropriately process the information." *Id.* at 1:28–31.

A prior art structure for monitoring, reporting on, and controlling remote systems is illustrated conceptually (via block diagram) in Figure 1, which is reproduced below.



**FIG. 1**

**(PRIOR ART)**

Figure 1 shows a plurality of sensors/actuators 111–117 hardwired to local controller 110, which in turn is connected to remotely-located central

5

IPR2017-00359
Patent 6,437,692 B1

controller 130 via publicly switched telephone network (PSTN) 120.
Ex. 1001, 5:14–29.

    Figure 2 illustrates a block diagram of an embodiment of the
invention and is reproduced below.



**FIG. 2**

Figure 2 shows a plurality of sensors/actuators 212, 214, 216, 222, and 224
integrated with transceivers, which are preferably low power radio
frequency transceivers.  Ex. 1001, 5:45–53.  Figure 2 also illustrates stand-
alone transceivers 211, 213, 215, and 221, which can receive and transmit
signals between the integrated transceivers and local gateways 210 and 220.
*Id.* at 5:54–66.  The stand-alone transceivers are dispersed sufficiently to
provide adequate coverage in, for example, an industrial plant.  *Id.* at 6:63–

6

IPR2017-00359
Patent 6,437,692 B1

66.  "Local gateways 210 and 220 analyze the transmissions received, convert the transmissions into TCP/IP format and further communicate the remote data signal transmissions via WAN 230." *Id.* at 6:20–23.  Thus, the gateways "may communicate information, service requests, control signals, etc. to remote sensor/actuator transceiver combinations 212, 214, 216, 222, and 224 from server 260, laptop computer 240, and workstation 250 across WAN 230." *Id.* at 6:25–29.  Gateways 210 and 220 are connected to the various computers 240, 250, and 260 via the WAN.

### C.    The Challenged Claims

Claims 1, 3–8, 11–14, 24–32, 34, 36–38, 42, 43, 46–49, 51–57, and 59–64 are challenged.  Of those, claims 1, 24, 32, 42, 49, 55, and 60 are independent.  Claims 1, 24, 32, and 55 are illustrative and reproduced below, with emphasis added to limitations that are of particular discussion in this Decision.

> 1.    A system for remote data collection, assembly, and storage comprising:
>
> a computer configured to execute at least one computer program that formats and stores select information for retrieval upon demand from a remotely located device, said computer integrated with a wide area network (WAN);
>
> at least one wireless transmitter configured to transmit select information and transmitter identification information;
>
> a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically at defined locations configured to receive select information transmitted from at least one nearby wireless transmitter and further configured to transmit the select information, the transmitter identification information and transceiver identification information; and
>
> *at least one gateway connected to the wide area network configured to receive and translate the select information, the*

7

**Appx7**

*transmitter identification information, and transceiver identification information, said gateway further configured to farther transmit the translated information to the computer over the WAN.*

24.     A method for controlling a system comprising: remotely collecting data from at least one sensor; processing the data into a radio-frequency (RF) signal; transmitting the RF signal, via a relatively low-power RF transceiver, to a gateway;

translating the data in the RF signal into a network transfer protocol;

*sending the translated data to a computer, wherein the computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal*;

*sending the control signal via the network to the gateway*;

translating the control signal from a network transfer protocol into a RF control signal;

transmitting the RF control signal;

receiving the RF control signal;

translating the received RF control signal into an analog signal; and

applying the analog signal to an actuator to effect the desired system response.

8

IPR2017-00359
Patent 6,437,692 B1

32.    A system for monitoring remote devices comprising:

at least one sensor adapted to generate an electrical signal in response to a physical condition;

at least one wireless transmitter configured to encode the electrical signal, the wireless transmitter further configured to transmit the encoded electrical signal and transmitter identification information in a low-power radio-frequency (RF) signal;

at least one gateway connected a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN; and

a computer configured to execute at least one computer program that formats and stores select information responsive to the electrical signal for retrieval upon demand from a remotely located device.


55.    A method for collecting information and providing data services comprising:

adaptively configuring a data translator at the output of a local controller, wherein the data translator converts the output data stream into an information signal *consisting of* a transmitter code and an information field;

adaptively configuring at least one transmitter with the data translator, wherein the transmitter converts the information signal into a low-power RF signal;

placing a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically wherein the low-power RF signal is received and repeated as required to communicate the information signal to a gateway, the gateway providing access to a WAN;

translating the low-power RF signal within the gateway into a WAN compatible data transfer protocol;

9

IPR2017-00359
Patent 6,437,692 B1

> transferring the translated low-power RF signal via the
> WAN to a computer wherein the computer is configured to
> manipulate and store data provided in said signal; and

> granting client access to the computer.

## II.    ANALYSIS

### A.    Claim Construction

"A claim in an unexpired patent that will not expire before a final
written decision is issued shall be given its broadest reasonable construction
in light of the specification of the patent in which it appears." 37 C.F.R.
§ 42.100(b) (2016). Pursuant to that standard, the claim language should be
read in light of the specification, as it would be interpreted by one of
ordinary skill in the art. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260
(Fed. Cir. 2010). Thus, we generally give claim terms their ordinary and
customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257
(Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that
the term would have to a person of ordinary skill in the art in question.")
(internal quotation marks omitted).

Petitioner does not proffer any express constructions. *See* Pet. 26–27.
In its Patent Owner Response, Patent Owner proffers express constructions
for claim 55's recitation of "an information signal consisting of a transmitter
code and an information field" and for several claims' recitations of a low-
power radio-frequency (RF) signal. PO Resp. 15–21.

10

**Appx10**

IPR2017-00359
Patent 6,437,692 B1

1.    "an information signal consisting of a transmitter code and an
      information field"

Claim 55 is a "method" claim reciting the step of "adaptively
configuring a data translator at the output of a local controller, wherein the
data translator converts the output data stream into an information signal
*consisting of* a transmitter code and an information field." (Emphasis
added). Patent Owner proposes that "an information signal consisting of a
transmitter code and an information field" means "an information signal
containing only a transmitter code and an information field." PO Resp. 15.
In support, Patent Owner argues the following:

> This construction is consistent with the well-known principle
> that the transitional phrase "consisting of" excludes any element,
> step, or ingredient not specified in the claim. *In re Gray*, 53 F.2d
> 520, 11 USPQ 255 (CCPA 1931); *Ex parte Davis*, 80 USPQ 448,
> 450 (Bd. App. 1948) ("consisting of" defined as "closing the
> claim to the inclusion of materials other than those recited except
> for impurities ordinarily associated therewith").

*Id*. at 15–16.

Patent Owner's argument overstates the effect of "consisting of," as
that term is used in claim 55. Claim 55's transitional phrase is actually
"comprising," which is open-ended. *See* claim 55 ("A method for collecting
information and providing data services comprising: . . . ."). Claim 55 uses
the phrase "consisting of" within the body of the claim, and specifically
within the "adaptively configuring a data translator" step. In that step, the
"data translator converts the output data stream into an information signal
consisting of a transmitter code and an information field." Petitioner argues
that, even though "consisting of" is an exclusionary term, it "'is not
absolute,' and it 'does not exclude additional components or steps that are

11

**Appx11**

IPR2017-00359
Patent 6,437,692 B1

unrelated to the invention.'" Reply 10 (quoting *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006); citing *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331–32, (Fed. Cir. 2004) (holding that a bone repair kit "consisting of" claimed chemicals was infringed by a bone repair kit including a spatula in addition to the claimed chemicals because the presence of the spatula was unrelated to the claimed invention)).

Indeed, during the hearing, counsel for Patent Owner agreed that "consisting of" did not exclude additional components from the entirety of the transmitted signal.

> JUDGE FITZPATRICK: -- you've taken the position that because of "consisting of" and the traditional interpretation of that phrase, the information signal limitation is not met by Cunningham, because Cunningham's signal has additional components to it. Here's my question: would an information signal having the message structure shown on figure 11 [of the '692 patent], would it read on the information signal of claim 55?
>
> DR. GONSALVES: Sure, because it's just -- claim 55 is restricting what could be in the data field, for example, and what could be in the command field. Now, in Cunningham, there are additional -- those synchronization flags and synchronization fields are in Cunningham and they're not in the 692 patent.

Tr. 31:6–17.

We construe the term "consisting of" within the claim language "data translator converts the output data stream into an information signal consisting of a transmitter code and an information field" as modifying "the information signal," which was converted from "the output data stream." It does not modify the "low-power RF signal" into which "the information signal" ultimately is converted, in the next step of the claimed method. Indeed, and as discussed below in Ground 3, the '692 patent states that the

12

IPR2017-00359
Patent 6,437,692 B1

"Message Structure" of a low-power RF signal contains more than a transmitter code and an information field.

## 2.    The Low-Power RF Signal Limitations

Several challenged claims recite "low-power radio frequency (RF) signal" or "low-power RF signal" limitations.  Patent Owner proposes construing these terms to mean "radio frequency signals having a limited transmission range."  PO Resp. 16, 42.  Patent Owner argues that the claim language supports its construction.  *Id.* at 16–17.  However, contrary to Patent Owner's assertion, the claim language upon which Patent Owner relies does not mention transmission range.  Rather, these claim limitations refer to power.  *Id.*  Patent Owner also argues that the specification supports its construction because the specification "explains that a low-power RF transmitter has a limited range, which is an advantage of the invention."  *Id.* at 17 (citing Ex. 1001, 5:48–57, 6:67–7:4).  Although the specification describes a relationship between power and transmission range, the specification does not equate these two distinct transmission properties.  The specification explains that in one embodiment transceivers preferably transmit relatively low power RF signal, and as a result the transmission range *may* be relatively limited.  Ex. 1001, 5:50–54.  The specification also describes stand alone transceivers may be dispersed so that only one transceiver will pick up a transmission from a given integrated transceiver "due *in part* to the low power transmission nature of each transmitter."  *Id.* at 6:67–7:4 (emphasis added).  Accordingly, the specification describes low power as a property that may impact transmission range, but the specification does not equate these properties.  Also, this disclosure supports

13

IPR2017-00359
Patent 6,437,692 B1

Petitioner's argument that a limited transmission range does not necessarily correlate with low power, but instead may depend on multiple factors beyond power, such as frequency, hardware design, and environment. Reply 16–17.

Moreover, we agree with Petitioner that such a construction is "non-specific, vague and unhelpful" in the context of the '692 patent. Reply. 16. Patent Owner's construction limits "low power" to signals having a "limited transmission range," but provides no guidance of what "limited" means, or what its boundaries might be. Petitioner argues correctly that Patent Owner's construction

> fails to address questions its proposed construction raises, such as, what a 'limited' transmission range means and how 'limited' the range must be (*i.e.*, what the range's distance should be), whether the transmission range depends on the particular system or application, and whether other factors should be considered in determining whether the transmission range is limited.

Reply 16.

For the reasons we discussed above, we reject Patent Owner's proposed construction.

Petitioner argues that the low power radio frequency[/RF] signal claim terms should be given their plain and ordinary meaning, or should be construed to encompass transmitters/transceivers that transmit low power signals. Reply 18–19. We agree with Petitioner. The evidence of record suggests a person of ordinary skill in the art would have understood what was meant by a low power RF signal. As we discussed above, the specification does not define the term low power RF signal, and does not expressly limit it. In addition, Cunningham explicitly discloses "low power, radio frequency transmissions." Accordingly, we determine that the low

14

**Appx14**

IPR2017-00359
Patent 6,437,692 B1

power radio frequency[/RF] signal claim terms should be given their plain and ordinary meaning, which is to say that they are construed to encompass transmitters/transceivers that transmit low power signals.

### B.    Asserted Prior Art

#### 1.    Mason

Mason was filed March 17, 1998, and issued August 8, 2000.  On the record presented, it is prior art to the challenged claims under 35 U.S.C. § 102(e).

Mason discloses an automatic meter-reading ("AMR") system that includes a plurality of utility meters 12 (for metering electricity, gas or water).  Ex. 1005, 5:32–34.  Each of the meters 12 can send or receive radio-frequency ("RF") communications from a node 18.  *Id*. at 5:35–41.  The meters 12 can also send or receive RF communications directly from another meter 12 by operating as a repeater.  *Id*. at 6:27–35.

Figure 1 of Mason is reproduced below.

15

IPR2017-00359
Patent 6,437,692 B1



FIG. 1

Figure 1 depicts an AMR system that includes a plurality of utility meters 12A, 12B, 12C, . . . 12D for measuring electricity, gas, or water. *Id.* at 5:33–35. Each meter has a corresponding CEBUS RF module for exchanging RF communications with node 18 and for communicating with a CEBUS local area network within the residence or business with which the meter is associated. *Id.* 5:36–41. Node 18 preferably includes a WAN interface, a digital controller, and a CEBUS RF module, and is coupled with AMR server 20. *Id.* 5:41–43, 6:28–29. TCP and IP protocols may be used for communications among AMR server 20 and multiple nodes 18. *Id.* at 6:3–7.

In the drawing, meter 12D differs from meters 12A–12C in that it is considered "inaccessible" with respect to responsible node 18. By operating another meter within the network as a repeater, such as meter 12C, such an inaccessible meter may be still contacted. *Id.* at 6:27–35.

16

IPR2017-00359
Patent 6,437,692 B1

2.    Cunningham

Cunningham was filed September 11, 1998, and issued September 26, 2000.  Ex. 1004, at [22], [45].  On the record presented, it is prior art to the challenged claims under 35 U.S.C. § 102(e).

Cunningham discloses a "wide-area remote telemetry system which monitors and controls remote devices by means of a information control system."  *Id*. at [57] (Abstract).  Figure 1 of Cunningham is reproduced below.



Figure 1 shows a block diagram of a wide-area remote telemetry system.  *Id*. at 6:6–8.  Multiple sensor interface modules 102 act as data gathering equipment.  *Id*. at 6:9–11.  The sensor interface modules attach to gas, electric and water meters, and other types of monitored equipment, and include an appropriate hardware sensor for the device being monitored and a transmitter for communicating sensor data to data collection modules using low-power radio-frequency transmissions.  *Id*. at 7:30–44.  Cunningham discloses that the sensor interface modules can be configured to

17

IPR2017-00359
Patent 6,437,692 B1

communicate with data collection modules 112 and 114 via hardwire or wireless transmission (*id*. at 6:12–14), but it is the wireless embodiment teaching that Petitioner asserts against the challenged claims. *See, e.g.* Pet. 81 (asserting the wireless embodiment teaching of Cunningham against independent claim 32).

The data collection modules transmit the information received from the sensor interface modules to network system 118, which "forwards the transmitted information over a network connection 120 to a host module 122 where the information is stored or processed." *Id*. at 7:19–24. "The stored or processed information may then be transmitted from the host module 122 through a host connection 124 to the customer interface 126." *Id*. at 7:24–27.

"If the data collection module is used in remote areas, access to network connections to the host may be few and far between." *Id*. at 33:16–18. "Thus, it may be necessary for the data collection module to receive information from both sensor interface modules and from other data collection modules and transmit this information towards a data collection module which is connected to the host module through a network system." *Id*. at 33:18–23. "When the data collection module is used in this manner it is also called a data repeater module." *Id*. at 33:24–25.

3.    McGowan

McGowan was published in 1995. Ex. 1005, 4. On the record presented, it is prior art to the challenged claims under 35 U.S.C. § 102(b).

McGowan is a book titled *Direct Digital Control: A Guide to Distribute Building Automation*. Ex. 1005. McGowan discloses what is

18

referred to as a closed-loop control system in which a sensing element
provides feedback information to a controller, which in turn processes that
information and sends appropriate signals for corrective actions. *Id.* at 103.
McGowan discloses digital-to-analog conversion when the device to be
controlled—for example, HVAC equipment—is analog. *Id.* at 104.
McGowan explains that when data that a digital controller receives from a
sensor is in analog form, an analog-to-digital converter is required. *Id.*
After the controller processes the converted data, a digital signal is
transmitted to a digital-to-analog converter so that the actuator can
understand the analog signal and perform the desired response. *Id.*

    C.      Ground 1:  Claims 1, 3–8, and 11–14 as Obvious over Mason and
Cunningham

       The Petition asserts that claims 1, 3–8, and 11–14 would have been
obvious over Mason and Cunningham.  Pet. 30.

       A claim is unpatentable as obvious:

> if the differences between the subject matter sought to be
> patented and the prior art are such that the subject matter as a
> whole would have been obvious at the time the invention was
> made to a person having ordinary skill in the art to which said
> subject matter pertains.

35 U.S.C. § 103(a).  "Obviousness is a question of law based on underlying
facts." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1167 (Fed.
Cir. 2015), *cert. denied*, 136 S. Ct. 270 (2015).  The underlying facts include
(i) the scope and content of the prior art, (ii) the differences between the
prior art and the claimed invention, (iii) the level of ordinary skill in the field
of the invention, and (iv) any relevant objective considerations of
nonobviousness that are presented. *Id.* (citing *Graham v. John Deere*, 383

U.S. 1, 17–18 (1966)).  An additional underlying fact is whether there was a reason to combine prior art teachings as asserted.  *Id.*

Claim 1 recites, and claims 3–8 and 11–14 incorporate by reference, "a plurality of relatively low-power radio-frequency (RF) transceivers . . . configured to transmit the select information, the transmitter identification information and transceiver identification information."  In mapping the prior art to these three recited pieces of information, Petitioner relies on Mason's teaching that a meter may act as a repeater for another meter that is not directly accessible to a node.  Pet. 40.  With respect to the first recited piece of information, Petitioner argues that "[t]he retransmitted message would include the 'select information' (e.g., C12.18 application layer response information)."  *Id.* (citing Ex. 1003, 6:23–35, 12:24–36, 13:14–15:20, 15:37–47).  With respect to the second recited piece of information, Petitioner argues that "[b]ecause a meter's responses 'always contain the meter's unique address,' the retransmitted message would also include the 'transmitter identification information'."  *Id.* (citing Ex. 1003, 11:11–13).  With respect to the third recited piece of information, Petitioner argues that "[w]hen the Source Address field is nonzero, the second meter acts as a repeater to transfer a message between the node and the end meter, with the Source Address field holding information used to identify the second meter."  *Id.* at 40–41 (citing Ex. 1003, 7:19–31, 10:28–34).  Petitioner contends that this information in the Source Address field corresponds to the "transceiver identification information."  *Id.* at 41.

The challenged claims also require a gateway configured to translate all three recited pieces of information and further transmit the translated pieces of information.  Specifically, claim 1 recites "at least one gateway

IPR2017-00359
Patent 6,437,692 B1

connected to the wide area network configured to receive and translate the

select information, the transmitter identification information, and transceiver

identification information, said gateway further configured to farther

transmit the translated information to the computer over the WAN."  In

addressing this limitation, Petitioner contends that node 18 shown in

Figure 1 of Mason "corresponds to the claimed 'gateway.'"  *Id.*  Petitioner

contends "node 18 receives messages from the meters 12, which when

received from a meter acting as a repeater . . . include the claimed 'select

information, the transmitter identification information, and transceiver

identification information.'"  Pet. 41.  With respect to the remainder of the

limitation, namely the requirement of translation and further transmission to

the computer over the WAN, Petitioner argues the following:

> The node 18 also communicates with the AMR server 20 (which
> corresponds to the claimed "computer") using the TCP/IP
> protocol, and communicates with meters 12 (which include the
> claimed transceivers) using the CEBUS RF protocol. [Ex. 1003,]
> 6:1–13, FIG. 3.  In view of this teaching, a [person of ordinary
> skill in the art] would understand that the node 18 must translate
> messages in the CEBUS RF protocol received from meters 12
> into TCP/IP protocol for transmission to AMR server 20 over the
> WAN.

*Id.*

This argument is conclusory and not supported by sufficient evidence.

Moreover, the stated conclusion is vague with respect to the limitation at

issue.  Petitioner argues that "the node 18 must translate *messages*" (*id.*

(emphasis added)), but does not explicitly argue that all three recited pieces

of information—"the select information, the transmitter identification

information, and transceiver identification information"—must be translated.

Even assuming Mason's node must translate all three recited pieces of

21

**Appx21**

IPR2017-00359
Patent 6,437,692 B1

information, Petitioner does not show that all such translated pieces of information must be further transmitted to the AMR server over the WAN. In particular, Petitioner does not show that transceiver identification information would have to be further transmitted.

Petitioner alternatively relies on Cunningham to teach this limitation. Pet. 42 ("To the extent the Board does not believe that Mason's node 18 performs a translation, Cunningham teaches this feature."). Petitioner argues as follows:

> Because information from a sensor interface module is in a format other than TCP/IP when first received by a data collection module, but later sent to the host module as a TCP/IP signal, a POSITA would understand that the data collection module translates the sensor interface module information into a TCP/IP signal. Moreover the data collection module has an Internet address and is connected to the Internet, which is a WAN.

Id. (citing Ex. 1004, 45:60–46:2, Fig. 49). Although Petitioner's Cunningham argument accounts for some translation, it fails to account for translation of all three pieces of information recited in the challenged claims. Furthermore, even assuming transceiver identification information is received and translated by Cunningham's data collection module, Petitioner has not shown that it is further transmitted to the host module. Id. at 42. Likewise, Petitioner has not shown that doing so would have been obvious to a person of ordinary skill in the art based on Mason and/or Cunningham. Id. at 42–43.

Petitioner does not show how the asserted prior art renders obvious a:

> system for remote data collection, assembly, and storage comprising . . . at least one gateway connected to the wide area network configured to receive and translate the select information, the transmitter identification information, and transceiver identification information, said gateway further

22

**Appx22**

IPR2017-00359
Patent 6,437,692 B1

> configured to farther transmit the translated information to the
> computer over the WAN.

Accordingly, Petitioner fails to persuade us, based on a preponderance of the evidence, that claims 1, 3–8, and 11–14 would have been obvious over Mason and Cunningham.

D.    Ground 2:  Claims 24–31, 42, 43, 46–49, 51–54, and 60–64 as
      Obvious over Cunningham, McGowan, and Mason

The Petition asserts that claims 24–31, 42, 43, 46–49, 51–54, and 60–64 would have been obvious over Cunningham, McGowan, and Mason. Pet. 50.

Independent claim 24 is a method claim and recites "sending the translated data to a computer, wherein the computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal; sending the control signal via the network to the gateway."  Independent claim 42 is a system claim and recites "a computer configured to execute at least one computer program that generates at least one control signal responsive to a system input signal; said computer integrated with a wide area network (WAN)."  Independent claims 49 and 60 are system and method claims, respectively, that include similar limitations directed to a computer on a WAN issuing a control signal in response to data originating from a sensor on the side of a gateway. Collectively, we refer to these limitations as the "control signal" limitations. The remainder of the claims challenged in this ground—claims 25–31, 43, 46–48, 51–54, and 60–64—depend from one of independent claims 24, 42, 49, and 60 and, thus, incorporate a control signal limitation. *See* 35 U.S.C. § 112 ¶4.

23

**Appx23**

IPR2017-00359
Patent 6,437,692 B1

To meet the control signal limitations of independent claims 24, 42, 49, and 60, Petitioner relies on Cunningham. Pet. 52. The relied-upon Cunningham excerpt provides as follows:

> Device adjustment modules are used to monitor and control the operation of various devices and applications according to varying utility prices and the device consumption information. An example of a device control module is a module to control a Johnson Control™ thermostat by attaching a device control module with a power system, processor with associated firmware, and a radio. The module monitors the energy usage by the air conditioning and heating systems controlled by the thermostat and can adjust the operation usage to stay below increased billing increment costs for energy supply and usage. A two-way sensor interface module would be utilized. The device adjustment module transmits information to the system and receives controlling information from system update transmissions.

Ex. 1004, 46:64–47:10. Petitioner argues that this excerpt teaches that "the host module that receives information from the data collection module responds with *controlling information*." Pet. 52 (emphasis added).

1. "Utility Prices"

In the Decision to Institute, we determined Cunningham's alleged "controlling information" does not correspond to the "control signal" as recited in the challenged claims. Inst. Dec. 17–18. Read in context, we determined Cunningham's use of the word "controlling information" refers back to "varying utility prices." *Id.* (comparing Ex. 1004, 46:64–67, with *id.* at 47:8–10. As discussed above, Petitioner did not proffer an express construction for any limitation.

In its supplemental briefing, Petitioner argues that "[u]nder the DI's interpretation of Cunningham, the utility prices to be varied are sent from the host module through the DCM to the DAM, which 'can adjust the operation

24

**Appx24**

usage to stay below increased billing increment costs for energy supply and usage.' Ex. 1004, 46:62-47:10." Supp. Br. 6.  Thus, according to Petitioner, "the DAM is sent a control signal to change the 'utility prices' that are used to 'adjust the operation usage'— e.g., turn the thermostat on and off as discussed in the Petition. Pet. 53-58." *Id.* at 6–7.  According to Petitioner, the plain and ordinary meaning of control signal should include any signal that controls something, such as, in this case a signal that sends updated prices that ultimately results in a thermostat being turned on or off.  *Id.* at 6.[6] Petitioner points to an example from the Specification to support its construction, i.e. the '692 describes control signals that communicate "temperature set points" or "the climate control mode" that are used to adjust the operation usage of the thermostat:

> The addition of actuator 380 to the assembly permits data interface 321 to apply control signals to the manual temperature control for the temperature set point, the climate control mode switch, and the system on/off switch. In this way, a remote workstation 250 or laptop 240 with WAN access (see FIG. 2) could control a home heating system from a remote location.

Supp. Br. 7 (quoting Ex. 1001, 10:5–11).  The difference between this example and the disclosure they rely on in Cunningham is that the signals

---

[6] As will be explained below, this reference to plain meaning does not account for all the language in the claim.  Additionally, Petitioner does not "construe" the claim but rather reorders the words in the claim so no additional claim construction is necessary and as noted in the claim construction section of this decision we do not construe this claim term beyond the explicit language of the claim.  For example, Petitioner's counsel testified "control signal, we do think it just has a plain, ordinary meaning. It's a signal that has some type of control information. It relates somehow to control, and it needs no further construction than that, it's just what the terms already say."  Supp. Tr. 10:25–11:4.

25

IPR2017-00359
Patent 6,437,692 B1

sent in the '692 patent are used to control specific functions of the device

such as temperature settings, and switches on the device.

At the supplemental hearing counsel for Petitioner admitted that such

functions occur in the device to be controlled:

> JUDGE MOORE: . . . So I'm trying to figure out where you're
> saying that that list implies that there needs to be some further
> translation or further calculation of those modes -- or of those
> signals.
>
> MR. DAVIS: Yes. And thank you for the question. I think each
> of those illustrates how further processing would be needed. For
> example, if you have a temperature set point, you constantly need
> to do processing to see if you've surpassed that or not, just like –
>
> JUDGE MOORE: And wouldn't that processing be on the
> device, not in the DAM?
>
> MR. DAVIS: Correct. . . .

Supp. Tr. 39:2–13. Thus, an actuator signal could be sent to the

device to change the "temperature set point." Counsel for Petitioner

went on to argue that the fact that some processing occurs on the

device to be controlled means that "temperature set point" does not

directly control the device and is more analogous to "utility prices."

Tr. 39:25–40:12. For example, setting the temperature set point may

result in the HVAC being turned off at some point when the

temperature reaches the right level. Petitioner suggests that under our

narrow reading of control signal a signal to turn on/off the device

would be the only control signal that meets the limitation in the claims

that needs to be sent to the actuator. *Id.* We disagree. Setting the

"temperature set point" is itself a function that can be actuated by the

"temperature set point" signal. Thus, we find that each of the

26

IPR2017-00359
Patent 6,437,692 B1

examples in the specification, including "temperature set point"
involve directly controlling a device rather than information that is
processed outside of the device to determine whether to send control
signals to the device.

   "Utility prices" are at best tangentially related to controlling the
device because some calculation must be done on those prices outside of the
HVAC device to determine whether a change to a device setting should be
made.  Ex. 1004, 46:62-47:10.  While "utility prices" may be information
related to controlling the device or even used in determining whether to
control the device they do not cause a controlling action to be done to the
device.  *See id.*

   Patent Owner asserts "it is beyond belief that a utility price could be
translated into an analog signal and applied to an actuator."  Supp. Resp. 9.
Despite the hyperbolic framing of the issue, Patent Owner properly focuses
on the language of the claim, i.e. the control signal must be capable of being
"translated" into an analog signal.  Patent Owner argues further that
"Petitioner conflates mere data that may be referenced to determine how to
control an actuator as taught by Cunningham with a control signal that is
translated into an analog signal to control an actuator, as claimed by the '692
patent." *Id.*

   We agree that Petitioner has not shown that "utility prices" is
controlling information because it is not of a character that controls the
operation of a device such as a thermostat.  Additionally, Petitioner has not

27

IPR2017-00359
Patent 6,437,692 B1

explained how "utility prices" can be "translated[7]" "from a network transfer protocol into a RF control signal" and then "an RF control signal into an analog signal" that can be applied ultimately to an actuator. We find that this could not be done because a "utility price" does not indicate any action to be taken by the actuator.

2. U.S. Prov. App. No. 60/058,978 ("the '978 provisional")

Petitioner asserts "the DI does not address Petitioner's arguments concerning the disclosures in Cunningham's provisional that are incorporated by reference into Cunningham and, with respect to Cunningham's other disclosures." Supp. Br. 2. We address the '978 provisional below.

As background it is important to understand that, in Cunningham, the host module—which is on the network (Ex. 1001, 7:21–24)—generates transmissions updating the price of the utility being consumed (e.g., electricity). Ex. 1001, 46:64–47:10. The device adjustment module—which is not on the network but rather on the other side of the asserted gateway (*id*. at 46:67–47:3 (describing "attaching a device control module" to a thermostat)—uses the price information, along with locally-obtained energy usage information, to generate control signals. *Id*. at 46:64–67 ("Device adjustment modules [DAMs] are used to monitor *and control* the operation of various devices and applications according to varying utility prices and

---

[7] Petitioner does not argue that determining whether the received utility prices should result in some action being performed by an actuator is "translation." Although there is no dispute regarding the meaning of "translation" and we do not need to construe that term, the parties have properly focused on translating as converting a signal from one format to another.

IPR2017-00359
Patent 6,437,692 B1

the device consumption information.") (emphasis added).  Thus, Cunningham does not meet the limitation to "computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal" and "sending the control signal via the network to the gateway" because the control signal from the DAM is sent on same side of the network as the device to be controlled and not "via the network to the gateway."

Thus, it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham.  With that background, in the Petition, after discussing how Cunningham meets the limitation to "computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal," Petitioner states:

> Further evidence of this operation exists in U.S. Provisional Application No. 60/058,978 ("the '978 application"), to which Cunningham claims priority, and which is incorporated by reference[8] into Cunningham. Cunningham at 1:5-11.  For example, the '978 application discloses the use of Energy Management Services to control HVAC and lighting based on defined cost parameters and energy usage across the entire systems. Ex1010 at 5. The Energy Management Services are run by a processing center called the Williams Network Control Center (which corresponds to the claimed "computer"). *Id*. at 6. See Kinney, ¶¶61-63.

---

[8] Patent Owner does not contest that the relied upon disclosure is not incorporated by reference.  Additionally, because we determine that Petitioner has not shown a limitation of the independent claims challenged in Ground 2, we do not need to determine whether the '978 Provisional is properly incorporated by reference into Cunningham based on existing precedent.

29

IPR2017-00359
Patent 6,437,692 B1

Pet. 52–53; *see also* Supp. Reply 3 (restating this contention from the Petition). Thus, Petitioner asserts the "Williams Network Control Center" is the "computer" from the claim and "Energy Management Services" is used to control[s] HVAC and lighting. Also, in describing how the limitation to "computer configured to execute a multiplicity of computer programs, each computer program executed to generate at least one control signal in response to at least one application system input" recited in claim 49 is met, Petitioner states "The '978 application describes Energy Management Services as '*Routines* to reduce the amount of energy used by monitoring and controlling HVAC and lighting usage at customer locations.' (emphasis added). Ex1010 at 6." Pet. 69–70. Petitioner's declarant testifies nearly word for word the same contentions quoted above. Ex. 1003 ¶¶48, 63, 86, 99.

Notably, Petitioner says these contentions are "further evidence" but does not explain how this evidence is to be used to buttress Cunningham's disclosure or how it is to be combined with Cunningham's disclosure. Specifically, given the limited contentions in the Petition detailed above, Petitioner does not explain how Energy Management Services or the "routines" described in the Provisional send control signals from the computer to the actuator as required by the claims. For example, even if we to accept that the "Williams Network Control Center" creates control signals as required by the claim Petitioner has not explained how those signals are translated from network transfer protocol to RF signals and then translated to an analog signal that can be used at an actuator.

Even though the '978 Provisional is allegedly incorporated by reference, an obviousness determination still requires--"[w]hether a

30

**Appx30**

IPR2017-00359
Patent 6,437,692 B1

[obviousness challenge] is based on combining disclosures from multiple references, *combining multiple embodiments from a single reference*, or selecting from large lists of elements in a single reference[--] a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination." *In re Stepan Co.*, 868 F.3d 1342, 1346 n. 1 (Fed. Cir. 2017); *c.f. Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) (finding obviousness shown despite fact that "all of the limitations are found in two separate embodiments pictured side by side in the patent, not in one embodiment" because the party showed motivation to combine and reasonable likelihood of success).  Additionally, "there must be evidence presented on the obviousness of the claim as a whole." *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1337 (Fed. Cir. 2015) (citing *KSR*, 550 U.S. at 420, 127 S.Ct. 1727); *see also Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1352 (Fed. Cir. 2018) ("The determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim").

Here, the "routines" described in the '978 Provisional work differently than the "utility prices" embodiment of Cunningham.  Petitioner has not explained how those would work together to meet the claim limitations.

In its supplemental briefing, Petitioner asserts:

[T]he '978 does not limit its description of the 'control' signals to varying utility prices: the 'Energy Management Services' supported by the NCC are used to 'control HVAC and lighting based on defined cost parameters and energy usage across the entire system.' Ex. 1010, 5-6. The NCC/host module thus sends control signals based on energy usage across the entire system— i.e., based on system-wide information that the NCC/host

IPR2017-00359
Patent 6,437,692 B1

> module, not the ECM/DAM at an individual customer location,
> has.  Even if the ECM/DAM in Cunningham has additional
> control capabilities, this does not preclude the NCC/host module
> from also sending control signals, nor does it limit Cunningham's
> disclosure of sending "controlling information" to sending
> changes to the "utility prices."

Supp Br. 5–6.  In other words, Petitioner asserts two alternatives: 1) that the "control signals" generated and sent in the '978 Provisional are sent "also," or in addition, to "utility prices;" or 2) that Cunningham could send "controlling information" other than "utility prices," presumably some control information associated with the "routines" disclosed in the Provisional.

In the first alternative, Petitioner is not combining the "utility prices" with the alleged control signals in the '978 Provisional.  In that case, Petitioner has not explained, in the Petition, how the Provisional's alleged control signals would meet the other limitations of the claim. [9]  In the second alternative, Petitioner has not accounted for the fact that the "routines" allegedly send control signals from the network that can directly control a device such as an HVAC, but, as noted above, in Cunningham, the device adjustment module [DAM]—which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with

---

[9] In its supplemental briefing and in the supplemental hearing, counsel for Petitioner purports to explain how the structures of the '978 Provisional and Cunningham are related and how the Provisional meets each limitation of the claim.  Supp. Br. 3–5; Supp. Tr. 8:1–9:7.  However, this description is not found in the Petition and we cannot rely on such substantive contentions as to how the provisional would meet claim limitations from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition.

32

IPR2017-00359
Patent 6,437,692 B1

locally-obtained energy usage information, to generate control signals. Thus, Petitioner has not explained why or how the DAM would use the alleged control signals from the "routines" rather than its own generated control signals.

In sum, Petitioner does not show how the asserted prior art renders obvious the claimed methods and systems including the control signal limitations. Accordingly, Petitioner fails to persuade us, based on a preponderance of the evidence, that claims 24–31, 42, 43, 46–49, 51–54, and 60–64 would have been obvious over Cunningham, McGowan, and Mason.

E.    Ground 3:  Claims 32, 34, 36–38, 55–57, and 59 as Anticipated by, or Obvious over, Cunningham

The Petition asserts that claims 32, 34, 36–38, 55–57, and 59 "are anticipated by or rendered obvious over Cunningham." Pet. 80.

Anticipation requires that "each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).[10]

1.    Independent Claim 32

Independent claim 32 is directed to a system for monitoring remote devices. Claim 32 recites "at least one sensor adapted to generate an electrical signal in response to a physical condition." To meet this limitation, Petitioner points to Cunningham's sensor interface modules.

---

[10] The law with respect to obviousness is discussed above.

33

IPR2017-00359
Patent 6,437,692 B1

Pet. 80–81 (citing various excerpts of Ex. 1004)).  In one of the excerpts
cited by Petitioner, Cunningham states:

> The sensor interface modules 102 are intelligent communications
> devices which attach to gas, electric and water meters and other
> types of monitored equipment.  The basic sensor interface
> modules 102 may be adapted to any number of systems to be
> monitored, including but not limited to:  electrical systems, gas
> systems, water systems, security systems, temperature control
> systems, vending machines, and remotely monitored devices of
> any sort.  The sensor interface modules 102 include an
> appropriate hardware sensor for the device being monitored; a
> computerized monitoring system with associated firmware;
> battery power supply and/or a converter for external power; and
> a transmitter.

Ex. 1004, 7:30–44 (cited at Pet. 80).

Patent Owner does not contest that Cunningham discloses "at least
one sensor adapted to generate an electrical signal in response to a physical
condition."  *See* PO Resp. 22–29, 41–46.

We are persuaded that Cunningham discloses this limitation.

Claim 32 also recites "at least one wireless transmitter configured to
encode the electrical signal, the wireless transmitter further configured to
transmit the encoded electrical signal and transmitter identification
information in a low-power radio-frequency (RF) signal."  To meet this
limitation, Petitioner cites to Cunningham's disclosure at, among other
places, columns 6 and 13.  Pet 81 (citing Ex. 6:11–18, 13:29–35, 14:12–31,
29:64–31:2).  There, Cunningham discloses the following:

> The sensor interface module 102 receives information from
> external hardware sensors attached to the device or devices being
> monitored.  This information is interpreted by the module's
> processing system which processes the information *and then
> transmits the processed information to a data collection module*.

34

IPR2017-00359
Patent 6,437,692 B1

> . . .
>
> Sensor interface modules 102 communicate with data collection modules 110 through a hardwire or wireless transmission 108. Standard wire connection may be utilized for the hardwire or *wireless transmission* 108, or various types of known, *low-power, radio-frequency transmissions* may be utilized.

Ex. 1004, 13:29–35, 6:11–16 (emphasis added); *see also id.* at 14:12–31, 29:64–31:2; Ex. 1002 ¶36.

Patent Owner does not contest that Cunningham's sensor interface modules include wireless transmitters but it does contest that those transmitters are configured to transmit "in a low-power radio-frequency (RF) signal," as recited in claim 32. PO Resp. 41–46. That argument, however, is premised on Patent Owner's proposed construction that conflates RF transmission *power* with RF transmission *range*. *Id.* at 42. As discussed above, however, Patent Owner's construction is erroneous. Further, Cunningham explicitly discloses that "various types of known, low-power, radio-frequency transmissions may be utilized." Ex. 1004, 6:13–17. In addition, Petitioner points out that the FCC reference upon which Patent Owner relies specifies that FCC regulations limit low power 902–928 MHz transmitters to a maximum power output power of 1 Watt (Ex. 1047, 7, 9, 18 and Ex. 1004), and Cunningham teaches that its transmitter is limited to only 100 mW (Ex. 1004, 18:58–62)—i.e., one tenth the power of what the FCC considers to be low power. Reply 19–20. We find this to be persuasive evidence that the radio frequency transmissions in Cunningham are low power.

We are persuaded that Cunningham discloses "at least one wireless transmitter configured to encode the electrical signal, the wireless transmitter further configured to transmit the encoded electrical signal and

35

IPR2017-00359
Patent 6,437,692 B1

transmitter identification information in a low-power radio-frequency (RF) signal."

Claim 32 also recites "at least one gateway connected a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." To meet this limitation, Petitioner relies on Cunningham's data collection module. Pet. 82 (Ex. 1004, 7:19–27, 13:29–35, 14:12–61, 29:63–30:65, 32:27–34, 45:54–67, Fig. 49; Ex. 1002 ¶137). Petitioner correctly points out that the data collection module receives information from sensor interface modules and sends it to a host module over the Internet, which it must do in the form of a TCP/IP signal. Pet. 82 (citing Ex. 1004 at, for example, 7:19–21 ("The data collection modules 110 transmit the information received from the sensor interface modules 102 over a data module connection 116 to a network system 118."), 29:63–30:65 (similar disclosure), 45:60–67 ("In the preferred embodiment, the data collection module will be assigned an Internet address and communicate through a modem as is well known in the prior art. The host module will be assigned an address for transmitting and receiving the data collection module signals. The data collection module will send and receiving [sic] information to and from the host module as an Internet protocol (TCP/IP) Signal.").

Patent Owner argues that the asserted gateway (Cunningham's data collection module) does not receive a "low-power radio-frequency (RF) signal" from the asserted transmitter (a part of Cunningham's sensory interface module) and translate *it*, i.e., the actual low-power radio frequency

36

IPR2017-00359
Patent 6,437,692 B1

(RF) signal that was received.  Relying on its declarant, Patent Owner

explains as follows:

> Cunningham's data collection module does not perform any
> express translation/protocol conversion of a signal that it
> receives from a sensor interface module into TCP/IP format.
> None of the signals received from sensor interface module by a
> data collection module is directly forwarded/routed in whole,
> crossing a network boundary from the sensor interface module
> format to the host module over WAN.  Thus, there is no direct
> mapping of network address and protocols between the two
> distinct networks.

PO Resp. 25 (quoting Ex. 2012 ¶118).  Patent Owner further explains that

Cunningham's "data collection module decodes information from sensor

interface modules, processes and accumulates this information over a period

of time and then puts the processed/accumulated information in a packet to

be transmitted to a host module."  PO Resp. 25.

Patent Owner's argument is inapposite, as it is premised on reading a

limitation into the claims, namely that the information encoded in the RF

signal must be translated in real time.  Further, we agree with Petitioner, that

even under such an erroneously narrow construction, Cunningham would

meet the limitation.  In that regard, Petitioner argues that, "although

Cunningham discloses sending cumulative data readings, individual signals

from the sensor are identified by the gateway and this information is then

transmitted (with transmitter identification information) to a computer on the

WAN."  Reply 6 (citing Ex. 1046 ¶¶31–32; Ex. 1004, 31:6–28).  Petitioner

argues, and we are persuaded, that "Cunningham explains that the 'most

current cumulative reading' is the current absolute 'reading' (i.e.,

information signal) from the sensor (Ex. 1004, 13:44–46) and that two

cumulative readings can be used to 'interpolate' and 'recover' a missed

IPR2017-00359
Patent 6,437,692 B1

reading (i.e., a signal from the sensor)." Reply 7 (citing Ex. 1004, 13:44–56; 31:6–27; Pet. 75; Ex. 1002 ¶¶115, 152; Ex. 1046 ¶32).

We are persuaded that Cunningham discloses this limitation.

Lastly, claim 32 also recites "a computer configured to execute at least one computer program that formats and stores select information responsive to the electrical signal for retrieval upon demand from a remotely located device." To meet this limitation, Petitioner accurately points out that "Cunningham discloses that[,] in response to receiving information from the sensor interface module through the data collection modules, the host module compiles the information into a user specified readable format and stores it for later retrieval upon demand from a customer computer or workstation." Pet. 83 (citing Ex. 1004, 7:19–27, 44:12–41, 44:53–64, 46:44–61, 47:44–54, Ex. 1002 ¶¶138–140).

Patent Owner does not contest that Cunningham discloses "a computer configured to execute at least one computer program that formats and stores select information responsive to the electrical signal for retrieval upon demand from a remotely located device." *See* PO Resp. 22–29, 41–46.

We are persuaded that Cunningham discloses this limitation.

For the forgoing reasons, Petitioner has shown by a preponderance of the evidence that claim 32 is anticipated by or rendered obvious by Cunningham.

2.      Dependent Claim 34

Claim 34 depends from claim 32 and additionally recites "wherein each wireless transmitter is configured to transmit a relatively low-power radio-frequency (RF) signal." To the extent this is a further limitation (*see*

38

IPR2017-00359
Patent 6,437,692 B1

claim 32 and 35 U.S.C. § 112 ¶4), Cunningham discloses it and Patent
Owner does not contest that it does.  Pet. 84 (citing Ex. 1004, 6:11–18, Ex.
1002 ¶¶141)

Petitioner has shown by a preponderance of the evidence that claim 34
is anticipated by or rendered obvious by Cunningham.

### 3.    Dependent Claim 36

Claim 36 depends from claim 32 and additionally recites "wherein the
gateway translates [1] the encoded electrical signal, [2] the transmitter
identification, and [3] the transceiver identification information into TCP/IP
for communication over the WAN."  Independent claim 32 introduces the
term "transmitter identification information," and claim 36's reference to
"the transmitter identification" likely refers back to it.  However, as
Petitioner notes, there is no antecedent basis in claim 32 for claim 36's
recitation of "the transceiver identification information."  Pet. 84.  The lack
of antecedent basis is an issue arising under 35 U.S.C. § 112, and Section
112 is not proper subject matter for an *inter partes* review.  *See* 35 U.S.C.
§ 311(b).  Neither party has addressed any resulting issues under 35 U.S.C.
§ 112 beyond pointing out the issue.

Nevertheless, when we construe "transceiver identification
information" consistently with how that term is used in claim 1,[11] we are not
persuaded that Petitioner has shown sufficiently that Cunningham meets this

---

[11] Claim 1 recites "a plurality of relatively low-power radio-frequency (RF)
transceivers . . . configured to transmit the select information, the transmitter
identification information and transceiver identification information."

39

IPR2017-00359
Patent 6,437,692 B1

limitation. Petitioner relies on Cunningham to teach this limitation. Pet. 84.

Petitioner argues as follows:

> Cunningham discloses that a data collection module (which corresponds to the claim "gateway") translates the encoded electrical signal and the transmitter identification into TCP/IP for communication over the WAN as detailed in the analysis for claim element [32d].

*Id.* As explained above in the analysis of claim 1, although Petitioner's Cunningham argument accounts for some translation, it fails to account for translation of all three pieces of information recited in claim 36. *See supra* Section II.C. Petitioner also relies on Mason as teaching identification information for a transceiver, but refers back to its contention regarding claim 1 ("Mason teaches this feature as detailed in the analysis for claim element [1e]"). Pet. 84. As explained above in the analysis of claim 1, we are not persuaded by this contention.

Petitioner has not shown by a preponderance of the evidence that claim 36 is anticipated by or rendered obvious by Cunningham.

### 4.    Dependent Claim 37

Claim 37 depends from claim 32 and additionally recites "wherein the WAN is the Internet." To meet this limitation, Petitioner points out that "the network used by data collection modules and the host module to communicate with each other is the Internet." Pet. 62 (citing Ex. 45:60–46:5, Fig. 49; Ex. 1002 ¶ 81), 85. Patent Owner does not contest that Cunningham discloses this limitation.

Petitioner has shown by a preponderance of the evidence that claim 37 is anticipated by or rendered obvious by Cunningham.

IPR2017-00359
Patent 6,437,692 B1

5.    Dependent Claim 38

Claim 38 depends from claim 32 and additionally recites "wherein the WAN is a dedicated Intranet."  To meet this limitation, Petitioner points out that "one of the provisional applications to which Cunningham claims priority, and which is incorporated by reference into Cunningham, discloses that its energy management operations are accessible over the Williams private frame relay network."  Pet. 62 (citing Ex. 1010, 4; Ex. 1002 ¶82). Patent Owner does not contest that the relied upon disclosure is not incorporated by reference or otherwise contest that Cunningham discloses this limitation.

Petitioner has shown by a preponderance of the evidence that claim 38 is anticipated by or rendered obvious by Cunningham.

6.    Independent Claim 55

Independent claim 55 is directed to "[a] method for collecting information and providing data services."  Claim 55 recites "adaptively configuring a data translator at the output of a local controller, wherein the data translator converts the output data stream into an information signal consisting of a transmitter code and an information field."  To meet this limitation, Petitioner points to Cunningham's sensor interface module, and specifically its micro-controller.  Pet. 85–87.  As argued by Petitioner, Cunningham's sensor interface module includes a micro-controller (1402) that is configured to receive input data from an external hardware sensor (204).  *Id.* at 85 (citing Ex. 1004, 12:60–13:3, Fig. 20).  And, as further argued by Petitioner, the micro-controller converts the data received from the sensor into an information signal that includes information identifying

41

IPR2017-00359
Patent 6,437,692 B1

the sensor interface module and encoding the sensed data. *Id.* at 86 (citing

Ex. 1004, 6:11–18, 13:29–35, 14:12–31, 29:64–31:2, Fig. 21). Cunningham

further discloses that its sensory interface modules are adaptable to existing

local controllers, stating:

> The sensor interface module may be designed to include meter
> interface connectors for all of the major residential and
> commercial gas meters. These connectors may be molded
> directly into the sensor interface main body casing, or may be
> accomplished through adapters or various types of sensor
> interface harnesses. These adaptions allow the sensor interface
> modules to be installed on new or existing meters and allow
> monitoring of the entire system or area being monitored
> regardless of the age of the device being monitored.

Ex. 1004, 10:10–19 (quoted at Pet. 85–86).

Patent Owner argues that Cunningham does not disclose this

limitation because, although the asserted data translator (Cunningham's

micro-controller) converts the output data stream into an information signal

that includes a transmitter code and an information field, the asserted low-

power RF signal converted from that information signal includes additional

data. PO Resp. 30–33. Patent Owner directs us to a diagram of the asserted

low-power RF signal, illustrated in Figure 21 of Cunningham and

reproduced below. *Id.* at 30.



FIG. 21

Figure 21, reproduced above, "illustrates the elements of a sensor interface

module transmission to a data collection module." Ex. 1004, 27–28. Patent

Owner argues that, because this transmission includes "Synch Flags", "Sync

42

IPR2017-00359
Patent 6,437,692 B1

Byte", "Counter" and "CRC" fields, it is not an "information signal
*consisting of* a transmitter code and an information field."  PO Resp. 30–31
(emphasis added).

We are not persuaded by Patent Owner's argument.  Per claim 55,
what is "convert[ed] . . . into an information signal consisting of a
transmitter code and an information field" is "the output data stream."  In
our judgment, Cunningham meets this limitation even though it teaches a
"transmission" (*see* Ex. 1004, 27–28, Fig. 21) that includes additional fields
not derived from the output data stream, such as "Synch Flags," "Sync
Byte," "Counter," and "CRC" fields.  This is so, first, because those
additional fields are not excluded from claim 55 generally.  Rather, they are
excluded only from the "information signal" that is converted from "the
output data stream."

Cunningham's "transmission" is consistent entirely with the '692
patent's disclosure.  The '692 patent does not describe a transmission
containing only "a transmitter code and an information field."  In that
regard, the '692 patent states:

> FIG. 11 . . . describes the data structure of messages sent and
> received using the invention.   In this regard, the standard
> message consists of: to address; from address; packet number;
> maximum packet number, packet length; command; data; packet
> check sum (high byte); and packet check sum (low byte).

Ex. 1001, 15:10–16.  Figure 11 of the '692 patent is reproduced below.

43

**FIG. 11**     Message Structure



Figure 11 of the '692 patent, above, illustrates a "Message Structure" having nine fields. *See also* Ex. 1001, 4:61–62 ("FIG. 11 is a table illustrating the message protocol of the present invention.").

We are persuaded that Cunningham discloses "adaptively configuring a data translator at the output of a local controller, wherein the data translator converts the output data stream into an information signal consisting of a transmitter code and an information field."

Claim 55 also recites "adaptively configuring at least one transmitter with the data translator, wherein the transmitter converts the information

44

**Appx44**

IPR2017-00359
Patent 6,437,692 B1

signal into a low-power RF signal." To meet this limitation, Petitioner

directs us to, among other things, the following disclosure from

Cunningham:

> Sensor interface modules 102 communicate with data collection
> modules 110 through a hardwire or wireless transmission 108.
> Standard wire connection may be utilized for the hardwire or
> wireless transmission 108, or various types of known, *low-
> power, radio-frequency transmissions may be utilized*. The
> preferred embodiment communicates by using a frequency-
> hopping spread-spectrum transmission in an unlicensed range,
> such as 902-928 Mhz.

Ex. 1004, 6:11–18 (cited at Pet. 87).

Patent Owner contests whether Cunningham discloses the "low-

power" aspect of this limitation. PO Resp. 41–46. As discussed above, with

respect to claim 32, that argument is premised on an erroneous construction

that conflates RF transmission power with RF transmission range. *Id.* at 42.

We are persuaded that Cunningham discloses this limitation.

Claim 55 also recites "placing a plurality of relatively low-power

radio-frequency (RF) transceivers dispersed geographically wherein the low-

power RF signal is received and repeated as required to communicate the

information signal to a gateway, the gateway providing access to a WAN."

To meet this limitation, Petitioner directs us to the multiple data collection

modules. Pet. 88 (citing Ex. 1004, 20:4–10, 31:6–23, Fig. 30, Fig. 49.). As

argued by Petitioner, Cunningham explicitly discloses the use of data

collection modules with signal repeating capabilities for use in remote areas.

Ex. 1004, 33:15–44 (cited at Pet. 88). "When the data collection module is

used in this manner it is also called a data repeater module." *Id.* at 33:24–

25.

45

IPR2017-00359
Patent 6,437,692 B1

Patent Owner responds that Cunningham does not meet this limitation because it does not disclose the "low power" aspect of it.  *See* PO Resp. 41–46.  We disagree, as discussed above.

We are persuaded that Cunningham discloses this limitation.

Claim 55 also recites "translating the low-power RF signal within the gateway into a WAN compatible data transfer protocol."  To meet this limitation, Petitioner relies on Cunningham's data collection module. Pet. 42, 89.  Petitioner correctly points out that the data collection module receives information from sensor interface modules and sends it to a host module over the Internet (a WAN), which it must do by translating the information into the form of a TCP/IP signal.  Pet. 42 (citing Ex. 1004 at, for example, 7:19–21 ("The data collection modules 110 transmit the information received from the sensor interface modules 102 over a data module connection 116 to a network system 118."), 29:63–30:65 (similar disclosure), 45:60–67 ("In the preferred embodiment, the data collection module will be assigned an Internet address and communicate through a modem as is well known in the prior art.  The host module will be assigned an address for transmitting and receiving the data collection module signals. The data collection module will send and receiving [sic] information to and from the host module as an Internet protocol (TCP/IP) Signal.").

Patent Owner responds that Cunningham does not disclose this limitation because the RF signal that Cunningham's data collection module translates was not converted from an information signal containing only a transmitter code and an information field.  We have already rejected that claim construction argument above.  Accordingly, we are likewise not persuaded of Patent Owner's application of such a construction here.

46

IPR2017-00359
Patent 6,437,692 B1

We are persuaded that Cunningham discloses "translating the low-power RF signal within the gateway into a WAN compatible data transfer protocol."

Lastly, claim 55 also recites "transferring the translated low-power RF signal via the WAN to a computer wherein the computer is configured to manipulate and store data provided in said signal; and granting client access to the computer."  To meet these limitations, Petitioner relies on Cunningham's disclosure that a host module receives data from a plurality of data collection modules, uses software to compile the information into a user-specified readable format, and makes the information available to users on a computer.  Pet. 32 (citing Ex. 1004, 7:19–27, 44:12–64, 45:60–46:5, 46:44–61, 47:44–54, Figs. 21, 49), 89.

Patent Owner does not contest that Cunningham discloses these limitations.  We are persuaded by the cited evidence that Cunningham discloses these limitations.

Apart from addressing specific limitations, Patent Owner argues that Cunningham does not disclose claim 55 because it allegedly does not disclose Patent Owner's global characterization of the claim as requiring "a data stream to pass 1) from a local controller, 2) through a transmitter, 3) through low-power RF transceivers, 4) through a gateway, 5) through a WAN to 5) [sic, 6)] a computer on the WAN."  PO Resp. 37.  Patent Owner further states:  "In particular, [in Cunningham] 'the RF signal that is alleged to be translated into a WAN compatible data transfer protocol by the data collection module by Petitioner (Petition, p. 88) is not the translated data stream from the sensor interface module.'"  *Id*. at 38–39 (quoting Ex. 1002 ¶135).  During the hearing, it became apparent that Patent Owner was

47

IPR2017-00359
Patent 6,437,692 B1

attempting to read a limitation into claim 55 that would require that the

transitory "output data stream" itself propagate all the way through the steps

of the claimed method to the "computer" recited at the end of the claim.  For

example, counsel for Patent Owner stated:

> The difference between this type of communication [in Cunningham] where it changes drastically is like the difference between night and day when it's compared to what's recited in claim 55 where it talks about, as I said when I opened, that there is a low-power RF signal, there is an information signal, and that *these signals remain the same as they propagate from its origination point* through the plurality of low-power radio frequency transceivers that are dispersed geographically.

Tr. 20:7–14 (emphasis added)

> So the point I'm trying to make is that you see the communication from the SIM [sensory interface module] to the DCM [data collection module], that uses one type of protocol, and then the communication from a DCM 112 to, for example, the DCM that's to the right of that before it gets to the gateway, that uses an entirely different protocol.  It doesn't pass the – what's referred to as the low-power RF signal through the network, it receives the low-power RF signal from the SIM and then it starts over with a completely different protocol, a completely different format called the RWB.  *There's no propagation of the low-power RF signal.  It receives it, ditches it, and then starts over*.

*Id*. at 22:5–13 (emphasis added).

> Petitioner's expert, Mr. Kinney, testified [on cross-examination] that "[] an RF signal from the SIM is temporal, it exists.  When it exists after it exists, so to speak, later, it doesn't; the RF signal doesn't exist anymore.  It was received, demodulated and decoded by the receiver, so the RF signal -- the information off the RF signal is stored by the data collection module."

*Id*. at 28:12–17.

48

IPR2017-00359
Patent 6,437,692 B1

> Oh, it's a completely different signal. It has no resemblance at
> all to the signal that it receives from the SIM. When it leaves the
> DCM, it's a completely different signal. It's not any -- it's the
> signal it has received goes away, it creates a completely different
> one using the WRB [wireless radio backbone]; it's a completely
> different protocol. And this is in contrast with the explicit
> language of *claim 55, which recites the low-power RF signal
> propagating through the network from the time it's converted
> from the output stream . . . to the time it gets to the gateway*.

*Id*. at 24:19–26 (emphasis added).

We are not persuaded by Patent Owner's attempt to distinguish
Cunningham from claim 55. First, there is no language in claim 55 to
support Patent Owner's construction that the same low-power RF signal
must propagate all the way from the data translator to the gateway. In fact,
the claim explicitly requires otherwise because, in one step, it requires that
"the low-power RF signal is received and repeated." During oral argument,
counsel for Patent Owner conceded that when a transceiver repeats an RF
signal, it creates a new RF signal; although the new RF signal may be
identical to the received RF signal, it is a new signal. *See* Tr. 29:22–30:6.

For the forgoing reasons, Petitioner has shown by a preponderance of
the evidence that claim 55 is anticipated by or rendered obvious by
Cunningham.

### 7. Dependent Claim 56

Claim 56 depends from claim 55 and additionally recites "wherein the
WAN is the Internet." To meet this limitation, Petitioner points out that "the
network used by data collection modules and the host module to
communicate with each other is the Internet." Pet. 62 (citing Ex. 45:60–

49

IPR2017-00359
Patent 6,437,692 B1

46:5, Fig. 49; Ex. 1002 ¶81), 89.  Patent Owner does not contest that
Cunningham discloses this limitation.

Petitioner has shown by a preponderance of the evidence that claim 56
is anticipated by or rendered obvious by Cunningham.

### 8.    Dependent Claim 57

Claim 57 depends from claim 55 and additionally recites "wherein the
WAN is an Intranet."  To meet this limitation, Petitioner points out that "one
of the provisional applications to which Cunningham claims priority, and
which is incorporated by reference into Cunningham, discloses that its
energy management operations are accessible over the Williams private
frame relay network."  Pet. 62 (citing Ex. 1010, 4; Ex. 1002 ¶82), 89–90.
Patent Owner does not contest that the relied upon disclosure is not
incorporated by reference or otherwise contest that Cunningham discloses
this limitation.

Petitioner has shown by a preponderance of the evidence that claim 57
is anticipated by or rendered obvious by Cunningham.

### 9.    Dependent Claim 59

Claim 59 depends from claim 55 and additionally recites "wherein
clients access the information using a web browser."  To meet this
limitation, Petitioner points out that "Cunningham discloses that '[a]n
Internet or other TCP/IP type of connection allows customers to use
software applications which allow the user to graphically view the stored
information and their energy consumption rates" and "the Internet
connection allows the customer to see their energy consumption . . . by

50

**Appx50**

IPR2017-00359
Patent 6,437,692 B1

simply accessing a web site on the Internet.'" Pet. 90 (quoting Ex. 1004, 46:48–58); *see also* Ex. 1002 ¶160.

Petitioner has shown by a preponderance of the evidence that claim 59 is anticipated by or rendered obvious by Cunningham.

## III.    CONCLUSION

Petitioner has not met its burden to prove, by a preponderance of the evidence, that any claim challenged in Grounds 1 or 2 is unpatentable. However, Petitioner has met that burden with respect to each claim challenged in Ground 3, except claim 36.

## IV.    ORDER

Accordingly, it is

ORDERED that claims 32, 34, 37–38, 55–57, and 59 of U.S. Patent No. 6,437,692 B1 are unpatentable;

FURTHER ORDERED that claims 1, 3–8, 11–14, 24–31, 36, 42, 43, 46–49, 51–54, and 60–64 of U.S. Patent No. 6,437,692 B1 have not been shown to be unpatentable; and

FURTHER ORDERED that parties to the proceeding seeking judicial review of this Final Written Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

51

IPR2017-00359
Patent 6,437,692 B1

Petitioner:

Steven Pepe
James L. Davis, Jr.
Daniel Richards
Kathryn N. Hong
ROPES & GRAY LLP
steven.pepe@ropesgray.com
james.l.davis@ropesgray.com
Daniel.richards@ropesgray.com
Kathryn.hong@ropesgray.com

Patent Owner:
Gregory Gonsalves
Thomas Meagher
MEAGHER EMANUAEL LAKES GOLDBERG & LIAO, LLP
gonsalves@gonsalveslawfirm.com
tmeagher@meagheremanuel.com



US006437692B1

(12) **United States Patent**
Petite et al.

(10) **Patent No.:**   **US 6,437,692 B1**
(45) **Date of Patent:**   **Aug. 20, 2002**

(54) **SYSTEM AND METHOD FOR MONITORING AND CONTROLLING REMOTE DEVICES**

(75) Inventors: **Thomas D. Petite**, Douglasville; **Richard M. Huff**, Conyers, both of GA (US)

(73) Assignee: **StatSignal Systems, Inc.**, Atlanta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/439,059**

(22) Filed: **Nov. 12, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/271,517, filed on Mar. 18, 1999, which is a continuation-in-part of application No. 09/102,178, filed on Jun. 22, 1998, which is a continuation-in-part of application No. 09/172,554, filed on Oct. 14, 1998, now Pat. No. 6,028,522, which is a continuation-in-part of application No. 09/412,895, filed on Oct. 5, 1999, now Pat. No. 6,218,953

(60) Provisional application No. 60/146,817, filed on Aug. 2, 1999.

(51) Int. Cl.⁷ ............................................. G08B 21/00
(52) U.S. Cl. ...................... **340/540**; 340/531; 340/539; 340/3.1; 340/426; 340/521; 340/870.01; 340/870.03; 340/870.07; 340/870.08; 340/870.16; 340/870.17; 700/108; 702/56
(58) Field of Search ................................. 340/531, 539, 340/3.1, 426, 540, 521, 870.01, 870.03, 870.07, 870.08, 870.16, 870.17, 988; 700/108; 343/711, 700 R, 720; 702/56

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,212,645 A | * | 5/1993 | Wildes et al. ............... | 700/108 |
| 5,736,965 A | * | 4/1998 | Mosebrook et al. ........ | 343/702 |
| 5,774,052 A | * | 6/1998 | Hamm et al. ............... | 340/540 |
| 5,845,230 A | * | 12/1998 | Lamberson ................. | 702/56 |
| 5,880,677 A | * | 3/1999 | Lestician .................... | 340/3.1 |
| 5,917,405 A | * | 6/1999 | Joao ........................... | 340/426 |
| 6,023,223 A | * | 2/2000 | Baxter, Jr. ................. | 340/531 |
| 6,060,994 A | * | 5/2000 | Chen .......................... | 340/521 |

* cited by examiner

*Primary Examiner*—Benjamin C. Lee
(74) *Attorney, Agent, or Firm*—Thomas, Kayden, Horstemeyer & Risley

(57) **ABSTRACT**

The present invention is generally directed to a system for monitoring a variety of environmental and/or other conditions within a defined remotely located region. In accordance with one aspect of the invention, a system is configured to monitor utility meters in a defined area. The system is implemented by using a plurality of wireless transmitters, wherein each wireless transmitter is integrated into a sensor adapted to monitor a particular data input. The system also includes a plurality of transceivers that are dispersed throughout the region at defined locations. The system uses a local gateway to translate and transfer information from the transmitters to a dedicated computer on a network. The dedicated computer, collects, compiles, and stores the data for retrieval upon client demand across the network. The computer further includes means for evaluating the received information and identifying an appropriate control signal, the system further including means for applying the control signal at a designated actuator.

**64 Claims, 18 Drawing Sheets**



Petitioner Emerson's Exhibit 1001
Page 1 of 31

**Appx53**



# FIG. 1

# (PRIOR ART)

Petitioner Emerson's Exhibit 1001
Page 2 of 31



**FIG. 2**

Petitioner Emerson's Exhibit 1001
Page 3 of 31



**FIG. 3A**

Petitioner Emerson's Exhibit 1001
Page 4 of 31



**FIG. 3B**

Petitioner Emerson's Exhibit 1001
Page 5 of 31



**FIG. 3C**

Petitioner Emerson's Exhibit 1001
Page 6 of 31



**FIG. 3D**

Petitioner Emerson's Exhibit 1001
Page 7 of 31



**FIG. 3E**

Petitioner Emerson's Exhibit 1001
Page 8 of 31



FIG. 4

Petitioner Emerson's Exhibit 1001
Page 9 of 31



**FIG. 5**

Petitioner Emerson's Exhibit 1001
Page 10 of 31



**FIG. 6**

Petitioner Emerson's Exhibit 1001
Page 11 of 31



**FIG. 7**

Petitioner Emerson's Exhibit 1001
Page 12 of 31

Case: 19-1301    Document: 28    Page: 143    Filed: 08/09/2019



**FIG. 8**

Petitioner Emerson's Exhibit 1001
Page 13 of 31



**FIG. 9**

Petitioner Emerson's Exhibit 1001
Page 14 of 31



**FIG. 10**

## FIG. 11    Message Structure

| To Addr. (1-6) | From Addr. (6) | Pkt. No. (1) | Pkt. Max. (1) | Pkt. Lngth. (1) | Cmd. (1) | Data (0-238) | CkH (1) | CkL (1) |
|---|---|---|---|---|---|---|---|---|

The order of appearance remains fixed although byte position number in each packet may vary due to one or more of the following reasons:

1.    Scalability of the "TO ADDRESS" (1 to 6 Bytes).
2.    The CMD Byte.
3.    Scalability of the Data portion of the message (0 to 238 Bytes).

**"To Address"** Byte Assignment:

| | |
|---|---|
| MSB - Byte 1 Device Type | FF-F0 (16) - Broadcast All Devices (1 Byte Address) |
| | EF-1F (224) - Device Type Base (2 to 6 Byte Address) |
| | 0F-00 (16) - Personal Transceiver Identification (6 Byte Address) |
| Byte 2 Mfg./Owner ID | FF-F0 (16) - Broadcast all Devices (Byte 1 Type) (2 Byte Broadcast Address) |
| | EF-00 (240) - Mfg./Owner Code Identification Number |
| Byte 3 Mfg./Owner Extension ID | FF-F0 (16) - Broadcast all Devices (Byte 1 & Byte 2 Type) (3 Byte Broadcast Address) |
| | EF-00 (240) - Device Type/Mfg./Owner Code ID Number |
| Byte 4 | FF-F0 (16) - Broadcast all Devices (Byte 1 & Byte 2 Type) (4 Byte Broadcast Address) |
| | EF-00 (240) - ID Number |
| Byte 5 | (FF-00) 256 - Identification Number |
| Byte 6 | (FF-00) 256 - Identification Number |

**"From Address"** Byte Assignment:

| | |
|---|---|
| From Address | (FF-00) Full "ID" of Originating Device (up to 6 Bytes) |
| Packet Number | (FF-00) Packet Number of Msg. longer than 256 Bytes |
| Packet Max. | (FF-00) Number of Packets in Message over 256 Bytes |
| Packet Length | (FF-00) Length (in Bytes) of Packet/Message Transmission[*] |
| Command | (FF-00) Command Byte |
| Data | (FF-00) Data as required by specific command |
| ChkH | (FF-00) Packet Checksum, High Byte |
| ChkL | (FF-00) Packet Checksum, Low Byte |

[*] Packet Length - 13 Bytes (Min.) / 256 Bytes (Max.)

Petitioner Emerson's Exhibit 1001
Page 16 of 31

## Sample Messages

Central Server to Personal Transceiver - Broadcast Message - FF (Emergency)

Byte Count = 12

| To Addr. (FF) | From Addr. (12345678) | Pkt. No. (00) | Pkt. Max. (00) | Pkt. Lngth. (0C) | Cmd. (FF) | CkH (02) | CkL (9E) |
|---|---|---|---|---|---|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

First Transceiver to Repeater (Transceiver)
Broadcast Message - FF (Emergency)

Byte Count = 17



| To Addr. (F0) | From Addr. (12345678) | Pkt. No. (00) | Pkt. Max. (00) | Pkt. Lngth. (11) | Cmd. (FF) | | CkH (03) | CkL (A0) |
|---|---|---|---|---|---|---|---|---|

Data
(A000123456)

Note:  Additional Transceiver Re-Broadcasts do not change the message.
The messages are simply received and re-broadcast.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Message to Device "A0" From Device "E1"  Command - "08" (Respond to PING)
Response will reverse "To" and "From" Addresses

Byte Count = 17

| To Addr. (A012345678) | From Addr. (E112345678) | P # (00) | P Max. (00) | P Lngth. (11) | Cmd. (08) | Data (A5) | CkH (04) | CkL (67) |
|---|---|---|---|---|---|---|---|---|

## FIG. 12

Petitioner Emerson's Exhibit 1001
Page 17 of 31



**FIG. 13**

Petitioner Emerson's Exhibit 1001
Page 18 of 31

Appx70



**FIG. 14**

Petitioner Emerson's Exhibit 1001
Page 19 of 31

US 6,437,692 B1

**1**

# SYSTEM AND METHOD FOR MONITORING AND CONTROLLING REMOTE DEVICES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent applications Ser. No. 09/271,517; filed Mar. 18, 1999, and entitled, "System For Monitoring Conditions in a Residential Living Community;" Ser. No. 09/102,178; filed Jun. 22, 1998, entitled, "Multi-Function General Purpose Transceiver;" Ser. No. 09/172,554; filed Oct. 14, 1998, entitled, "System for Monitoring the Light Level Around an ATM," now Pat. No. 6,028,522; Ser. No. 09/412,895; filed Oct. 5, 1999, entitled, "System and Method for Monitoring the Light Level Around an ATM now U.S. Pat. No. 6,218,953; and further claims the benefit of provisional patent application Serial No. 60/146,817; filed Aug. 2, 1999 entitled, "System and Method for Monitoring and Controlling Residential Devices." Each of the above identified disclosures are incorporated herein by reference in their entireties.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention generally relates to remotely operated systems, and more particularly to a computerized system for monitoring, reporting on, and controlling remote systems by transferring information signals through a wide area network (WAN) and using software applications hosted on a connected server to appropriately process the information.

### 2. Discussion of the Related Art

As is known, there are a variety of systems for monitoring and controlling manufacturing processes, inventory systems, emergency control systems, and the like. Most automatic systems use remote sensors and controllers to monitor and automatically respond to system parameters to reach desired results. A number of control systems utilize computers to process system inputs, model system responses, and control actuators to implement process corrections within the system. Both the electric power generation and metallurgical processing industries have had success controlling production processes by implementing computer controlled control systems in individual plants.

One way to classify control systems is by the timing involved between subsequent monitoring occurrences. Monitoring processes can be classified as aperiodic or random, periodic, and real-time. A number of remotely distributed service industries implement the monitoring and controlling process steps through manual inspection and intervention.

Aperiodic monitoring systems (those that do not operate on a predetermined cycle) are inherently inefficient as they require a service technician to physically traverse an area to record data, repair out of order equipment, add inventory to a vending machine, and the like. Such service trips are carried out in a number of industries with the associated costs being transferred to the consumers of the service.

Conversely, utility meter monitoring, recording, and client billing are representative of a periodic monitoring system. In the past, utility providers sent a technician from meter to meter on a periodic basis to verify meter operation and to record utility use. One method of cutting operating expenses in the utility industry involved increasing the period at which manual monitoring and meter data recording was performed. While this method decreased the monitoring

**2**

and recording expense associated with more frequent meter observation and was convenient for consumers who favor the consistent billed amounts associated with "budget billing," the utility provider retained the costs associated with less frequent meter readings and the processing costs associated with reconciling consumer accounts.

Lastly, a number of environmental and safety systems require constant or real-time monitoring. Heating, ventilation, and air-conditioning systems, fire reporting and damage control systems, alarm systems, and access control systems are representative systems that utilize real-time monitoring and often require immediate feedback and control. These real-time systems have been the target of control systems theory and application thereof for some time.

A problem with expanding the use of control systems technology to distributed systems are the costs associated with the sensor-actuator infrastructure required to monitor and control functions within such systems. The typical approach to implementing control system technology is to install a local network of hard-wired sensors and actuators along with a local controller. Not only is there expense associated with developing and installing appropriate sensors and actuators but the added expense of connecting functional sensors and controllers with the local controller. Another prohibitive cost associated with applying control systems technology to distributed systems is the installation and operational expense associated with the local controller.

Accordingly, an alternative solution to applying monitoring and control system solutions to distributed systems that overcomes the shortcomings of the prior art is desired.

## SUMMARY OF THE INVENTION

Certain objects, advantages and novel features of the invention will be set forth in part in the description that follows and in part will become apparent to those skilled in the art upon examination of the following or may be learned with the practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instrumentalities and combinations particularly pointed out in the appended claims.

To achieve the advantages and novel features, the present invention is generally directed to a cost effective method of monitoring and controlling remote devices. More specifically, the present invention is directed to a computerized system for monitoring, reporting, and controlling remote systems and system information transfer by transmitting information signals to a WAN gateway interface and using applications on a connected server to process the information. Because the applications server is integrated on a WAN, Web browsers can be used by anyone with Internet access (and the appropriate access permissions) to view and download the recorded data.

In accordance with a broad aspect of the invention, a system is provided having one or more sensors to be read and/or actuators to be controlled remotely, ultimately through a computer on the Internet. The sensors and/or actuators are interfaced with wireless transceivers that transmit and/or receive data to and from the Internet. In this regard, additional wireless transceivers may relay information between the transceivers disposed in connection with the sensors and actuators and a gateway to the Internet. It should be appreciated that, a portion of the information communicated includes data that uniquely identifies the sensors and/or actuators.

In accordance with one aspect of the invention, a system is configured to monitor and report system parameters. The

Petitioner Emerson's Exhibit 1001
Page 20 of 31

US 6,437,692 B1

3

system is implemented by using a plurality of wireless transceivers. At least one wireless transceiver is interfaced with a sensor, transducer, actuator or some other device associated with the application parameter of interest. In this regard, the term "parameter" is broadly construed and may include, but is not limited to, a system alarm condition, a system process variable, an operational condition, etc. The system also includes a plurality of transceivers that act as signal repeaters that are dispersed throughout the nearby geographic region at defined locations. By defined locations, it is meant only that the location of each transceiver is known to a central computer. The central computer may be informed of transceiver physical locations after permanent installation, as the installation location of the transceivers is not limited. Each transceiver that serves to repeat a previously generated data signal may be further integrated with its own unique sensor or a sensor actuator combination as required. Additional transceivers may be configured as stand-alone devices that serve to simply receive, format, and further transmit system data signals. Further, the system includes a local data formatter that is configured to receive information communicated from the transceivers, format the data, and forward the data via the gateway to one or more servers interconnected with the WAN. The server further includes means for evaluating the received information and identifying the system parameter and the originating location of the parameter. The server also includes means for updating a database or further processing the reported parameters.

Consistent with the broader concepts of the invention, the "means" for evaluating the received information and the "means" for reporting system parameters are not limited to a particular embodiment or configuration. Preferably, these "means" will be implemented in software that is executed by a processor within a server integrated with the Internet. However, dedicated WANs or Intranets are suitable backbones for implementing defined system data transfer functions consistent with the invention.

In one embodiment, a client retrieves configured system data by accessing an Internet Web site. In such an embodiment, a system consistent with the present invention acts as a data collector and formatter with data being delivered upon client request, with availability twenty-four hours a day, seven days a week.

In more robust embodiments, a system can be configured to collect, format, and deliver client application specific information on a periodic basis to predetermined client nodes on the WAN. In these embodiments, client intervention would serve to close the feedback loop in the control system.

In yet another embodiment, a system can be configured to collect, format, and control client application specific processes by replacing a local control computer with a WAN interfaced server and integrating system specific actuators with the aforementioned system transceivers.

It should be further appreciated that the information transmitted and received by the wireless transceivers may be further integrated with other data transmission protocols for transmission across telecommunications and computer networks other than the Internet. In addition, it should be further appreciated that telecommunications and computer networks other than the Internet can function as a transmission path between the networked wireless transceivers, the local gateways, and the central server.

In yet a further embodiment, a system can be configured using the present invention to translate and transmit control

4

signals from an existing local controller via the networked wireless transceivers. In this regard, the system of the present invention would require a data translator to tap into the data stream of an existing control system. Distinct control system signals may be mapped to function codes used by the present invention in order to provide customer access to control system data. In this way, the system of the present invention can be integrated with present data collection and system controllers inexpensively, as customers will only have to add a data translator and a wireless transmitter or transceiver as the application demands. By integrating the present invention with the data stream generated by present monitoring and control systems, potential customers enjoy the benefits of the present invention without the difficulties associated with integrating sensors and actuators to monitor individual system parameters.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings incorporated in and forming a part of the specification, illustrate several aspects of the present invention, and together with the description serve to explain the principles of the invention. In the drawings:

FIG. 1 is a block diagram of a prior art control system;

FIG. 2 is a block diagram illustrating a monitoring/control system of the present invention;

FIG. 3 A is a functional block diagram that illustrates a transmitter in accordance with the present invention integrated with user operable buttons that trigger data transmissions as desired;

FIG. 3B is a functional block diagram that illustrates the integration of a sensor with a transmitter in accordance with the invention;

FIG. 3C is a block diagram illustrating a transceiver in accordance with the present invention integrated with a sensor and an actuator;

FIG. 3D is a functional block diagram further illustrating the transceiver of FIG. 3C as applied to a heating, ventilation, and air conditioning system controller;

FIG. 3E is a functional block diagram illustrating the combination of the transceiver of FIG. 3D with a global positioning system (GPS) receiver;

FIG. 4 is a functional block diagram that illustrates the functional components of a local WAN gateway constructed in accordance with the invention;

FIG. 5 is a diagram illustrating WAN connectivity in a system constructed in accordance with the invention;

FIG. 6 is a block diagram illustrating a client specific application in accordance with the invention (simple data collection or monitoring);

FIG. 7 is a block diagram illustrating another data monitoring and reporting application consistent with the present invention;

FIG. 8 is a block diagram illustrating a third client specific application in accordance with the invention (monitoring and controlling a process);

FIG. 9 is a block diagram illustrating the present invention as deployed in a particular business application;

FIG. 10 is a block diagram further illustrating the present invention as deployed in a plurality of business applications;

FIG. 11 is a table illustrating the message protocol of the present invention;

FIG. 12 illustrates three sample messages using the message protocol of the present invention;

FIG. 13 is a block diagram illustrating the system of the present invention integrated with the local controller of FIG. 1; and

Petitioner Emerson's Exhibit 1001
Page 21 of 31

US 6,437,692 B1

<table>
<tr><td>5</td><td>6</td></tr>
</table>

FIG. **14** is a block diagram illustrating the system of the present invention integrated with a mobile inventory unit.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Having summarized the invention above, reference is now made in detail to the description of the invention as illustrated in the drawings. While the invention will be described in connection with these drawings, there is no intent to limit it to the embodiment or embodiments disclosed therein. On the contrary, the intent is to cover all alternatives, modifications and equivalents included within the spirit and scope of the invention as defined by the appended claims.

Referring now to the drawings, reference is made to FIG. **1**, which is a block diagram illustrating certain fundamental components of a prior art control system **100**. More particularly, a prior art control system **100** includes a plurality of sensor actuators **111, 112, 113, 114, 115, 116,** and **117** electrically coupled to a local controller **110**. In a manner well known in the art of control systems, local controller **110** provides power, formats and applies data signals from each of the sensors to predetermined process control functions, and returns control signals as appropriate to the system actuators. Often, prior art control systems are further integrated via the public switched telephone network (PSTN) **120** to a central controller **130**. Central controller **130** can be further configured to serve as a technician monitoring station or to forward alarm conditions via PSTN **120** to appropriate public safety officers.

Prior art control systems consistent with the design of FIG. **1** require the development and installation of an application-specific local system controller, as well as, the routing of electrical conductors to each sensor and actuator as the application requires. Such prior art control systems are typically augmented with a central controller **130** that may be networked to the local controller **110** via PSTN **120**. As a result, prior art control systems often consist of a relatively heavy design and are subject to a single point of failure should local controller **110** go out of service. In addition, these systems require electrical coupling between the local controller and system sensors and actuators. As a result, appropriately wiring an existing industrial plant can be a dangerous and expensive proposition.

Having described a prior art control system and delineated some of its shortcomings, reference is now made to FIG. **2**, which is a block diagram that illustrates a control system in accordance with the present invention. Control system **200** consists of one or more sensor/actuators **212, 214, 216, 222,** and **224** each integrated with a transceiver. The transceivers are preferably RF (Radio Frequency) transceivers, that are relatively small in size and transmit a relatively low power RF signal. As a result, in some applications, the transmission range of a given transceiver may be relatively limited. As will be appreciated from the description that follows, this relatively limited transmission range of the transceivers is an advantageous and desirable characteristic of control system **200**. Although the transceivers are depicted without a user interface such as a keypad, in certain embodiments of the invention the transceivers may be configured with user selectable buttons or an alphanumeric keypad. Often, the transceivers will be electrically interfaced with a sensor or actuator, such as a smoke detector, a thermostat, a security system, etc., where external buttons are not needed.

Control system **200** also includes a plurality of stand-alone transceivers **211, 213, 215,** and **221**. Each stand-alone transceiver **211, 213, 215,** and **221** and each of the integrated

transceivers **212, 214, 216, 222,** and **224** may be configured to receive an incoming RF transmission (transmitted by a remote transceiver) and to transmit an outgoing signal. This outgoing signal may be another low power RF transmission signal, a higher power RF transmission signal, or alternatively may be transmitted over a conductive wire, fiber optic cable, or other transmission media. The internal architecture of a transceiver integrated with a sensor/actuator **212** and a stand-alone transceiver **211** will be discussed in more detail in connection with FIGS. **3A** through **3C**. It will be appreciated by those skilled in the art that integrated transceivers **212, 214, 216, 222,** and **224** can be replaced by RF transmitters (not shown) for client specific applications that require data collection only.

Local gateways **210** and **220** are configured and disposed to receive remote data transmissions from the various stand-alone transceivers **211, 213, 215,** and **221** or integrated transceivers **212, 214, 216, 222,** and **224** having an RF signal output level sufficient to adequately transmit a formatted data signal to the gateways. Local gateways **210** and **220** analyze the transmissions received, convert the transmissions into TCP/IP format and further communicate the remote data signal transmissions via WAN **230**. In this regard, and as will be further described below, local gateways **210** and **220** may communicate information, service requests, control signals, etc. to remote sensor/actuator transceiver combinations **212, 214, 216, 222,** and **224** from server **260**, laptop computer **240**, and workstation **250** across WAN **230**. Server **260** can be further networked with database server **270** to record client specific data.

It will be appreciated by those skilled in the art that if an integrated transceiver (either of **212, 214, 216, 222,** and **224**) is located sufficiently close to local gateways **210** or **220** such that its RF output signal can be received by a gateway, the RF data signal need not be processed and repeated through stand-alone transceivers **211, 213, 215,** or **221**.

It will be further appreciated that a monitoring system constructed in accordance with the teachings of the present invention may be used in a variety of environments. In accordance with a preferred embodiment, a monitoring system such as that illustrated in FIG. **2** may be employed to monitor and record utility usage by residential and industrial customers as illustrated in FIG. **6**. Another preferred monitoring system is illustrated in FIG. **7**. FIG. **7** depicts the transfer of vehicle diagnostics from an automobile via a RF transceiver integrated with the vehicle diagnostics bus to a local transceiver that farther transmits the vehicle information through a local gateway onto a WAN.

It will be further appreciated that a monitoring and control system consistent with the present invention may be used in a variety of environments. In accordance with a preferred embodiment, a control system such as that illustrated in FIG. **2** may be employed to monitor and control an irrigation system as illustrated in FIG. **8**. Another preferred control system is illustrated in FIG. **9**. FIG. **9** depicts a business application of a control system wherein the operation of a parking facility may be automated.

As will be further appreciated from the discussion herein, transceivers **212, 214, 216, 222,** and **224** may have substantially identical construction (particularly with regard to their internal electronics), which provides a cost effective implementation at the system level. Furthermore, a plurality of stand-alone transceivers **211, 213, 215,** and **221**, which may be identical, are disposed in such a way that adequate coverage in an industrial plant or community is provided. Preferably, stand-alone transceivers **211, 213, 215,** and **221**

Petitioner Emerson's Exhibit 1001
Page 22 of 31

US 6,437,692 B1

7

8

may be dispersed sufficient that only one stand-alone transceiver will pick up a transmission from a given integrated transceiver 212, 214, 216, 222, and 224 (due in part to the low power transmission nature of each transmitter). However, in certain instances two, or even more, stand-alone transceivers may pick up a single transmission. Thus, the local gateways 210 and 220 may receive multiple versions of the same data transmission signal from an integrated transceiver, but from different stand-alone transceivers. The local gateways 210 and 220 may utilize this information to triangulate, or otherwise more particularly assess the location from which the transmission is originating. Due to the transmitting device identification that is incorporated into the transmitted signal, duplicative transmissions (e.g., transmissions duplicated to more than one gateway, or to the same gateway, more than once) may be ignored or otherwise appropriately handled.

In accordance with the preferred embodiment shown in FIG. 2, integrated transceivers 212, 214, 216, 222, and 224 may be disposed within automobiles (see FIG. 7), a rainfall gauge (see FIG. 8), or a parking lot access gate (see FIG. 9) to monitor vehicle diagnostics, total rainfall and sprinkler supplied water, and access gate position, respectively. The advantage of integrating a transceiver, as opposed to a one-way transmitter, into a monitoring device relates to the ability of the transceiver to receive incoming control signals, as opposed to merely transmitting data signals. Significantly, local gateways 210 and 220 may communicate with all system transceivers. Since local gateways 210 and 220 are permanently integrated with WAN 230, server 260 can host application specific software which was typically hosted in an application specific local controller as shown in FIG. 1. Of further significance, the data monitoring and control devices of the present invention need not be disposed in a permanent location as long as they remain within signal range of a system compatible transceiver that subsequently is within signal range of a local gateway interconnected through one or more networks to server 260. In this regard, small application specific transmitters compatible with control system 200 can be worn or carried about one's person as will be further described below.

In one embodiment, server 260 collects, formats, and stores client specific data from each of the integrated transceivers 212, 214, 216, 222, and 224 for later retrieval or access from workstation 250 or laptop 240. In this regard, workstation 250 or laptop 240 can be used to access the stored information through a Web browser in a manner that is well known in the art. In another embodiment, server 260 may perform the additional functions of hosting application specific control system functions and replacing the local controller by generating required control signals for appropriate distribution via WAN 230 and local gateways 210 and 211 to the system actuators. In a third embodiment, clients may elect for proprietary reasons to host control applications on their own WAN connected workstation. In this regard, database 270 and server 260 may act solely as a data collection and reporting device with client workstation 250 generating control signals for the system.

It will be appreciated by those skilled in the art that the information transmitted and received by the wireless transceivers of the present invention may be further integrated with other data transmission protocols for transmission across telecommunications and computer networks other than the Internet. In addition, it should be further appreciated that telecommunications and computer networks other than the Internet can function as a transmission path between the networked wireless transceivers, the local gateways, and the central server.

Reference is now made to FIG. 3A, which is a block diagram that illustrates the functional components of a RF transmitter 320, of a type worn or carried by a person, in more detail. Blocks 327 and 329 represent physical buttons, which a user may actuate to cause the RF transmitter 320 to initiate different signal transmissions. In the illustrated embodiment, these include a "transmit" button 327 and a panic or "emergency" button 329. Of course, additional, fewer, or different buttons may be provided on a given transmitter, depending upon the system or implementation desired. Each of these buttons may be electrically wired to a data interface 321 which is configured to receive electrical signals from buttons 327 and 329, and ultimately convey that information to a data formatter 324. In one embodiment, data interface 321 may simply comprise an addressable port that may be read by the data formatter 324.

For example, each of the signal lines extending between the buttons and the data interface 321 may be pulled up by individual pull up resistors (not shown). Depressing any of the individual buttons may ground the electrical signal line interconnecting the respective button and the data interface 321. Data formatter 324 may constantly read from the port defined by data interface 321, and all bit positions should remain high at any given time, if no buttons are depressed. If, however, the data formatter 324 reads a zero in one or more of the bit positions, it then recognizes that one or more of the buttons 327 and 329 have been depressed.

Each transmitter unit may be configured to have a unique identification code (e.g., transmitter identification number) 326, that uniquely identifies the transmitter to the functional blocks of control system 200 (see FIG. 2). This transmitter identification number may be electrically programmable, and implemented in the form of, for example, an EPROM. Alternatively, the transmitter identification number may be set/configured through a series of DIP switches. Additional implementations of the transmitter identification number, whereby the number may be set/configured, may be implemented consistent with the broad concepts of the present invention.

Finally, an additional functional block of the transmitter 320 is a RF transmitter 328. This circuit is used to convert information from digital electronic form into a format, frequency, and voltage level suitable for transmission from antenna 323 via an RF transmission medium.

The data formatter 324 operates to format concise data packets 330 that may be transmitted via RF to a nearby transceiver. From a substantive basis, the information conveyed includes a function code, as well as, a transmitter identification number. As previously mentioned, the transmitter identification number is set for a given transmitter 320. When received by server 260 (see FIG. 2), the transmitter identification number may be used to access a look up table that identifies, for example, the person assigned to carry that particular transmitter. Additional information about the person may also be provided within the lookup table, such as, a physical description, and/or any other information that may be deemed appropriate or useful under the circumstances or implementation of the particular system.

In addition, a function code is communicated from RF transmitter 320 to the nearby transceiver. FIG. 3A illustrates a lookup table 325 that may be provided in connection with data formatter 324. Lookup table 325 may be provided to assign a given and unique function code for each button pressed. For example, transmit button 327 may be assigned a first code to identify the party depressing the button. The

Petitioner Emerson's Exhibit 1001
Page 23 of 31

US 6,437,692 B1

9

emergency button **329** may be assigned a second code. Furthermore, additional codes may be provided as necessary to accommodate additional functions or features of a given transmitter **320**. Thus, in operation, a user may depress the emergency button **329**, which is detected by the data formatter **324**. The data formatter **324** may then use the information pertaining to the emergency button **329** to access a look up table **325** to retrieve a code that is uniquely assigned to emergency button **329**. The data formatter **324** may also retrieve the preconfigured transmitter identification number **326** in configuring a data packet **330** for communication via RF signals to a nearby transceiver.

Reference is now made briefly to FIG. 3B, which is a block diagram illustrating certain functional blocks of a similar transmitter **340** that may be integrated with sensor **310**. For example, sensor **310** in its simplest form could be a two-state device such as a smoke alarm. Alternatively, the sensor **310** may output a continuous range of values to the data interface **321**. If the signal output from the sensor **310** is an analog signal, the data interface **321** may include an analog-to-digital converter (not shown) to convert signals output to the actuator **340**. Alternatively, a digital interface (communicating digital signals) may exist between the data interface **321** and each sensor **310**.

As illustrated, many of the components of RF transmitter **340** are similar to that of RF transmitter **320** and need not be repeated herein. The principal difference between the configurations of RF transmitter **320** of FIG. 3A and the RF transmitter **340** of FIG. 3B lies at the input of the data interface **321**. Specifically, RF transmitter **320** included user interface buttons **327** and **329**. RF transmitter **340**, illustrates electrical integration with sensor **310**. Unique transmitter identification code **326** coupled with a function code for a smoke alarm on condition is formatted by data controller **324** for transformation into a RF signal by RF transmitter **328** and transmission via antenna **323**. In this way, data packet **330** communicated from transmitter **340** will readily distinguish from similar signals generated by other RF transmitters in the system. Of course, additional and/or alternative configurations may also be provided by a similarly configured RF transmitter. For example, a similar configuration may be provided for a transmitter that is integrated into, for example, a carbon monoxide detector, a door position sensor and the like. Alternatively, system parameters that vary across a range of values may be transmitted by RF transmitter **340** as long as data interface **321** and data controller **324** are configured to apply a specific code, consistent with the input from sensor **3 1 0**. As long as the code was understood by server **260** or workstation **250** (see FIG. 2) the target parameter could be monitored with the present invention.

Reference is now made to FIG. 3C, which is a block diagram similar to that illustrated in FIGS. 3A and 3B, but illustrating a transceiver **360** that is integrated with a sensor **310** and an actuator **380**. In this illustration, data interface **321** is shown with a single input from sensor **310**. It is easy to envision a system that may include multiple sensor inputs. By way of example, a common home heating and cooling system might be integrated with the present invention. The home heating system may include multiple data interface inputs from multiple sensors. A home thermostat control connected with the home heating system could be integrated with a sensor that reports the position of a manually adjusted temperature control (i.e., temperature set value), as well as, a sensor integrated with a thermister to report an ambient temperature. The condition of related parameters can be input to data interface **321** as well, including the condition

10

of the system on/off switch, and the climate control mode selected (i.e., heat, fan, or AC). In addition, depending upon the specific implementation, other system parameters may be provided to data interface **321** as well.

The addition of actuator **380** to the assembly permits data interface **321** to apply control signals to the manual temperature control for the temperature set point, the climate control mode switch, and the system on/off switch. In this way, a remote workstation **250** or laptop **240** with WAN access (see FIG. 2) could control a home heating system from a remote location.

Again, each of these various input sources are routed to data interface **321** which provides the information to a data controller **324**. The data controller may utilize a look up table to access unique function codes that are communicated in data packet **330**, along with a transceiver identification code **326** via RF, to a local gateway and further onto a WAN. In general, the operation of transceiver **360** will be similar to that described for a transmitter as previously illustrated in FIGS. 3A and 3B. It is significant to note that data packet **330** will include a concatenation of the individual function codes selected for each of the aforementioned input parameters. As by way of example, server **260** may provide client workstation **250** with a Web page display that models a common home thermostat. As previously described, either server **260** or workstation **250** may include application software that would permit a user with access to remotely adjust the controls on a home heating system by adjusting related finctional controls on a graphical user interface updated with feedback from the aforementioned control system.

Reference is now made to FIG. 3D, which is a block diagram further illustrating the transceiver of FIG. 3C in light of the home heating system described above. Specifically, transceiver **360** is shown with four specific parameters related to four specific function codes as illustrated in look up table **325**. In this regard, sensor(s) **310** (one sensor shown for simplicity) inputs a data signal to data interface **321**. Data controller receives an input from data interface **321** that it associates with a specific function code as shown in look up table **325**. Data controller **324** assembles data packet **332** by concatenating received data packet **330** with its own transceiver identification code **326** and its own specific function codes. Data packet **332** is configured by RF transceiver **350** for transmission via antenna **323** to either a stand-alone transceiver as shown in FIG. 2, or alternatively, to local gateway **210**. It will be appreciated by persons skilled in the art that data interface **321** may be uniquely configured to interface with specialized sensor(s) **310**. This circuit, therefore, may differ from transceiver to transceiver, depending upon the remote system parameter that is monitored and the related actuator to be controlled. Implementation of data interface **321** will be understood by persons skilled in the art, and need not be described herein.

Reference is now made to FIG. 3E, which is a block diagram further illustrating the transceiver of FIG. 3C in combination with a GPS receiver. Specifically, GPS receiver **327** replaces data interface **321**, sensor **310**, and actuator **380** as illustrated in FIG. 3C. In this regard, GPS receiver **327** inputs a data signal containing latitude and longitude coordinates to data controller **324**. Data controller **324** assembles data packet **332** by concatenating received data packet **330** with its own transceiver identification code **326** and the coordinates received from GPS receiver **327**. Data packet **332** is configured by RF transceiver **350** for transmission via antenna **323** to either a stand-alone transceiver as shown in FIG. 2, or alternatively, to local gateway **210** as previously described.

Petitioner Emerson's Exhibit 1001
Page 24 of 31

US 6,437,692 B1

11

Having illustrated and described the operation of the various combinations of RF transmitters and transceivers consistent with the present invention, reference is now made to FIG. 4, which is a block diagram illustrating certain principal components and the operation of a local gateway 210 of a control system 100 (see FIG. 2) constructed in accordance with the present invention. The primary physical components that may be provided within local gateway 210 are a transceiver 420, a CPU 422, a memory 424, a network card 426, a DSL modem 428, an ISDN card 430, as well as other components not illustrated in the FIG. 4 that would enable a TCP/IP connection to WAN 230. The transceiver 420 is configured to receive incoming signals consistently formatted in the convention previously described. Local gateway 210 may be configured such that memory 424 includes look up table 425 to assist in identifying the remote and intermediate transceivers used in generating and transmitting the received data transmission. Program code within the memory 424 may also be provided and configured for controlling the operation of a CPU 422 to carry out the various functions that are orchestrated and/or controlled by local gateway 210. For example, memory 424 may include program code for controlling the operation of the CPU 422 to evaluate an incoming data packet to determine what action needs to be taken. In this regard, look up tables 425 may also be stored within memory 424 to assist in this process. Furthermore, memory 424 may be configured with program code configured to identify a remote transceiver 427 or identify an intermediate transceiver 429. Function codes, transmitter and or transceiver identification numbers, may all be stored with associated information within look up tables 425.

Thus, one look up table may be provided to associate transceiver identification numbers with a particular user. Another look up table may be used to associate function codes with the interpretation thereof For example, a unique code may be associated by a look up table to identify functions such as test, temperature, smoke alarm active, security system breach, etc. In connection with the lookup tables 425, memory 424 may also include a plurality of code segments that are executed by CPU 422, and which largely control the operation of the computer. For example, a first data packet segment 330 may be provided to access a first lookup table to determine the identity of the transceiver which transmitted the received message. A second code segment may be provided to access a second lookup table to determine the proximate location of the message generating transceiver, by identifying the transceiver that relayed the message. A third code segment may be provided to identify the content of the message transmitted. Namely, is it a fire alarm, a security alarm, an emergency request by a person, a temperature control setting, etc. Consistent with the invention, additional, fewer, or different code segments may be provided to carryout different functional operations and data signal transfers throughout the transceiver network. The local gateway 210 may also include one or more mechanisms through which to communicate with remote systems. For example, the gateway may include a network card 426, which would allow the gateway 210 to communicate across a local area network to a network server, which in turn may contain a backup gateway to WAN 230. Alternatively, local gateway 210 may contain a DSL modem 428, which may be configured to provide a direct dial link to a remote system, by way of the PSTN. Alternatively, local gateway 210 may include an ISDN card 430 configured to communicate via an ISDN connection with a remote system. Other communication gateways may be provided as well to serve as primary

12

and or backup links to WAN 230 or to local area networks that might serve to permit local monitoring of gateway health and data packet control.

Reference is now made to FIG. 5, which is a diagram illustrating WAN connectivity in a system constructed in accordance with the invention. In this regard, local gateway 210 is configured to transmit control signals and receive data signals using the open data packet protocol as previously described. Local gateway 210 is preferably interconnected permanently on WAN 230 and configured to translate received data signals for WAN transfer via TCP/IP. A server 530 configured with web applications and client specific applications as required is connected to WAN 230 via router 510 and further protected and buffered by firewall 520. Consistent with the present invention, server 530 is assisted in its task of storing and making available client specific data by database server 540. A workstation 560 configured with a Web browser is connected to WAN 230 at client premises by any suitable means known by those of skill in the art. Alternatively, clients may access WAN 230 via remote laptop 550 or other devices configured with a compatible Web browser. In this way, server 530 may provide client specific data upon demand.

Having described the control system of FIG. 2, reference is now made to FIG. 6 which illustrates a specific monitoring embodiment consistent with application of the invention. More specifically, FIG. 6 illustrates a remote utility meter monitoring system 600. Remote utility meter subsystem 610 consists of utility meter 613 and an appropriately integrated sensor 612 wherein the current utility meter operational status and current utility meter usage total is transmitted via functional codes along with a transceiver identification code in a manner previously described by transmitter 614 to stand-alone transceiver 221. Stand-alone transceiver 221 further processes and transmits the encoded data to local gateway 210 which translates the data packet information into TCP/IP format for transfer across WAN 230 to server 260. Server 260 collects and formats the utility meter information for viewing and or retrieval upon client demand in a manner previously described.

Having described a specific client application consistent with the present invention wherein the remote transmitter is permanently integrated with a stationary data input point (a utility meter), reference is now made to FIG. 7 which more fully illustrates the flexibility of the invention. More specifically, FIG. 7 illustrates a remote automotive diagnostics monitoring system 700. Remote automotive diagnostics interface unit 710 consists of sensor 712 integrated with the vehicle diagnostics data bus 711, and transmitter 714 wherein contents of the vehicle diagnostics can be downloaded upon a control signal to sensor 712 from a remote location serviced by local gateway 210. In this manner, a vehicle in need of service but still capable of accessing the vehicle diagnostics codes can be remotely diagnosed by uploading the information through remote automotive diagnostics monitoring system 700 and accessing a custom report created by server 260 in a manner previously described. In this regard, server 260 could be configured to perform any of a number of levels of diagnostics and provide service manual instructions, figures, and local authorized service contact information via WAN 230 on a fee basis or per a predetermined level of service plan.

Having described a monitoring system consistent with the present invention wherein the control signal initiates the monitoring process, reference is now made to FIG. 8. FIG. 8 illustrates a client specific control system consistent with both monitoring and control functions of the invention.

Petitioner Emerson's Exhibit 1001
Page 25 of 31

US 6,437,692 B1

**13**

More specifically, FIG. **8** illustrates a remote irrigation control system **800**. For simplicity, controlled area **810** is represented by a single rain gauge **813** and a single related spray head **817**. It is easy to see that such a system could be modified and expanded to monitor and control any of a number of irrigation systems integrated with the present invention.

Controlled area **810** is configured with a rain gauge **813** integrated with sensor **811** wherein rainfall and applied water to the adjacent area is transmitted via functional codes by transmitter **812** along with a related transceiver identification code in a manner previously described to stand-alone transceiver **221**. Stand-alone transceiver **221** further processes and transmits the encoded data to local gateway **210** which translates the data packet information into TCP/IP format for transfer across WAN **230** to server **260**. Server **260** collects and formats the rain gauge data for viewing or retrieval upon client demand in a manner previously described. Additionally, server **260** may be configured to communicate data to operate spray head **817** by opening water supply valve **816** integrated with actuator **814** by sending a control signal to transceiver **815**, per a client directed water application control schedule. Alternatively, a customer workstation **250** could periodically download and review the rain gauge data and could initiate an automatic control signal appropriate with the customer's watering requirements. In yet another embodiment, a customer technician could initiate a control signal upon review of the rain gauge information and making the determination that more water is required.

Reference is now made to FIG. **9** which illustrates the operation of an automated parking control system **900** consistent with the present invention. Automated parking facility **910** consists of a controlled access area with ingress gate **920** and egress gate **930**. Both gates **920** and **930** are further configured with a position sensor, an actuator, and transceiver illustrated as ingress assembly **922** and egress assembly **932**, respectively. Parking spaces **940** may be configured with vehicle sensors. Sensor—transceiver assembly **932** may be configured to transmit a function code associated with the condition of parking spaces **1**, **2**, **3**, and **4**. It will be appreciated by those skilled in the art that the single row of four appropriately configured parking spaces illustrated can be expanded by adding parking spaces configured with vehicle sensors integrated with control system **900** via multiple sensor—transceiver assemblies. Automated parking control system **900** collects data signals from each sensor—transceiver assembly **932**, integrated in the system, and compiles a master schedule consisting of scheduled use for each parking space in the automated parking facility. In this manner, a customer with access to WAN **230** and server **530** may make a reservation and or check the availability of parking spaces at the automated parking facility from her home or office (or through any Internet portal). For example, a customer that will be out of town on business for **2** days next week, may access the automated parking control system server **530** by using a Web browser to view parking availability for the target travel dates. The customer may reserve the parking slot by providing a personal transmitter identification code (or other identification code) that the customer intends to use to access and exit the facility the following week. When the customer arrives at the ingress gate **920**, the customer may enter the automated parking facility **910** by depressing a button on her personal portable transmitter (see FIG. **3A**). Ingress assembly **922** receives and forwards the customer's transmitted identification code to server **530** via gateway **210** and WAN **230** in a manner

**14**

previously described. Server **530** confirms the customer's reservation, alternatively checks space availability to determine if access should be granted. In addition, server **530** may be further programmed to determine if the particular customer has an established account with the facility owner or whether a credit card payment transaction is in order. Automatic parking facility control system **900** would record the actual use of the reserved parking space for storage on database server **540**. Server **530** could retrieve the stored usage information on a periodic basis from database server **540** and generate appropriate bills for each customer.

Alternatively, the customer could reserve the slot by providing billing information via WAN **230** and ingress gate **920** could be further configured with a credit card reader and an alphanumeric keypad interface. Both the credit card reader and the alphanumeric keypad interface could be interconnected to the automated parking facility control system **900** by their own appropriately configured transceiver. Either or both the credit card reader and the alphanumeric keypad interface could be used to identify customers with reservations.

The operator of parking facility control system **900**, can expand both the level of security of the parking facility and the services provided by adding networked peripherals in a manner previously described and upgrading the software applications on server **530**. For example, by adding automated ingress and egress gates configured to allow the entry and exit of parking facility customers and authorized personnel and configuring the egress gate **930** for vehicles such that only identified customers may exit with a vehicle, both customers and their vehicles are protected from thieves.

A further example of expanding the services offered by automated parking facility control system **900** might consist of offering a schedule of vehicle services that could be scheduled and performed on the vehicles of long-term parking customers. By adding the appropriate interface to server **530**, parking facility customers could be prompted when making their reservation with a list of potential vehicle services that could be scheduled and performed by vehicle service technicians during the duration of the customer's business trip. A customer interested in having her automobile's oil changed and tires rotated would authorize and schedule the desired services when arranging her parking reservation. Upon leaving the parking facility at the start of her business trip, the customer could leave her vehicle valet key in an appropriately identified lock box. After her trip is complete, the customer returns to the lot. She gains access to the lot by any of the aforementioned methods and retrieves her valet key by similarly identifying herself as the vehicle owner.

Having illustrated specific applications using the present invention in FIGS. **6** through **9**, reference is now made to FIG. **10** which illustrates a system **1000** that monitors and controls remote data points associated with a plurality of systems. In this embodiment, server **530** may be configured with monitor/control remote services **1010** application-specific software. For example, the controlled area **810** of the irrigation control system shown in FIG. **8**, the remote utility meter subsystem **610** of FIG. **6**, and the automated parking facility **910** of FIG. **9** may be monitored and remotely controlled (where required) by server **530**. In a manner previously described herein, server **530** collects and processes data information transferred and sent over WAN **230** by local gateways coupled via RF links to transceivers and transmitters associated with systems **1020**, **1030**, and **1040**. Alternatively, server **530** initiates control signals that may be sent via the gateways to the appropriate transceivers

Petitioner Emerson's Exhibit 1001
Page 26 of 31

US 6,437,692 B1

15

and transmitters as required. For ease of illustration and description, FIG. **10** shows each of the systems serviced by server **530** requiring its own dedicated local gateway. It will be appreciated by those skilled in the art that small-scale systems jointly located within a geographic area served by an array of transceivers and a gateway may be configured to share the transceiver and gateway infrastructure of a previously installed local system.

Having described the physical layer of a system consistent with the present invention, reference is now made to FIG. **11** which describes the data structure of messages sent and received using the invention. In this regard, the standard message consists of: to address; from address; packet number; maximum packet number, packet length; command; data; packet check sum (high byte); and packet check sum (low byte). The "to address" or message destination consists from 1 to 6 bytes. The "from address" or message source device is coded in a full 6 byte designator. Bytes **11** through **13** are used by the system to concatenate messages of packet lengths greater than 256 bytes. Bytes **14** is a command byte. Byte **14** works in conjunction with bytes **15** through **30** to communicate information as required by system specific commands. Bytes **31** and **32** are packet check sum bytes. The packet check sum bytes are used by the system to indicate when system messages are received with errors. It is significant to note that bytes **31** and **32** may be shifted in the message to replace bytes **15** and **16** for commands that require only one byte. The order of appearance of specific information within the message protocol of FIG. **11** remains fixed although the byte position number in individual message transmissions may vary due to scalability of the "to address," the command byte, and scalability of the data frame.

Having described the general message structure of a message of the present invention, reference is directed to FIG. **12** which illustrates three sample messages. The first message illustrates the broadcast of an emergency message "FF" from a central server with an address "0012345678" to a personal transceiver with an address of "FF."

The second message illustrated reveals how the first message might be sent to a transceiver that functions as a repeater. In this manner, emergency message "FF" from a central server with address "0012345678" is first sent to transceiver "F0." The second message, further contains additional command data "A000123456" that may be used by the system to identify further transceivers to send the signal through on the way to the destination device.

The third message illustrated on FIG. **12** reveals how the message protocol of the present invention may be used to "ping" a remote transceiver in order to determine transceiver health. In this manner, source unit "E112345678" originates a ping request by sending command "08" to a transceiver identified as "A012345678." The response to the ping request can be as simple as reversing the "to address" and the "from address" of the command, such that, a healthy transceiver will send a ping message back to the originating device. The system of the present invention may be configured to expect a return ping within a specific time period. Operators of the present invention could use the delay between the ping request and the ping response to model system loads and to determine if specific system parameters might be adequately monitored and controlled with the expected feedback transmission delay of the system.

Having described the message structure of a message of the present invention, reference is directed to FIG. **13** which illustrates the integration of the system of the present

16

invention with the control system of FIG. **1**. Having previously illustrated several variations consistent with the principles of the present invention, it will be appreciated by those skilled in the art that multiple variations of the present invention may be integrated with existing control systems. In this regard, an existing control system with local controller **110** and a plurality of sensor actuators **115** (one shown for simplicity of illustration) are in communication with central controller **130** via PSTN **120** as previously described. In a manner well known in the art of control systems, local controller **110** transmits appropriate status information via PSTN **120** to central controller **130**.

Control systems consistent with the design of FIG. **1**, as further illustrated in FIG. **13**, require the routing of electrical conductors to each sensor and actuator as the application requires. It will be appreciated by those skilled in the art that the system of the present invention can take advantage of the infrastructure of an existing system by inserting data translator **140** such that system data is sent to both the central controller **130** in the old configuration, as well as, the data translator **140**. Data translator **140** serves to convert system data to function codes as previously described. Once data translator **140** successfully converts the system data stream to the message protocol of the present invention, transceiver **815** further converts the system data stream to a RF signal.

As previously described in connection with FIG. **2**, stand-alone transceiver **221** receives and repeats the RF data transmission received from transceiver **815**. Local gateway **210** receives the RF data transmission repeated by stand-alone transceiver **221** and converts the RF data transmission into TCP/IP for further transmission across WAN **230** to server **260**. In this regard, server **260** may further manage the data for internal storage or alternatively storage in database **270**. Customers with WAN **230** access may access the system data from workstation **250** or laptop computer **240**.

Having described integration of the system of the present invention with the control system of FIG. **1** in FIG. **13**, reference is now directed to FIG. **14** which illustrates integration of the system of the present invention with mobile inventory units. In this regard, system **1060** consists of the system of the present invention as previously illustrated and described in FIGS. **1** and **13**. Having previously illustrated several variations consistent with the principles of the present invention, it will be appreciated by those skilled in the art that multiple variations of the present invention may be integrated with mobile inventory units **1070**. In this regard, sensor/actuator **115** integrated with transceiver **815** in sensor-transceiver assembly **1065** is further integrated with any of a number of mobile inventory units **1070** (one sensor-transceiver unit **1065** shown for simplicity of illustration). It will be appreciated by those skilled in the art that as long as a mobile inventory unit **1070**, herein represented by a package, ship, airplane, train, and a taxi are within the radio-frequency transmission and receiving range of stand-alone transceiver **221**, the system of the present invention may be used to monitor, store and report information of and relating to mobile inventory unit **1070**.

It will be further appreciated by those skilled in the art that the system of the present invention may be used to transfer information to adequately equipped mobile inventory units **1070**. In this regard, shipping companies may use the present invention to update a database containing location and status information for each mobile inventory unit **1070** in the company fleet. Shipping companies may also transfer informative messages or other information using the system of the present invention.

In one embodiment, the present invention may be used to store, retrieve, and update maintenance information related

Petitioner Emerson's Exhibit 1001
Page 27 of 31

US 6,437,692 B1

17

to individual mobile inventory units. For example, federally registered airplanes must keep a maintenance log with the craft detailing all inspections, maintenance, and repairs. The system of the present invention could be used by fixed base operators (FBOs) who perform inspections and maintenance on aircraft to retrieve and update the aircraft maintenance log. In this way, FBOs located throughout the world will be able to retrieve and update an electronic version of the maintenance history of an aircraft. In addition, a properly configured system could also contain maintenance directives and other service bulletins related to the particular aircraft.

In yet another embodiment, a properly integrated sensor/ actuator **115** with transceiver **815** may be used to monitor mobile inventory unit system parameters. For example, an airplane could be configured to monitor and report engine run time, time elapsed since the last recorded inspection of a particular type, and related system information. It will be appreciated by those skilled in the art that the system of the present invention may be integrated with remote units other than those shown. The ship, package, airplane, train, and taxi shown in FIG. **14** are for example only and not meant to limit the scope of the present invention.

It will be appreciated that the foregoing description has illustrated certain fundamental concepts of the invention, but that other additions and/or modifications may be made consistent with the inventive concepts. For example, the one-way transmitters illustrated in FIG. **3A** and implemented in a control system as illustrated in FIG. **6** may be adapted to monitor the current status of water, gas, and other utility meters. One-way transmitters might further be used to monitor and report actual operational hours on rental equipment or any other apparatus that must be serviced or monitored on an actual runtime schedule.

The two-way transceivers of the current invention, may be adapted to monitor and apply control signals in an unlimited number of applications. By way of example only, two-way transceivers of the current invention can be adapted for use with pay type publicly located telephones, cable television set converter boxes, as well as, for use with a host of residential appliances and devices to enable a remote controllable home automation and security system.

In a geographic area appropriately networked with permanently located transceivers consistent with the invention, personal transmitters consistent with the invention can be used to monitor and control personnel access and egress from specific rooms or portions thereof within a controlled facility. Personal transmitters can further be configured to transfer personal information to public emergency response personnel, personal billing information to vending machines, or to monitor individuals within an assisted living community.

Two-way transceivers consistent with the present invention can be integrated to monitor and control a host of industrial and business applications as well. By way of example only, building automation systems, fire control systems, alarm systems, industrial trash compactors, and building elevators can be monitored and controlled with devices consistent with the present invention. In addition, courier drop boxes, time clock systems, automated teller machines, self-service copy machines, and other self-service devices can be monitored and controlled as appropriate. By way of further example, a number of environment variables that require monitoring can be integrated with the system of the present invention to permit remote monitoring and control. For instance, light levels in the area adjacent to automated teller machines must meet minimum federal

18

standards, the water volume transferred by water treatment plant pumps, smokestack emissions from a coal burning power plant or a coke fueled steel plant oven may also be remotely monitored.

The two-way transceivers of the present invention may be further integrated with a voice-band transmitter and receiver. As a result, when a person presses, for example, the emergency button on his/her transmitter, medical personnel, staff members, or others may respond by communicating via two-way radio with the party in distress. In this regard, each transmitter may be equipped with a microphone and a speaker that would allow the person to communication information such as their present emergency situation, their specific location, etc.

The foregoing description has been presented for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise forms disclosed. Obvious modifications or variations are possible in light of the above teachings. For example, it should be appreciated that, in some implementations, the transceiver identification number is not necessary to identify the location of the transmitter. Indeed, in implementations where the transmitter is permanently integrated into an alarm sensor or other stationary device within a system, then the control system server and or local gateway could be configured to identify the transmitter location by the transmitter identification number alone. In will be appreciated that, in embodiments that do not utilize repeating transceivers, the transmitters will be configured to transmit at a higher RF power level, in order to effectively communicate with the control system local gateway.

The embodiment or embodiments discussed were chosen and described illustrate the principles of the invention and its practical application to enable one of ordinary skill in the art to utilize the invention in various embodiments and with various modifications as are suited to the particular use contemplated. All such modifications and variations are within the scope of the invention as determined by the appended claims when interpreted in accordance with the breadth to which they are fairly and legally entitled.

What is claimed is:

1. A system for remote data collection, assembly, and storage comprising:

a computer configured to execute at least one computer program that formats and stores select information for retrieval upon demand from a remotely located device, said computer integrated with a wide area network (WAN);

at least one wireless transmitter configured to transmit select information and transmitter identification information;

a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically at defined locations configured to receive select information transmitted from at least one nearby wireless transmitter and further configured to transmit the select information, the transmitter identification information and transceiver identification information; and

at least one gateway connected to the wide area network configured to receive and translate the select information, the transmitter identification information, and transceiver identification information, said gateway further configured to farther transmit the translated information to the computer over the WAN.

Petitioner Emerson's Exhibit 1001
Page 28 of 31

US 6,437,692 B1

**19**

2. The system defined in claim 1, the computer program further comprising:

a first segment for evaluating received information to identify an originating transmitter;

a second segment for evaluating the received information and identifying transceivers that relayed the select information from the originating transmitter to the gateway;

a third segment for evaluating the select information transmitted from the originating transmitter embedded within the received information; and

a fourth segment responsive to the first, second, and third segments for determining an action to be taken based upon the select information, the identified originating transmitter, and the identified transceivers.

3. The system as defined in claim 1, wherein each wireless transmitter is configured to transmit a relatively low-power radio-frequency (RF) signal.

4. The system as defined in claim 1, wherein each wireless transmitter is integrated with a sensor.

5. The system as defined in claim 1, wherein the RF signal transmitted by the transceiver contains a concatenation of information comprising select information and transmitter identification information from the originating transmitter and transceiver identification information for each transceiver that receives and repeats the RF signal.

6. The system as defined in claim 5, wherein the at least one transmitter is replaced by a transceiver, the transceiver further integrated with an actuator.

7. The system as defined in claim 6, wherein the transceivers are configured to communicate with the gateway via a RF signal.

8. The system as defined in claim 7, wherein the computer is further configured to respond to received select information by communicating a control signal to at least one transceiver, wherein the actuator integrated with the transceiver is responsive to the control signal.

9. The system as defined in claim 8, wherein select transceivers further include a microphone, a speaker, and means for communicating two-way voice information to the WAN via the transceivers.

10. The system as defined in claim 1, wherein the gateway is permanently connected to the WAN.

11. The system as defined in claim 1, wherein the gateway includes one selected from the group consisting of: a modem for establishing a dial-up connection with a remote computer; a network card for communicating across a local area network; a network card for communicating across the WAN; a DSL modem; and an ISDN card to permit backup access to the computer.

12. The system as defined in claim 1, wherein the gateway translates the select information, the transmitter identification, and the transceiver identification information into TCP/IP for communication over the WAN.

13. The system as defined in claim 1, wherein the WAN is the Internet.

14. The system as defined in claim 1, wherein the WAN is a dedicated Intranet.

15. The system as defined in claim 2, further including a first lookup table that is utilized by the first segment, wherein the first lookup table is configured to associate a plurality of unique transmitter identification numbers with a plurality of unique transmitter identifiers, wherein each transmitter identification number is uniquely associated with a unique transmitter identifier.

16. The system as defined in claim 15, further including a second lookup table that is utilized by the second segment,

**20**

wherein the second lookup table is configured to associate a plurality of unique transceiver identification numbers with a plurality of unique geographic locations, wherein each transceiver identification number is uniquely associated with a unique geographic location.

17. The system as defined in claim 16, further including a third lookup table that is utilized by the third segment, wherein the first lookup table is configured to associate a plurality of unique transmitter codes with a plurality of unique information fields associated with the transmitter codes, wherein each transmitter code is uniquely associated with a unique information field.

18. A method for collecting information and providing data services comprising:

adaptively configuring at least one transmitter with a sensor wherein the transmitter generates an information signal consisting of a transmitter identification code and an information field;

placing a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically wherein the information signal is received and repeated as required to communicate the information signal to a gateway, the gateway providing access to a WAN;

translating the information signal within the gateway into a WAN compatible data transfer protocol;

transferring the information signal via the WAN to a computer wherein the computer is configured to manipulate and store data provided in the information signal; and granting client access to the computer.

19. The method of claim 18, wherein the WAN is the Internet.

20. The method of claim 18, wherein the WAN is an Intranet.

21. The method of claim 18, wherein the computer is configured to provide the information in hypertext mark-up language (HTML).

22. The method of claim 18, wherein clients access the information using a web browser.

23. The method of claim 18, wherein the step of adaptively configuring at least one transmitter is modified to replace the sensor with a global positioning system receiver.

24. A method for controlling a system comprising:

remotely collecting data from at least one sensor;

processing the data into a radio-frequency (RF) signal;

transmitting the RF signal, via a relatively low-power RF transceiver, to a gateway;

translating the data in the RF signal into a network transfer protocol;

sending the translated data to a computer, wherein the computer is configured to appropriately respond to the data generated by the at least one sensor by generating an appropriate control signal;

sending the control signal via the network to the gateway;

translating the control signal from a network transfer protocol into a RF control signal;

transmitting the RF control signal;

receiving the RF control signal;

translating the received RF control signal into an analog signal; and

applying the analog signal to an actuator to effect the desired system response.

25. The method of claim 24, wherein the RF signal contains a concatenation of information comprising encoded data information and transmitter identification information from an originating transmitter.

Petitioner Emerson's Exhibit 1001
Page 29 of 31

US 6,437,692 B1

21

**26**. The method of claim **25**, wherein the step of transmitting the RF signal is further performed by at least one transceiver, wherein the transceiver is configured to concatenate a transceiver identification code to the RF signal.

**27**. The method of claim **25**, wherein the step of transmitting the RF control signal is further performed by at least one transceiver, wherein the transceiver is configured to receive and transmit the RF control signal.

**28**. The method of claim **25**, wherein the steps of translating and applying the received RF control signal are performed only by an identified transceiver electrically integrated with an actuator.

**29**. The method of claim **25**, wherein the network is the Internet.

**30**. The method of claim **25**, wherein the network is an Intranet.

**31**. The method of claim **25**, wherein the network transfer protocol is TCP/IP.

**32**. A system for monitoring remote devices comprising:
   at least one sensor adapted to generate an electrical signal in response to a physical condition;
   at least one wireless transmitter configured to encode the electrical signal, the wireless transmitter further configured to transmit the encoded electrical signal and transmitter identification information in a low-power radio-frequency (RF) signal;
   at least one gateway connected a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN; and
   a computer configured to execute at least one computer program that formats and stores select information responsive to the electrical signal for retrieval upon demand from a remotely located device.

**33**. The system defined in claim **32**, the at least one computer program further comprising:
   a first segment for evaluating received information to identify an originating transmitter;
   a second segment for evaluating the received information and identifying transceivers that relayed the select information from the originating transmitter to the gateway;
   a third segment for evaluating the select information transmitted from the originating transmitter embedded within the received information; and
   a fourth segment responsive to the first, second, and third segments for determining an action to be taken based upon the select information, the identified originating transmitter, and the identified transceivers.

**34**. The system as defined in claim **32**, wherein each wireless transmitter is configured to transmit a relatively low-power radio-frequency (RF) signal.

**35**. The system as defined in claim **32**, wherein the at least one gateway is permanently connected to the WAN.

**36**. The system as defined in claim **32**, wherein the gateway translates the encoded electrical signal, the transmitter identification, and the transceiver identification information into TCP/IP for communication over the WAN.

**37**. The system as defined in claim **32**, wherein the WAN is the Internet.

**38**. The system as defined in claim **32**, wherein the WAN is a dedicated Intranet.

**39**. The system as defined in claim **33**, further including a first lookup table that is utilized by the first segment, wherein the first lookup table is configured to associate a plurality of unique transmitter identification numbers with a plurality of unique transmitter identifiers, wherein each transmitter identification number is uniquely associated with a unique transmitter identifier.

**40**. The system as defined in claim **39**, further including a second lookup table that is utilized by the second segment, wherein the second lookup table is configured to associate a plurality of unique transceiver identification numbers with a plurality of unique geographic locations, wherein each transceiver identification number is uniquely associated with a unique geographic location.

**41**. The system as defined in claim **40**, further including a third lookup table that is utilized by the third segment, wherein the first lookup table is configured to associate a plurality of unique transmitter codes with a plurality of unique information fields associated with the transmitter codes, wherein each transmitter code is uniquely associated with a unique information field.

22

**42**. A system for controlling remote devices comprising:
   a computer configured to execute at least one computer program that generates at least one control signal responsive to a system input signal; said computer integrated with a wide area network (WAN);
   at least one gateway connected to the WAN configured to receive and translate the at least one control signal; said gateway further configured to transmit a radio-frequency (RF) signal containing the control signal and destination information;
   at least one wireless low-power RF transceiver configured to receive the RF signal from the gateway; said wireless transceiver configured to translate the RF signal to an analog output signal, the wireless transceiver electrically coupled with an actuator; and
   an actuator configured to receive the analog output signal from the wireless transceiver, the actuator further configured to translate the analog output signal into a response.

**43**. The system defined in claim **42**, the system input signal comprising:
   a concatenation of information including data from a sensor, transceiver identification information from the originating transceiver, and transceiver identification information for each transceiver that receives and repeats the RF signal.

**44**. The system defined in claim **42**, at least one computer program further comprising:
   a first segment for evaluating a system input signal to identify an originating transmitter;
   a second segment for evaluating the system input signal and identifying transceivers that relayed the system input from the originating transceiver to the gateway;
   a third segment for evaluating the system input signal transmitted from the originating transceiver; and
   a fourth segment responsive to the first, second, and third segments for determining an action to be taken based upon the data from a sensor, the identified originating transceiver, and the identified transceivers.

**45**. The system as defined in claim **42**, wherein the at least one gateway is permanently connected to the WAN.

**46**. The system as defined in claim **42**, wherein the gateway translates the RF signal and the RF control signal into TCP/IP for communication over the WAN.

**47**. The system as defined in claim **42**, wherein the WAN is the Internet.

**48**. The system as defined in claim **42**, wherein the WAN is a dedicated Intranet.

Petitioner Emerson's Exhibit 1001
Page 30 of 31

US 6,437,692 B1

23

**49**. A system for managing an arrangement of application specific remote devices comprising:

a computer configured to execute a multiplicity of computer programs, each computer program executed to generate at least one control signal in response to at least one application system input, said computer integrated with a wide area network (WAN);

at least one gateway connected to the WAN configured as a two-way communication device to receive and translate the at least one control signal and the at least one application system input; said gateway further configured to translate and transmit a radio-frequency (RF) signal containing the control signal and destination information, said gateway further configured to receive and translate the at least one application system input and source information;

at least one wireless relatively low-power RF transceiver per computer program configured to receive the RF signal from the gateway; said wireless transceiver configured to translate the RF signal to an analog output signal, the wireless transceiver electrically coupled with an actuator and a sensor;

an actuator configured to receive the analog output signal from the wireless transceiver, the actuator further configured to translate the analog output signal into a response; and

a sensor configured to translate a physical condition into an analog version of the application system input.

**50**. The system as defined in claim **49**, wherein the at least one gateway is permanently connected to the WAN.

**51**. The system as defined in claim **49**, wherein the at least one gateway translates the RF signal and the RF control signal into TCP/IP for communication over the WAN.

**52**. The system as defined in claim **49**, wherein the WAN is the Internet.

**53**. The system as defined in claim **49**, wherein the WAN is a dedicated Intranet.

**54**. The system as defined in claim **49**, wherein the at least one gateway is connected to the WAN by a network selected from the group consisting of a telecommunications network, private radio-frequency network, and a computer network.

**55**. A method for collecting information and providing data services comprising:

adaptively configuring a data translator at the output of a local controller, wherein the data translator converts the output data stream into an information signal consisting of a transmitter code and an information field;

adaptively configuring at least one transmitter with the data translator, wherein the transmitter converts the information signal into a low-power RF signal;

placing a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically wherein the low-power RF signal is received and repeated as required to communicate the information signal to a gateway, the gateway providing access to a WAN;

translating the low-power RF signal within the gateway into a WAN compatible data transfer protocol;

24

transferring the translated low-power RF signal via the WAN to a computer wherein the computer is configured to manipulate and store data provided in said signal; and

granting client access to the computer.

**56**. The method of claim **55**, wherein the WAN is the Internet.

**57**. The method of claim **55**, wherein the WAN is an Intranet.

**58**. The method of claim **55**, wherein the computer is configured to provide the information in hypertext mark-up language (HTML).

**59**. The method of claim **55**, wherein clients access the information using a web browser.

**60**. A method for controlling an existing control system with a local controller comprising:

adaptively configuring a data translator disposed between and in communication with both a local controller and a wireless transceiver, wherein the data translator is configured to translate the local controller data stream into an information signal consisting of a transceiver identification code and a concatenation of function codes, the data translator further configured to translate control signals from the wireless transceiver into local controller recognized control signals;

remotely collecting data from at least one relatively low-power radio-frequency (RF) transceiver integrated with the data translator;

processing the data into a RF signal;

transmitting the RF signal to a gateway;

translating the data in the RF signal into a network transfer protocol;

sending the translated data to a computer, wherein the computer is configured to appropriately respond to the data generated by at least one sensor by generating an appropriate control signal;

sending the control signal via the network to the gateway;

translating the control signal from a network transfer protocol into a RF control signal;

transmitting the RF control signal;

receiving the RF control signal;

translating the received RF control signal into a local controller recognized control signal; and

applying the local controller recognized control signal via a local controller to effect the desired system response.

**61**. The method of claim **60**, wherein the step of transmitting the RF control signal is further performed by at least one transceiver, wherein the transceiver is configured to receive and transmit the RF control signal.

**62**. The method of claim **60**, wherein the network is the Internet.

**63**. The method of claim **60**, wherein the network is an Intranet.

**64**. The method of claim **60**, wherein the network transfer protocol is TCP/IP.

* * * * *

Petitioner Emerson's Exhibit 1001
Page 31 of 31

**CERTIFICATE OF SERVICE**

On August 9, 2019, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Douglas Hallward Driemeier*
Douglas Hallward-Driemeier
*Counsel for Emerson Electric Co.*

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,910 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ Douglas Hallward-Driemeier*
Douglas Hallward-Driemeier
*Counsel for Emerson Electric Co.*