Appeal No. 19-1301, 19-1490

# *United States Court of Appeals*
*for the*
# *Federal Circuit*

EMERSON ELECTRIC CO.,

*Appellant*,

– v. –

SIPCO, LLC,

*Cross-Appellant*.

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD, IN CASE NO. IPR2017-00359

**PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANT SIPCO, LLC**

DR. GREGORY GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, Virginia 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

*Counsel for Cross-Appellant*
*SIPCO, LLC*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellee SIPCO, LLC, certifies as follows:

1. The full name of every party represented by me is:

**SIPCO, LLC**

2. The name of the real party in interest represented by me is:

**Not applicable**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

Glocom, Inc.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**Meagher Emanuel Laks Goldberg & Liao, LLP:**

Thomas F. Meagher

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are:

*SIPCO, LLC, et al. v. Emerson Electric Co., et al.*, Civil Action No. 6:15-cv-00907-JRG-KNM (E.D. Texas), which has been transferred to the Northern District of Georgia, Case No. 1:16cv2690.

Respectfully submitted,

/s/ Gregory J. Gonsalves
GREGORY J. GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, VA 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

*Counsel for Appellee*
*SIPCO, LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ ii

TABLE OF CONTENTS ........ iv

TABLE OF AUTHORITIES ........ vi

TABLE OF ABBREVIATIONS ........ x

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 2

I. COUNTER STATEMENT OF THE ISSUES ........ 2

II. STATEMENT OF THE CASE AND FACTS ........ 4

A. CONVENTIONAL CONTROL AND MONITORING SYSTEMS ........ 4

B. THE '692 PATENT: DAVID PETITE AND RICHARD HUFF INVENT A NEW TYPE OF SYSTEM FOR REMOTE MONITORING AND CONTROL THAT COLLECTS DATA FROM A SENSOR AND TRANSMITS THE DATA THROUGH NETWORKS AND A GATEWAY TO A COMPUTER, WHICH GENERATES A CONTROL SIGNAL THAT IS TRANSMITTED TO AN ACTUATOR WHERE IT IS APPLIED ........ 7

C. THE PTAB PROCEEDING ........ 11

1. Emerson's Petition and Expert Declaration ........ 11

2. Preliminary Response and Patent Owner Response ........ 12

3. The Board's Decision Denying Institution of Ground 2 ........ 13

4. The Board's Post-Hearing Order and Additional Briefing ........ 14

5. The Board's Final Written Decision ........ 17

III. SUMMARY OF THE ARGUMENT ........ 22

IV. STANDARD OF REVIEW ........ 28

V. ARGUMENT ..........29

A. THE BOARD'S FINDINGS THAT THE GROUND 2 CLAIMS ARE NOT OBVIOUS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE..........29

1. THE BOARD'S FINDING THAT CUNNINGHAM FAILS TO TEACH THE "CONTROL SIGNAL" LIMITATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE..........30

2. THE BOARD'S CONCLUSION THAT CUNNINGHAM FAILS TO TEACH THE "TRANSLATING" LIMITATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE..........46

3. THE BOARD DID NOT ABUSE ITS DISCRETION WHEN IT REJECTED EMERSON'S REQUEST TO FILE ANOTHER EXPERT DECLARATION..........49

B. THE BOARD OVERLOOKED CRITICAL EVIDENCE IN ITS ANTICIPATION AND OBVIOUSNESS ANALYSIS OF THE GROUND 3 CLAIMS..........53

1. THE BOARD OVERLOOKED UNDISPUTED RECORD EVIDENCE THAT CUNNINGHAM'S DATA COLLECTIONS MODULES ARE NOT LOW POWER..........56

2. THE BOARD APPLIED THE WRONG CLAIM CONSTRUCTION STANDARD, ERRED IN ITS CLAIM CONSTRUCTION OF "LOW POWER RADIO FREQUENCY (RF) TRANSCEIVER," AND APPLIED ITS ERRONEOUS CLAIM CONSTRUCTION TO ITS PATENTABILITY ANALYSIS..........62

3. THERE IS NO EVIDENCE THAT CUNNINGHAM'S GATEWAY DELIVERS AN "ENCODED ELECTRICAL SIGNAL" TO A COMPUTER ON THE WAN..........66

VI. CONCLUSION..........70

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anacor Pharm. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) ....................51

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................60

*Belden Inc. v. BerkTek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................29

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) .................... 33, 40, 45

*Dell Inc. v. Acceleron, LLC*,
884 F.3d 1364 (Fed. Cir. 2018) .................... 15, 16, 51, 52

*Eidos Display, LLC. v. AU Optronics Corp.*,
779 F.3d 1360 (Fed. Cir. 2015) ....................28

*Ericsson Inc. v. Intellectual Ventures I LLC,*
890 F.3d 1336 (Fed. Cir. 2018) .................... 35, 40

*Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm.*,
825 F.3d 1360 (Fed. Cir. 2016) ....................52

*Grain Processing Corp. v. Am.-Maize Prods. Co.*,
840 F.2d 902 (Fed. Cir. 1988) ....................36

*HP Inc. v. MPHJ Tech. Invs., LLC,*
817 F.3d 1339 (Fed. Cir. 2016) ....................28

*In re Beattie*,
974 F.2d 1309 (Fed. Cir. 1992) ....................28

*In re Chapman*,
595 F.3d 1330 (Fed. Cir. 2010) ....................28

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ....................28

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997) .................... 61, 70

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ....................29

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ....................28

*In re Schulze*,
346 F.2d 600 (CCPA 1965) .................... 61, 70

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) .................... 18-19, 43

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) ....................62

*In re Translogic Tech., Inc.*,
504 F.3d 1249 (Fed. Cir. 2007) ....................62

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ....................36

*Israel Bio-Eng'g Project v. Amgen Inc.*,
475 F.3d 1256 (Fed. Cir. 2007) ....................41

*K/S HIMPP v. Hear-Wear Technologies, LLC*,
751 F.3d 1362 (Fed. Cir. 2014) ....................34-35, 36, 60, 69

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1343 (Fed. Cir. 2012) ....................36

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................55

*Microsoft Corp. v. Proxyconn, Inc.*,
789 F.3d 1292 (Fed. Cir. 2015) ....................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).................... 55, 59

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ....................28

*Orthopedic Equip. Co. v. United States*,
702 F.2d 1005 (Fed. Cir. 1983) ....................36

*Personal Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................60

*Phillips v. AWH*,
415 F.3d 1303 (Fed. Cir. 2005) .......... *passim*

*Power Integrations, Inc. v. Lee,*
797 F.3d 1318 (Fed. Cir. 2005) .......... 59

*Rovalma, S.A. v. Bohler-Edelstahl GmbH*,
856 F.3d 1019 (Fed. Cir. 2017) .......... 55, 59, 60

*SAS Institute, Inc. v. Iancu*,
138 S. Ct. 1348 (2018) .......... 2, 14

*SAS Institute, Inv. v. ComplementSoft, LLC*,
825 F.3d 1341 (Fed. Cir. 2016) .......... 52

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 55

*SIPCO, LLC v. Emerson Elec. Co.*,
No. 2018-1635, 2019 U.S. App. LEXIS 28935
(Fed. Cir. Sep. 25, 2019) .......... 21, 26, 65

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd.* (BVI),
Case Nos. 2018-2125, 2018-2151, 2019 WL 272316 (Fed. Cir.
July 1, 2019) .......... 43

*Wowza Media Sys., LLC v. Adobe Sys., Inc.*,
IPR2013-00054, Paper 16 (P.T.A.B. July 13, 2013) .......... *passim*

**<u>Statutes</u>**

28 U.S.C. § 1295(a)(4)(A) .......... 2

35 U.S.C. § 141(c) .......... 2

35 U.S.C. § 141 .......... 2

35 U.S.C. § 319 .......... 2

**<u>Rules</u>**

Fed. Cir. R. 47.5(a) .......... 1

Fed. Cir. R. 47.5(b) .......... 1

**Regulations**

37 C.F.R. § 42.100(b) (2016) ........................................................................ 62

Trial Practice Guide,
77 Fed. Reg. 48756 (Aug. 14, 2012) ........................................ 17, 24, 33, 40

**Other Authorities**

MPEP § 2258 .................................................................................... 26, 63

MPEP § 2666.01 ................................................................................ 26, 63

# TABLE OF ABBREVIATIONS

**Parties**

| | |
|---|---|
| Appellee, Cross-Appellant, Patent Owner, SIPCO | SIPCO, LLC |
| Appellant, Petitioner, or Emerson | Emerson Electric Co. |

**Citations**

| | |
|---|---|
| Appx____ | Joint Appendix at page(s) _____ |
| MPEP | Manual of Patent Examining Procedure |

**Terms**

| | |
|---|---|
| ’692 Patent | United States Patent No. 6,437,692 |
| AIA | America Invents Act |
| APA | Administrative Procedure Act |
| Cunningham | United States Patent No. 6,124,806 |
| Mason | United States Patent No. 6,100,817 B2 |
| Shuey | United States Patent No. 5,874,903 B2 |
| McGowan | John J. McGowan, *Direct Digital Control: A Guide to Distributed Building Automation*, 1995. |
| Board, PTAB | Patent Trial and Appeal Board |
| IPR | *Inter Partes* Review |
| POSITA | person of ordinary skill in the art |

## STATEMENT OF RELATED CASES

Under Fed. Cir. R. 47.5(a), counsel for Appellee, SIPCO, LLC ("SIPCO"), certifies that no other appeal from the same proceeding in the United States Patent & Trademark Office, Patent Trial and Appeal Board ("PTAB" or "the Board") is or was previously before this Court or any other appellate court, whether under the same or a similar title.

Under Fed. Cir. R. 47.5(b), counsel for SIPCO states that the Court's decision in this appeal may affect the following judicial and administrative matters:

United States District Court actions involving the patent at issue

1. IPCO asserted the '692 patent in the following litigation: *SIPCO, LLC, et al. v. Emerson Electric Co., et al.*, Civil Action No. 6:15-cv-00907-JRG-KNM (E.D. Texas), which has been transferred to the Northern District of Georgia, Case No. 1:16cv2690.
2. *Ex parte* reexamination No. 90/014,177 (PTAB), involves U.S. Patent No. 6,437,692.
3. *Ex parte* reexamination No. 90/014,178 (PTAB), involves U.S. Patent No. 6,437,692

## STATEMENT OF JURISDICTION

This is an appeal under 35 U.S.C. § 141(c) from the Final Written Decision of the Patent Trial and Appeal Board entered on November 28, 2018, in *Inter Partes* Review No. IPR2017-00359. Emerson Electric Co. filed a timely Notice of Appeal on December 10, 2018. SIPCO filed a timely Notice of Cross-Appeal on January 29, 2019. This Court therefore has jurisdiction over this appeal under 35 U.S.C. §§ 141 and 319 and 28 U.S.C. § 1295(a)(4)(A).

## I. COUNTER STATEMENT OF THE ISSUES

1. Does substantial evidence support the Board's factual finding that the host module in Cunningham does not generate control signals that are transmitted via a gateway and translated to an analog signal to control an actuator?

2. Does substantial evidence support the Board's factual findings that Emerson failed to show that a POSA would have combined the teachings of the different embodiments in Cunningham and the provisional '978 application and reasonably expect success?

3. Has Emerson showed that the Board failed to comply with the Administrative Procedure Act by permitting Emerson to file two supplemental briefs to address the newly instituted claims (Ground 2) after the Supreme Court's ruling in *SAS Institute, Inc. v. Iancu*,138 S. Ct. 1348 (2018) but denying a second expert declaration?

4. Did the Board err in applying the "broadest reasonable" claim construction standard in its Final Written Decision after the '692 patent had expired?

5. Did the Board err in its construction of "low power radio frequency signal" when its construction is inconsistent and in conflict with this Court's construction of the same limitation in a patent having the same inventors and relating to the same technology?

6. Did the Board err in concluding that the prior art discloses or teaches the limitations of claims 32, 34, 36-38, 55-57, and 59 (Ground 3), including the "low power radio frequency signal," under the proper claim construction?

## II. Statement Of The Case And Facts

The Board correctly held that claims 24-31, 42, 43, 46-49, 51-54, and 60-64 of the ‘692 patent were not obvious over the prior art (*i.e.*, Cunningham, Mason, and McGowan).[1] Appx51. The Board committed reversible error, however, in finding that claims 32, 34, 37-38, 55-57, and 59 were anticipated by and/or obvious over Cunningham. Appx51.

### A. Conventional Control and Monitoring Systems

“[C]ontrol systems utilize computers to process system inputs, model system responses, and control actuators to implement process corrections within the system.” Appx72, 1:38-42. Types of control and monitoring systems include “aperiodic or random, periodic, and real-time.” Appx72, 1:48-49. “Aperiodic monitoring systems (those that do not operate on a predetermined cycle) are inherently inefficient as they require a service technician to physically traverse an area to record data, repair out of order equipment, add inventory to a vending machine, and the like.” Appx72, 1:53-57. Periodic control systems include “meter monitoring, recording, and client billing.” Appx72, 1:60-61. Utility providers cut expenses by “increasing the period at which manual monitoring and meter data recording was performed.” Appx72, 2:65-67. Nonetheless, “the utility provider

---

[1] The Board also correctly held that claim 36 was patentable. Appx39-40. That holding is not at issue in this appeal.

retained the costs associated with less frequent meter readings and the processing costs associated with reconciling consumer accounts." Appx72, 2:5-6. Exemplary real time control systems include "[H]eating, ventilation, and air-conditioning systems, fire reporting and damage control systems, alarm systems, and access control systems." Appx72, 2:8-11. Real time control systems present the most challenging problems because they "require immediate feedback and control." Appx72, 2:12-13.

Typically, control and monitoring systems were implemented in remote, distributed environments by installing "a local network of hard-wired sensors and actuators along with a local controller." Appx72, 2:21-22. Such a system, showing the sensors/actuators communicating directly with a local controller that communicates through a WAN to a central controller, is depicted shown below in FIG. 1 (reproduced below).




**FIG. 1**
**(PRIOR ART)**

Appx54. Problems associated with this typical approach included "the costs associated with the sensor-actuator infrastructure required to monitor and control functions within such systems." Appx72, 2:17-19. Additional problems included the "added expense of connecting functional sensors and controllers with the local controller. Another prohibitive cost associated with applying control systems technology to distributed systems is the installation and operational expense associated with the local controller." Appx72, 2:23-24.

Accordingly, there existed a need to overcome the shortcomings of the prior art with "an alternative solution to applying monitoring and control system solutions to distributed systems." Appx72, 2:28-30.

### B. THE '692 PATENT: DAVID PETITE AND RICHARD HUFF INVENT A NEW TYPE OF SYSTEM FOR REMOTE MONITORING AND CONTROL THAT COLLECTS DATA FROM A SENSOR AND TRANSMITS THE DATA THROUGH NETWORKS AND A GATEWAY TO A COMPUTER, WHICH GENERATES A CONTROL SIGNAL THAT IS TRANSMITTED TO AN ACTUATOR WHERE IT IS APPLIED.

To solve the problems associated with the prior art systems, David Petite and his colleague Richard Huff created a new "system for monitoring a variety of environmental and/or other conditions within a defined remotely located region." Appx53, Abstract. FIG. 2, reproduced below, illustrates "a monitoring/control system of the present invention." Appx73, 4:23-24.




**FIG. 2**

Appx56. Rather than having the sensors primarily communicating with only a central node or controller, the system disclosed and claimed in the '693 patent includes "sensor/actuators 212, 214, 216, 222, and 224 each integrated with a transceiver" that allow a highly flexible network to be utilized. Appx74, 5:49-50. The system further includes "a plurality of stand-alone transceivers 211, 213, 215, and 221. Each stand-alone transceiver 211, 213, 215, and 221 and each of the integrated transceivers 212, 214, 216, 222, and 224 may be configured to receive

an incoming RF transmission (transmitted by a remote transceiver) and to transmit an outgoing signal." Appx74, 6:65-7:3. "Local gateways 210 and 220 are configured and disposed to receive remote data transmissions from the various standalone transceivers 211, 213, 215, and 221 or integrated transceivers 212, 214, 216, 222, and 224 having an RF signal output level sufficient to adequately transmit a formatted data signal to the gateways. Local gateways 210 and 220 analyze the transmissions received, convert the transmissions into TCP/IP format and further communicate the remote data signal transmissions via WAN 230." Appx74, 6:15-23. In particular, local gateways 210 and 220 communicate information control signals "to remote sensor/actuator transceiver combinations 212, 214, 216, 222, and 224 from server 260 … across WAN 230." *Id.* at 6:24-29. The WAN-connected server 260 "collects and formats the utility meter information for viewing and or retrieval upon client demand." Appx77, 12:38-39.

The integrated transceivers "have a unique identification code (e.g., transmitter identification number) 326, that uniquely identifies the transmitter to the functional blocks of control system 200 (see FIG. 2)." Appx75, 8:28-31. The integrated transceivers transmit to the standalone transceivers a data packet 330 including "a function code, as well as, a transmitter identification number." Appx75, 8:49-51. A standalone transceiver receiving a data packet 330 from an integrated transceiver forms its own data packet "by concatenating received data

packet 330 with its own transceiver identification code 326 and its own specific function codes." Appx76, 10:40-43.

The data packet is then sent from the standalone transceiver to the gateway, through the WAN to a server:

> local gateway 210 is configured to transmit control signals and receive data signals using the open data packet protocol as previously described. Local gateway 210 is preferably interconnected permanently on WAN 230 and configured to translate received data signals for WAN transfer via TCP/IP. A server 530 configured with web applications and client specific applications as required is connected to WAN 230 via router 510.

Appx77, 12:6-14.

Accordingly, the disclosed invention includes (1) a computer integrated with a wide area network (WAN); (2) transceivers configured to receive sensor data and identification information transmitted wirelessly from another nearby wireless transceiver electrically interfaced with the sensor and to wirelessly retransmit the received sensor data and identification information received from the nearby wireless transceiver, along with transceiver identification information associated with the transceiver making retransmission; and (3) a gateway connected to the WAN and configured to receive and translate the sensor data, the identification information associated with the nearby wireless transceiver, and transceiver identification information associated with the retransmitting transceivers, and to

further transmit the translated information to the computer over the WAN. The gateway can also be configured to receive control signals from the computer over the WAN, translate the control signals, and transmit the translated control signals to an actuator.

## C. The PTAB Proceeding

### 1. Emerson's Petition and Expert Declaration

On November 30, 2016, Emerson filed an IPR petition accompanied by an expert declaration from Mr. Kinney challenging claims 1, 3-8, and 11-14 as allegedly being obvious over Mason and Cunningham (Ground 1), claims 24-31, 42, 43, 46-49, 51-54, and 60-64 as alleged being obvious over Cunningham, McGowan, and Mason (Ground 2) and claims 32, 34, 36-38, 55-57, and 59 as allegedly anticipated and/or obvious over Cunningham. Appx95-96.

With respect to independent claim 24 as well as independent claims 42, 49, and 60, Petitioner alleged that "the host module [of Cunningham] that receives information from the data collection module responds with controlling ***information***," (Appx150 (*emphasis added*))—in contrast to the "control ***signal***" recited in the claims. Appx81, 20:53 (*emphasis added*). Petitioner further alleged that the "controlling information" was sent from the host module to a local controller called a "device adjustment module," which in turn, used that information to "control a thermostat to adjust the operation usage of an air

conditioning and heating system." Appx154. Petitioner relied upon the declaration of Mr. Kinney to support its obviousness theory. Appx148-151; Appx156.

### 2. Preliminary Response and Patent Owner Response

SIPCO filed a Preliminary Response on March 13, 2017 (Appx202-259) and filed a Patent Owner Response (Appx342-404) with an expert declaration from Dr. Almeroth (Appx3161-3226) on June 19, 2017.

In the Preliminary Response, Patent Owner explained that the disclosures of Cunningham and the secondary references differ sharply from the claimed invention of the '692 patent. Cunningham discloses that a local controller called a device adjustment module receives ***information*** from a host module and uses that information to generate signals to control actuators, such as a thermostat. More particularly, Patent Owner explained that "the Device Adjustment Module receives utility prices and based on its reading of the sensor and the received utility pricing, generates an appropriate control signal to control a thermostat." Appx238. In contrast, the '692 patent recites a computer that generates a control signal that is directly applied to an actuator, after the control signal is converted to an analog signal.

Patent Owner also noted that "Petitioner does not have any meaningful expert support for its opinion" because most of Mr. Kinney's declaration "was copied from the Petition." Appx238.

**3. The Board's Decision Denying Institution Of Ground 2.**

On June 1, 2017, the Board issued a Decision denying institution of Ground 2 because "Cunningham's 'controlling information' does not correspond to the 'control signal' as recited in the challenged claims." Appx276. The Board explained that "[r]ead in context, Cunningham's use of the word 'controlling information' refers back to 'varying utility prices.'" Appx277, *comparing* Appx1067, 46:64–67 *with* Appx1068, 47:8–10.

The Board explained that "[i]n Cunningham, the host module—which is on the network…—generates transmissions updating the price of the utility being consumed (e.g., electricity)." Appx277, *citing* Appx1067, 46:67-47:3; 46:64–47:10. "The device adjustment module—which is not on the network but rather on the other side of the asserted gateway… (describing "attaching a device control module" to a thermostat)—uses the price information, along with locally obtained energy usage information, to generate control signals." Appx277, *citing* Appx1067-1068, 46:67–47:34; Appx1067, 46:64– 67 ("Device adjustment modules are used to monitor and *control* the operation of various devices and

applications according to varying utility prices and the device consumption information.”).

“Thus, it is the local device adjustment module, not the host module on the network, that issues control signals in Cunningham.” Appx277. For these reasons, the Board held that “Petitioner does not show how the asserted prior art renders obvious the claimed methods and systems including the control signal limitations.” *Id.* The Board then concluded that there was not a reasonable likelihood Petitioner would prevail in showing that any of claims 24–31, 42, 43, 46–49, 51–54, and 60–64 would have been obvious over Cunningham, McGowan, and Mason.” *Id.*

#### 4. The Board’s Post-Hearing Order And Additional Briefing

On May 2, 2018, the Board issued an Order “to institute review of all claims and all grounds” in light of the Supreme Court’s decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018) and “granted additional briefing.” Appx3. In particular, the Board authorized Petitioner to file a Petitioner’s Brief; “authorized Patent Owner to file a Supplemental Response addressing the newly instituted claim … and authorized Petitioner to file a Supplemental Reply addressing issues raised by Patent Owner’s Supplemental Response.” Appx3.

The Board did not authorize Petitioner and Patent Owner to file a supplemental expert declaration with their supplemental briefs. Appx607. The

Board considered that "[t]he Federal Circuit [had] acknowledged 'the need for an adequate opportunity to respond . . . [b]ut … [did] not require the Board on remand to admit new evidence in response.'" Appx607, *quoting Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018).

In its supplemental brief for the newly-instituted grounds, Petitioner insisted—despite the Board's findings to the contrary in its Institution Decision—that the "'control signal' limitations are still met by sending 'controlling information' in the form of updated 'utility prices' that are used to 'adjust the operation usage of a thermostat." Appx621. That is, Petitioner acknowledged that there is a difference between a "control signal" that is applied to a thermostat (*i.e.*, a type of actuator) as recited in the claims of the '692 patent, and "controlling information" that is used by Cunningham's local device adjustment module to generate a control signal. *Id.* Petitioner nonetheless asserted that Cunningham's "controlling information" is the same as the '692 patent's "control signal." *Id.* Petitioner also relied upon the disclosure in Cunningham's U.S. Provisional Application No. 60/058,978 ("the '976 provisional application") of the Energy Management Services and the Williams Network Control Center. Appx622-624.

In its supplemental brief, Patent Owner explained that Cunningham's processing of a utility price differs from the claimed invention of the '692 patent

because the utility price "is not (i) a control signal generated by a computer in response to the received sensor data, (ii) sent via the network by a gateway, (iii) translated into a RF signal, (iv) transmitted, (v) received, (vi) translated into an analog signal, and (vii) applied to an actuator," as required by the claims. Appx648. Patent Owner explained that "Petitioner conflates mere data that may be referenced to determine how to control an actuator as taught by Cunningham with a control signal that is translated into an analog signal to control an actuator, as claimed by the '692 patent." *Id.*

Patent Owner further explained that the Energy Management System and the Williams Network Control Center (NCC) of the '978 application also do not satisfy these claim requirements. Patent Owner noted that the '978 application would not have taught that "the NCC generates a control signal that is subsequently translated and transmitted via the path required by claim 24." Appx644-645. As explained by Patent Owner, "[t]he claimed control signal must be (i) generated by a computer in response to the received sensor data (ii) sent via a network to a gateway, (iii) translated into a RF signal, (iv) transmitted, (v) received (vi) translated into an analog signal, and (vii) applied to an actuator," and "[t]here is no teaching in Cunningham or its '978 provisional application that any signal generated by the NCC satisfies all of these five claim requirements." Appx645.

Patent Owner also noted that "the Petition does not have any meaningful support from expert testimony because most of the declaration from Petitioner's expert (Mr. Kinney) is a copy of the argument from the Petition." Appx641. Patent Owner then explained that "Petitioner's argument that it should be permitted to file an additional expert declaration" is meritless because Petitioner "is not permitted to introduce new evidence to make a prima facia case of obviousness that it failed to make in its petition and because there was no reason why a legitimate expert declaration (instead of one that was copied from the Petition) could not have been filed with the Petition." Appx641, *citing* Trial Practice Guide, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012).

**4. The Board's Final Written Decision**

The Board issued a Final Written Decision on November 28, 2018 cancelling only claims 32, 34, 37-38, 55-57, and 59 of the '692 patent and ruling that claims 1, 3-8, 11-14, 24-31, 36, 42, 43, 46-49, 51-54, and 60-64 were not shown to be unpatentable. Appx51.

With respect to claims 24-31, 42, 43, 46-49, 51-54, and 60-64 (Ground 2), the Board reasoned that "[w]hile 'utility prices' may be information related to controlling the device or even used in determining whether to control the device they do not cause a controlling action to be done to the device." Appx27, *citing* Appx1067-1068, 46:62-47:10. The Board noted that the "utility prices" of

Cunningham "is not of a character that controls the operation of a device such as a thermostat." Appx27. The Board explained that "[t]he device adjustment module [of Cunningham]—which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with locally-obtained energy usage information, to generate control signals." Appx28. The Board therefore found that "it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham." Appx29.

The Board contrasted Cunningham's utility prices with the "examples in the specification [of the '692 patent], including 'temperature set point' [which] involve directly controlling a device rather than information that is processed outside of the device to determine whether to send control signals to the device." Appx27. The Board also noted that "Petitioner has not explained how 'utility prices' can be 'translated' 'from a network transfer protocol into a RF control signal' and then 'an RF control signal into an analog signal' that can be applied ultimately to san actuator." Appx28.

With respect to the combination of Cunningham and its provisional application ("the '978 provisional"), the Board explained that an obviousness determination based on "'combining multiple embodiments from a single reference'" requires "'a motivation to make the combination and a reasonable expectation that such a combination would be successful.'" Appx30-31, *quoting In*

*re Stepan Co.*, 868 F.3d 1342, 1346 n. 1 (Fed. Cir. 2017). The Board noted that Petitioner "does not explain how Energy Management Services or the 'routines' described in the Provisional send control signals from the computer to the actuator as required by the claims." The Board further noted that "the 'routines' described in the '978 Provisional work differently than the 'utility prices' embodiment of Cunningham" and that "Petitioner has not explained how those would work together to meet the claim limitations." Appx31. The Board noted that "Petitioner has not explained why or how the DAM would use the alleged control signals from the 'routines' rather than its own generated control signals." Appx33.

The Board also noted that "Petitioner has not explained, in the Petition, how the Provisional's alleged control signals would meet the other limitations of the claim." Appx32. With respect to Petitioner's description "in its supplemental briefing and in the supplemental hearing" purporting to "explain how the structures of the '978 Provisional and Cunningham are related," the Board noted that "this description is not found in the Petition" and that the Board "cannot rely on such substantive contentions … from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition." Appx32, fn. 9.

With respect to the claim construction issue, the Board applied the "broadest reasonable" standard based on its belief that the '692 patent "claims priority to multiple related applications, the earliest of which was filed August 2, 1999."

Appx4. The Board's belief is wrong. The earliest application to which the '692 patent claims priority was filed on June 22, 1998. Appx53.[2] The '692 patent, therefore, expired on June 22, 2018[3], before the date of the Final Written Decision (November 28, 2018). Accordingly, the Board should have applied the claim construction standard set forth in *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005) because the '692 patent had expired before the Board issued its Final Written Decision, but instead used the "broadest reasonable" standard.

Applying the improper claim construction standard, the Board rejected SIPCO's proposed construction of the claimed "low power radio frequency (RF) signal" as having a limited transmission range, even though the Specification indicates that "the claimed low-power radio frequency transmitter and transceiver have a short transmission range." Appx3207, ¶ 108.

The Board's construction of the "low-power radio frequency (RF) signal" limitation is in conflict with and is inconsistent with this Court's construction of the ***same limitation*** in a patent having the ***same inventors*** and relating to the ***same***

---

[2] A certificate of correction was issued to show parallel priority claims to three applications instead of claims to a series of applications. Appx303. But the priority claims in both the issued '692 patent and the corrected patent identify the earliest priority date as June 22, 1998. *Id.*; Appx53.

[3] There is no indication of any adjustment to the term of the '692 patent either on the face of the patent (Appx53) or the file history.

***subject matter***. *SIPCO, LLC v. Emerson Elec. Co.*, No. 2018-1635, 2019 U.S. App. LEXIS 28935, at *2 (Fed. Cir. Sep. 25, 2019). There, this Court held that "SIPCO's specification explicitly ties the low power transceiver to a limited transmission distance; accordingly, a skilled artisan would understand 'low-power' to mean that the transceiver operates at a power level corresponding to 'limited transmission range.'" *Id.*

Using the improper standard and claim construction, the Board ruled that Cunningham's Data Collection Module (alleged by Emerson to be one of the claimed "relatively low-power radio-frequency (RF) transceivers") and Sensor Interface Module (SIM) are "low power." The Board referred to the portion of Cunningham discussing the power level of the SIMs, but did not reference any portion of Cunningham discussing the power level of the DCMs. The DCM transmits over an outdoor Metropolitan Network and National Backbone Network. Appx3223, ¶144. The DCMs transmit over an outdoor Metropolitan Network and National Backbone Network that, according to Emerson's expert witness, span "10, 20 miles" or "a kilometer" Appx3337, 70:16-19. The SIMs have a transmission range of over 600 feet and up to 3 miles (Appx1053, 17:60-67).

## III. Summary Of The Argument

### *A. The Board's Ruling On Ground 2 Should Be Affirmed*

The Board's ruling that claims 24-31, 42, 43, 46-49, 51-54, and 60-64 (Ground 2) were not shown to be unpatentable should be affirmed. Nearly all of Emerson's arguments are challenges to the Board's factual findings, which are reviewed for and in this case supported by substantial evidence.

Petitioner's disagreements with the Board's interpretation of the prior art (*e.g.*, Cunningham and the provisional '978 application) are not nearly enough to warrant reversal of the Board's decision on Ground 2. So long as the Board's findings are supported by substantial evidence—and they are—its decision to favor one conclusion over another contradictory conclusion is the type of decision this Court must sustain.

Petitioner challenges the Board's Ground 2 ruling based on the argument that the Board "disregard[ed] Cunningham's express disclosure that '[t]he device adjustment module … *receives controlling information from* system update transmissions'" and "disregard[ed] the express disclosure in the '978 provisional application." Blue Br. 5-6 (*emphasis in original*). But the Board did not disregard Cunningham's disclosure of "controlling information" or the '978 provisional application. Rather, it provided a lengthy and detailed explanation of how

Cunningham's "controlling information" differs from the "control signal" recited in the claims of the '692 patent.

The Board explained that although controlling information such as "'utility prices' may be information related to controlling the device or even used in determining whether to control the device they do not cause a controlling action to be done to the device." Appx27, *citing* Appx1067-1068, 46:62-47:10. The Board noted that the "utility prices" of Cunningham "is not of a character that controls the operation of a device such as a thermostat." Appx27. The Board explained that "[t]he device adjustment module [of Cunningham]—which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with locally-obtained energy usage information, to generate control signals." Appx28. Petitioner's contentions are nothing more than a serious of disagreements with the Board's interpretation of Cunningham.

The Board also provided a well-reasoned and lengthy explanation as to why the disclosure of the '978 provisional application does not compensate for the deficiencies of Cunningham. The Board noted that Petitioner "does not explain how Energy Management Services or the 'routines' described in the Provisional send control signals from the computer to the actuator as required by the claims." Appx30. The Board further noted that "the 'routines' described in the '978 Provisional work differently than the 'utility prices' embodiment of Cunningham"

and that "Petitioner has not explained how those would work together to meet the claim limitations." Appx31. The Board also noted that Petitioner has not explained, in the Petition, how the Provisional's alleged control signals would meet the other limitations of the claim." Appx32. Substantial evidence supports the Board's decision on Ground 2.

With respect to Petitioner's description "in its supplemental briefing and in the supplemental hearing" purporting to "explain how the structures of the '978 Provisional and Cunningham are related," the Board recognized that "this description is not found in the Petition" and that the Board "cannot rely on such substantive contentions … from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition." Appx32, fn. 9.

The only argument raised by Emerson that is not purely a challenge to the Board's factual findings is its contention that the Board violated the Administrative Procedure Act (APA) because it did not permit Emerson to file an additional expert declaration with its supplemental briefs. But this argument is also reviewed deferentially, for abuse of discretion. And the Board did not abuse its discretion because it is not required to admit new expert testimony to enable a petitioner to compensate for its failure to set forth a *prima facia* case of obviousness in its Petition. Trial Practice Guide, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012) ("Examples of indications that a new issue has been raised in a reply include new

evidence necessary to make out a prima facie case for the … unpatentability of an original or proposed substitute claim, and new evidence that could have been presented in a prior filing.”).

The Petition and accompanying expert declaration from Mr. Kinney did not present a *prima facia* case of obviousness. As noted by the Board, the Petition does not explain how a person of ordinary skill in the art (POSA) would have combined the teachings of the different embodiments of Cunningham and the ‘978 provisional application to achieve the claimed invention and reasonably expect success. Also, nearly all of the declaration from Emerson’s expert Mr. Kinney was copied from the Petition. Such copied testimony cannot establish a *prima facia* case of obviousness because it is entitled to little or no weight. *See Wowza Media Sys., LLC v. Adobe Sys., Inc.*, IPR2013-00054, Paper 16 at p. 4 (P.T.A.B. July 13, 2013).

### ***B. The Board’s Ruling On Ground 3 Should Be Reversed Because It Erred By Disregarding Important Evidence On The Power Level Of Cunningham’s Data Collection Modules, Applied the Wrong Claim Construction Standard and Used An Erroneous Claim Construction.***

The Board’s ruling that Emerson showed that claims 32, 34, 37-38, 55-57, and 59 are unpatentable (Ground 3) should be reversed. The Board used the “broadest reasonable” claim construction standard even though it should have used the standard set forth in *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005) because the ‘692 patent had expired before the Board issued its Final Written Decision. The

PTO expressly acknowledges that the principles set forth in *Phillips* will result in narrower claim constructions: "Once the patent expires, a narrow claim construction is applied." MPEP 2666.01, *citing* MPEP § 2258, subsection I.G. That is, the Board used a broader claim construction standard than it should have used.

This error led to the Board's error in rejecting SIPCO's proposed construction of the claimed "low power radio frequency (RF) signal" as having a limited transmission range. The Board failed to properly consider the evidence in the specification indicating that the low power signals have a limited transmission range. *Phillips v. AWH Corp.*, 415 F.3d at 1315 (The specification is the single best source for claim interpretation.).

Importantly, the Board's construction of the "low-power radio frequency (RF) signal" limitation is in conflict with and is inconsistent with this Court's construction of the ***same limitation*** in a patent having the ***same inventors*** and relating to the ***same subject matter***. *SIPCO, LLC v. Emerson Elec. Co.*, 2019 LEXIS 28935, at *2. There, this Court held that "SIPCO's specification explicitly ties the low power transceiver to a limited transmission distance; accordingly, a skilled artisan would understand 'low-power' to mean that the transceiver operates at a power level corresponding to 'limited transmission range.'" *Id.* Here, the Specification of the '692 patent similarly explains that the transceivers are

"relatively small in size and transmit a relatively low power RF signal," that the transmission range is "relatively limited," and that "this relatively limited transmission range of the transceivers is an advantageous and desirable characteristic of control system 200." Appx74, '692 patent, 5:48-57. Thus, the Specification indicates that "the claimed low-power radio frequency transmitter and transceiver have a short transmission range." Appx3207, Dr. Almeroth's Declaration, ¶ 108.

Cunningham's Data Collection Module (alleged by Emerson to be one of the claimed "relatively low-power radio-frequency (RF) transceivers") is not, in fact, "low power" under this Court's construction. The Data Collection Module transmits over distances far in excess of a low-power transceiver over an outdoor Metropolitan Network and National Backbone Network. Appx392-393. Emerson's own expert witness Mr. Kinney testified that a Metropolitan network can span "10, 20 miles" or "a kilometer" Appx3337, 70:16-19. These distances are much greater than the "limited transmission range" of the claimed "low power" transceivers.

Accordingly, the Board's ruling on the Ground 2 claims should be affirmed. The ruling on the Ground 3 claims should be reversed or at a minimum, vacated and remanded to the Board with instructions to use the proper claim construction standard and this Court's claim construction of "low power RF signal."

## IV. STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo, and its factual findings for substantial evidence. *In re Chapman*, 595 F.3d 1330, 1336-37 (Fed. Cir. 2010). The Court reviews the Board's ultimate claim constructions *de novo* and its factual determinations concerning extrinsic evidence for substantial evidence. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015); *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). This Court need not consider the Board's findings on extrinsic evidence when construing the claims if the intrinsic record is clear. *See Eidos Display, LLC. v. AU Optronics Corp.*, 779 F.3d 1360, 1365 (Fed. Cir. 2015).

Obviousness is a legal question based on underlying questions of fact. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). Questions of fact underlying a determination of obviousness include what a reference teaches, *In re Beattie*, 974 F.2d 1309, 1311 (Fed. Cir. 1992), as well as motivation to combine and whether evidence of secondary considerations supports a finding of nonobviousness, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1327 (Fed. Cir. 2017).

"A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." *HP Inc. v. MPHJ Tech. Invs., LLC,* 817 F.3d 1339, 1343-44 (Fed. Cir. 2016) (citation omitted). If the record "will support several reasonable but contradictory conclusions, [this Court]

will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

Whether the Board acted properly in not permitting an IPR challenger from introducing a second expert declaration is reviewed only for abuse of discretion. *Belden Inc. v. BerkTek LLC*, 805 F.3d 1064, 1077-78 (Fed. Cir. 2015).

## V. ARGUMENT

### A. THE BOARD'S FINDINGS THAT THE GROUND 2 CLAIMS ARE NOT OBVIOUS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE.

Petitioner contends that the Board erred in its interpretation of Cunningham. Blue Br. 34. Although characterized as flaws in the Board's analysis, each of the arguments raised by Petitioner relates to the sufficiency of the evidence on which the Board's factual findings are based.

Petitioner argues that Cunningham discloses "exactly what the '692 Ground 2 Claims require" and that the Board "misread[] Cunningham's disclosure of device adjustment modules." *Id.* But as explained in detail by the Board, Cunningham is very different than the claimed invention. Appx25-27. In Cunningham, a local controller (*i.e.*, a Device Adjustment Module) on the same side of a gateway as the actuators (*e.g.*, a thermostats) receives "controlling information" (*e.g.*, utility prices) and uses that information to generate a control

signal that is sent to the actuators. Appx1067-1068, 46:67-47:34; Appx1067, 46:64-67. In the claimed invention, a computer on the opposite side of the gateway than the actuators, generates a control signal that is sent across one network, through the gateway where it is translated in a radio frequency signal and then transmitted through a wireless network to the actuators. Appx277; Appx23-28.

Moreover, Petitioner's interpretation of Cunningham is mere attorney argument and not supported by any meaningful expert testimony. The expert declaration from Petitioner's expert merely parrots the Petition and therefore, is given little or no weight. *Wowza Media Sys.,* Paper 16 at p. 4.

### 1. THE BOARD'S CONCLUSION THAT CUNNINGHAM FAILS TO TEACH THE "CONTROL SIGNAL" LIMITATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

#### a. Cunningham's Disclosure Of "controlling information" Would Not Have Taught The "control signal" Limitations Because "controlling information" Is Very Different Than A "control signal."

Petitioner argues that the Board erred in finding that Cunningham's disclosure of "'controlling information' sent from a computer to a device adjustment module" would not have taught the claimed "control signal" limitations of the '692 patent. Blue Br. 35. The Board did not. The Board's finding is supported by substantial evidence because the "controlling information" disclosed in Cunningham is very different than the claimed "control signal."

Indeed, the Board provided a lengthy and detailed explanation of how Cunningham's "controlling information" differs from the "control signal" recited in the claims of the '692 patent. The Board explained that although "controlling information" such as "'utility prices' may be information related to controlling the device or even used in determining whether to control the device they do not cause a controlling action to be done to the device." Appx27, *citing* Appx1067-1068, 46:62-47:10. The Board noted that the "utility prices" of Cunningham "is not of a character that controls the operation of a device such as a thermostat." Appx27. The Board explained that "[t]he device adjustment module [of Cunningham]—which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with locally-obtained energy usage information, to generate control signals." Appx28. The Board therefore found that "it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham." Appx29.

The Board contrasted Cunningham's utility prices with the "examples in the specification [of the '692 patent], including 'temperature set point' [which] involve directly controlling a device rather than information that is processed outside of the device to determine whether to send control signals to the device." Appx27. The Board also noted that "Petitioner has not explained how 'utility prices' can be 'translated' 'from a network transfer protocol into a RF control signal' and then 'an

RF control signal into an analog signal' that can be applied ultimately to san actuator." Appx28.

Petitioner's statement that its position on the "control signal" limitations is "set forth in the Petition and supported by the testimony of Mr. Kinney" is simply not true. Rather, "the Petition does not have any meaningful support from expert testimony because most of the declaration from Petitioner's expert (Mr. Kinney) is a copy of the argument from the Petition." Appx641. Indeed, the Board noted that "Petitioner's declarant testifies nearly word for word the same contentions" from the Petition. Appx30. Such parroted declarations are given little or no weight by the Board." *Wowza Media*, Paper 16 at p. 4.

Contrary to Petitioner's argument, the '978 provisional application does not compensate for Cunningham's lack of disclosure of the "control signal" limitations (e.g., a computer generating and sending a control signal through a gateway to an actuator). As noted by the Board, Petitioner made only a very brief mention of the Energy Management Services and Williams Network Control Center in its Petition. Appx29-30.

The Petition fails to set forth a prima facie case of obviousness using the '978 provisional application. As stated by the Board, "Petitioner does not explain how Energy Management Services or the 'routines' described in the Provisional send control signals from the computer to the actuator as required by the claims."

Appx30. "Petitioner has not explained how those signals are translated from network transfer protocol to RF signals and then translated to an analog signal that can be used at an actuator." *Id.* "Petitioner has not explained how" the "'routines' described in the '978 Provisional work differently than the 'utility prices' embodiment of Cunningham." Appx31. "Petitioner has not explained why or how the DAM [Device Adjustment Module] would use the alleged control signals from the 'routines' rather that its own generated control signals." Appx33.

With respect to the argument Petitioner made for the first time "in its supplemental briefing and in the supplemental hearing," the Board stated that it "cannot rely on such substantive contentions as to how the provisional would meet claim limitations from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition." Appx32. This Court has acknowledged that "the PTO has advised participants in its Board proceedings that, at oral argument, '[a] party . . . may only present arguments relied upon in the papers previously submitted. No new evidence or arguments may be presented at the oral argument.'" *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016) (alterations in original) (quoting Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012)). The Board, therefore, acted properly within its discretion to decline to consider the new evidence and arguments raised for the first time by Petitioner in a supplemental brief and at the hearing.

### b. The Board Did Not Misread Cunningham As Teaching That The Device Adjustment Module—Not The Host Module—Issues Control Signals.

The section of Unified Patents' brief commencing with the heading "[t]he Board made a critical error in misreading Cunningham to require the device adjustment module—not the host module—to issue control signals" (Blue Br. 43) in fact fails to identify one single control signal that is generated by the host module. This heading is a canard. It does not reflect the content of Petitioner's actual argument in the body of that section.

The Board pointed out that the host module in Cunningham send mere ***information*** to the device adjustment module (DAM) which uses the information to generate a control signal. Appx28-29. The Board explained that the host module generates, for example, "transmissions updating the price of the utility being consumed" and that "the device adjustment module…on the other side of the asserted gateway…uses the price information" to create "control ***signals***." Appx28 (*emphasis added*). "Thus, it is the local device adjustment module, not the host module on the network that issues control signals in Cunningham." Appx29.

Under this Court's precedents, the Board was not permitted to fill the gap with a finding that "common sense" led to the required modification of generating the control signal at the host module instead of the local device adjustment module, unless contemporaneous documentary evidence existed in the record. *K/S HIMPP v.*

*Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Circ. 2014)). Petitioner does not meaningfully challenge the basis for the Board's findings, nor does it challenge the absence of contemporaneous documentary evidence.

Petitioner does not identify a single control signal that is generated at Cunningham's host module. The portions of Cunningham cited by Petitioner relating to "utility disconnect actions" (Blue Br. 45) do not indicate that Cunningham's host module generates a control signal. Petitioner's first citation (Appx1059-1060(29:63-31:2) is in the section of Cunningham describing the Data Collection Module, not the host module. Appx1054-1060. Petitioner's second citation (Appx1046(4:58-62)) makes no mention of a utility disconnect action.

Petitioner relies on *Ericsson Inc. v. Intellectual Ventures I LLC,* 890 F.3d 1336 (Fed. Cir. 2018) for the proposition that the Board's failure to recognize that "a prior art reference explicitly disclosed" a claim limitation constitutes reversable error. Blue Br. 45. But *Ericsson* is inapposite. In *Ericsson*, the prior art satisfied the claimed "frequency hopping" limitation because it explicitly disclosed "frequency hopping standards such as [GSM]." 890 F.3d at 1344-46, 1348. It therefore does not conflict with *K/S HIMPP*. *K/S HIMPP* (but not *Ericsson*) addresses the situation at bar, where the prior art combination lacks a particular limitation (a computer generating a control signal and transmitting it through a first network, a gateway, and a second network to an actuator).

Petitioner failed to identify any documentary evidence that it would have been obvious to modify Cunningham to have the host module generate control signals, rather than the Device Adjustment Module. *See e.g.*, Blue Br. 43-45; Appx154-155. This Court has cautioned that "we must . . . be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1343, 1368 (Fed. Cir. 2012) (*quoting Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1374 n.3 (Fed. Cir. 2008)). Thus, "[c]are must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'" *Grain Processing Corp. v. Am.-Maize Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) (*quoting Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983)).

In summary, the combination of Cunningham and the secondary references lack a claim limitation (a computer generating a control signal and transmitting it through a first network, a gateway, and a second network to an actuator); the *K/S HIMPP* holding requires documentation of "common sense" reasoning to fill the gap to support any obviousness conclusion; and Petitioner did not cite to any such

documentation. For these additional reasons, this Court should affirm the Board's decision on Ground 2.

#### c. The Board Did Not Misread Cunningham, Let Alone Exacerbate A Misreading And Did Not Limit Cunningham's "controlling information" To "varying utility prices."

Petitioner's argument that "the Board exacerbated its misreading of Cunningham" (Blue Br. 46) has no merit. In order to exacerbate or worsen a misreading, there would necessarily need to be a misreading in the first place. It is impossible to exacerbate a misreading unless it exists. And the Board did not misread Cunningham; its conclusion that the combination of Cunningham and the secondary references teaches that Cunningham's host sends merely "controlling information" to the device adjustment module, when uses the "controlling information" to generate a "control signal" (Appx24-27) is supported by substantial evidence. §§ V.A.1.a-b, *supra.*

Petitioner's arguments are based on a gross misrepresentation of the Board's Final Written Decision. The Board did not limit—contrary to Petitioner's contention—Cunningham's "controlling information" to "varying utility prices.'" Blue Br. 46. Rather, the Board explained that Cunningham's use of the word "controlling information" in the passage relied upon by Petitioner in the Petition (Appx150, citing Appx1067-1068, 46:62-47:10) "refers back to 'varying utility prices.'" Appx24, *citing* Appx1067, 46:64-67; Appx1068, 47:8-10.

The Board's interpretation of the passage relied upon by Petitioner is supported by substantial evidence. Cunningham states that "[t]he device adjustment module transmits information to the system and receives ***controlling information*** from system update transmission." Appx1068, 47:8-10. Earlier in the very same paragraph, Cunningham states that "[d]evice adjustment modules are used to monitor and control the operation of various devices and applications according to ***varying utility prices*** and the device consumption information." Appx1067, 46:64-67 (*emphasis added*). No other type of "controlling information" is mentioned in the portion of Cunningham relied upon by Petitioner.

Moreover, the other types of information mentioned by Petitioner also do not satisfy the "control signal" claim limitations. "'Petitioner conflates mere data that may be referenced to determine how to control an actuator as taught by Cunningham with a control signal that is translated into an analog signal to control an actuator, as claimed by the '692 patent.'" Appx27, *quoting* Appx648. Like the "varying utility prices," the other types of information mentioned in Cunningham and the '978 provisional application that are referenced by Petitioner (e.g., "device consumption information," "defined cost parameters," "energy usage across the entire system") (Blue Br. 46-48) are not "capable of being 'translated' into an analog signal" and applied to an actuator. Appx27. There is no disclosure in Cunningham that the host module uses any of these types of information to

generate a control signal and to send the control signal across a gateway to an actuator. Rather, as found by the Board, the host module sends the information to the device adjustment module, which uses the information to generate a control signal that can be translated to an analog signal and applied to an actuator. Appx28.

For these reasons, the Board's interpretation of the "varying utility prices" and other types of "controlling information" disclosed in Cunningham and the '978 provisional application is supported by substantial evidence.

#### d. The Board Did Not Disregard Cunningham's '978 Provisional and Did Not Err In Its Interpretation Of That Reference.

The Board properly declined to consider a new obviousness argument using to the '978 Provisional that was introduced for the first time by the Petitioner in its supplemental briefing and the hearing. Moreover, even if the Board had abused its discretion in not considering the belatedly-introduced argument, the Board's ruling should still be upheld, as any such error was harmless. Even considering the new argument, there is substantial evidence to support the Board's conclusion that none of the Ground 2 claims would have been obvious over Cunningham, the '978 Provisional, and the other secondary references. Petitioner has not shown that a POSA would have been motivated to combine the teachings of the different

embodiments of Cunningham and the '978 Provisional to achieve the claimed invention with a reasonable expectation of success.

#### i. The Board Properly Rejected Petitioner's Belated Efforts To Introduce A New Obviousness Theory In Its Supplemental Briefing and At The Hearing.

With respect to the argument Petitioner made for the first time "in its supplemental briefing and in the supplemental hearing," the Board stated that it "cannot rely on such substantive contentions as to how the provisional would meet claim limitations from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition." Appx32. This Court has acknowledged that "the PTO has advised participants in its Board proceedings that, at oral argument, '[a] party . . . may only present arguments relied upon in the papers previously submitted. No new evidence or arguments may be presented at the oral argument.'" *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016) (alterations in original) (*quoting* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012)).

Petitioner's reliance on *Ericsson* (Blue Br. 35) is misplaced because *Ericsson* supports the unremarkable proposition that the Board must consider reply argument that "expands the same argument made in its Petition." 901 F.3d at 1380-81. But *Ericsson* is inapposite because Emerson did not merely expand on the argument in its Petition. The Petition contains less than one page of obviousness

analysis based on the combination of Cunningham and the ’978 Provisional. The Petitioner is not allowed to attempt to compensate for its failure to set forth a *prima facie* case of obviousness in the Petition with new argument in its supplemental briefing and at the hearing. The Board, therefore, acted properly within its discretion to decline to consider Petitioner’s new evidence and arguments. Likewise, Petitioner erred in introducing new argument on this prior art combination to this Court. *Israel Bio-Eng’g Project v. Amgen Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007) (“Ordinarily, this court has declined to consider arguments that were not presented to the district court.”).

#### ii. The Board Did Not Disregard Cunningham’s ‘978 Provisional and Did Not Err In Its Interpretation Of That Provisional.

Even considering Petitioner’s new argument, there is substantial evidence to support the Board’s conclusion that none of the Ground 2 claims would have been obvious over Cunningham, the ‘978 Provisional, and the other secondary references. Petitioner’s argument that “the Board’s errors were further compounded by the Board’s disregard of Cunningham’s ‘978 Provisional” (Blue Br. 49) is doubly wrong. In order to compound errors, there would necessarily need to be an error in the first place. It is impossible to compound an error that does not exist. And the Board did not make any errors with respect to Ground 2.

§§ A.1.a-c, *supra*. Also, the Board did not disregard the '978 provisional; it provided a lengthy and detailed explanation for why the Petition's very brief analysis of the combination of Cunningham and the '978 Provisional is not nearly sufficient for Petitioner to show that any of the Ground 2 claims would have been obvious. Appx28-33. Petitioner's contentions are nothing more than a serious of disagreements with the Board's interpretation of Cunningham and the '978 Provisional.

Petitioner's argument that the '978 Provisional "discloses the same embodiment of the DAM embodiment disclosed in Cunningham" (Blue Br. 50) is demonstrably false and misses the point of the Board's analysis. The Board provided a lengthy and detailed explanation of how the "controlling information" that is sent by the host module to the DAM in Cunningham's embodiment differs from the "control signal" recited in the claims of the '692 patent. Appx24-28. The Board reasoned that although controlling information such as "'utility prices' may be information related to controlling the device or even used in determining whether to control the device they do not cause a controlling action to be done to the device." Appx27, *citing* Appx1067-1068, 46:62-47:10. The Board noted that the "utility prices" of Cunningham's embodiment "is not of a character that controls the operation of a device such as a thermostat." Appx27. The Board explained that "[t]he device adjustment module [of Cunningham's embodiment]—

which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with locally-obtained energy usage information, to generate control signals." Appx28.

In sharp contrast, "the 'routines' described in the '978 Provisional work differently than the 'utility prices' embodiment of Cunningham" and "Petitioner has not explained how those would work together to meet the claim limitations." Appx31. Petitioner now alleges that the '978 Provisional discloses an embodiment in which a host module generates and sends a control signal to the DAM. Blue Br. 35. But this embodiment is very different than the embodiments of Cunningham, in which a host sends only "controlling information" (*i.e.,* data) to the DAM, which uses that data to generate a control signal.

As noted by the Board, an obviousness determination based on "'combining multiple embodiments from a single reference'" (like the obviousness theory set forth by Petitioner) requires "'a motivation to make the combination and a reasonable expectation that such a combination would be successful.'" Appx30-31, *quoting In re Stepan Co.*, 868 F.3d 1342, 1346 n. 1 (Fed. Cir. 2017). Petitioner's reliance on *Willis Elec. Co., Ltd. V. Polygroup Macau Ltd*. (BVI), Case Nos. 2018-2125, 2018-2151, 2019 WL 272316 (Fed. Cir. July 1, 2019) (Blue Br. 30) is misplaced. *Willis* does not conflict with the *In re Stepan Co* case cited by the Board (Appx32), because both cases indicate that it is necessary to "determine

whether it would have been obvious" to combine "different embodiments" from a single reference.

The Petition did not nearly demonstrate the required motivation. For example, the Petition does not explain why a POSA would have been motivated by the disclosure of the embodiment in the '978 Provisional to change Cunningham's embodiment such that its host module sends "control signals" instead of mere "controlling information," to be used by the DAM to produce the "control signals." In particular, the Board explained that "Petitioner has not accounted for the fact that the 'routines' allegedly send control signals from the network that can directly control a device such as an HVAC, but … in Cunningham, the device adjustment module [DAM]—which is not on the network but rather on the other side of the asserted gateway—uses the price information, along with locally-obtained energy usage information, to generate control signals." Appx32-33. The Board noted that "Petitioner has not explained why or how the DAM would use the alleged control signals from the 'routines' rather than its own generated control signals." Appx33.

In addition, the Board noted that the Petition "does not explain how Energy Management Services or the 'routines' described in the Provisional send control signals from the computer to the actuator as required by the claims." Appx32. The Board also noted that Petitioner has not explained, in the Petition, how the

Provisional's alleged control signals would meet the other limitations of the claim." *Id.*

Petitioner's belated attempts to compensate for the Petition's deficiencies with new argument in its supplemental brief and hearing before the Board and its opening brief are not permitted. With respect to Petitioner's description "in its supplemental briefing and in the supplemental hearing" purporting to "explain how the structures of the '978 Provisional and Cunningham are related," the Board noted that "this description is not found in the Petition" and that the Board "cannot rely on such substantive contentions … from counsel in a supplemental brief or at a hearing in this decision unless it was first presented in the Petition." Appx32, fn. 9; *Dell v. Acceleron*, 818 F.3d at 1307("No new evidence may be presented at oral argument.").

Neither Petitioner's disagreements with the Board's findings, nor the fact that Petitioner presented evidence contrary to those findings is grounds for reversal. So long as the Board's findings are supported by substantial evidence—and they are—its decision to favor one conclusion over another contradictory conclusion is the type of decision this Court must sustain.

### 2. THE BOARD'S CONCLUSION THAT CUNNINGHAM FAILS TO TEACH THE "TRANSLATING" LIMITATIONS IS SUPPORTED BY SUBSTANTIAL EVIDENCE.

The Ground 2 claims require (i) a first translation from a control signal generated by a computer to a RF control signal and (ii) as second translation from the RF control signal to an analog signal. The Board concluded that the combination of Cunningham, the Provisional '978, and the other secondary references would not have taught these claim requirements. Appx27-28.

Emerson's arguments with respect to the "translating" requirements are flawed because they are based on the mistaken position that the data sent by the host module in Cunningham is the claimed "control signal." Blue Br. 54. As explained in detail above, the data sent by the host module is not a "control signal"; it is instead data that is used by the Device Adjustment Module to generate a "control signal." §§ A.1.a-c, *supra*. Specifically, the Board reasoned that the data sent by the host computer and translated in Cunningham is not a control signal because "it is not of a character that controls the operation of a device such as a thermostat." Appx27. Accordingly, the first "translating" claim requirement is not met because the data from the host module that is translated in Cunningham is mere information, not a "control signal." In addition, the second "translating" requirement is not met because the data sent by the host in Cunningham such as a "'utility price' does not indicate any action to be taken by the actuator." Appx28.

The "control signal" generated by Cunningham's DAM is not "translated from a network transfer protocol into a RF control signal" as claimed in the '692 patent (Appx81, 20:56-57) because the DAM is not on the network and is instead on the same side of the gateway as the actuator that it controls. §§ A.1.a-c, *supra*.

Emerson's arguments that the Board erred because it "limit[ed] Cunningham's 'controlling information' to 'utility prices'" (Blue Br. 54) is also meritless because the Board did not so limit Cunningham's teaching. The Board instead found that in the passage from Cunningham relied upon by Emerson in its Petition, the "controlling information," referred to "utility prices." Appx24.

Likewise, Emerson's argument that the Board "fails to take into account Emerson's proposed prior art combination for Ground 2" is also flawed because the Board did, in fact, consider the teachings of all the references in the combination. The Board fully considered Emerson's arguments on the '978 Provisional, and concluded that Emerson had not demonstrate that a POSA would have been motivated based on the teachings of the '978 Provisional to modify Cunningham's host module to generate control signals. Also, Emerson did not allege that either Mason or McGowan would have taught translating the particular types of signals recited in the claims (*i.e.*, a control signal to a RF control signal, and a RF control signal to an analog signal). Emerson instead relied on these references for their teachings of translating generally, not the translating of the

particular types of data required by the claims. Appx151-152.

Moreover, Emerson does not have any meaningful support from its expert Mr. Kinney for this claim limitation because Mr. Kinney copied the attorney argument from the Petition into his declaration as indicated by the tables below:

| Paragraph Number from the Kinney declaration | Corresponding Paragraph in Petition |
|---|---|
| 61 (Appx944) | copied from page 52, paragraph 2 (Appx150) |
| 62 (Appx944) | copied from page 52, paragraph 3 (Appx150) |
| 63 (Appx944-945) | copied from page 52, paragraph 4 (Appx150) |
| 32 (Appx931) | copied from page 41, paragraph 2 (Appx139) |
| 33 (Appx932) | copied from page 41, paragraph 3 (Appx139) |
| 34 (Appx932-933) | copied from page 42, paragraph 1 (Appx140) |
| 35 (Appx933) | copied from page 42, paragraph 2 (Appx140) |

Emerson's arguments on the "translating" claim limitations cannot possibly be supported by Mr. Kinney's declaration because parroted declarations are given little or no weight by the Board. *Wowza Media,* Paper 16 at p. 4.

Emerson's interpretation of the prior art is flawed and has no meaningful expert support. The Board's interpretation is supported by substantial evidence.

### 3. The Board Did Not Abuse Is Discretion When It Rejected Emerson's Request To File Another Expert Declaration.

Emerson erroneously contends that the Board was required by the Administrative Procedure Act and due process to permit it to introduce another expert declaration by Mr. Kinney. The Board, however, did not abuse its discretion in denying Emerson's request.

Petitioner failed to present a *prima facia* case of obviousness in its Petition or support for obviousness challenges by an independent declaration from its expert. The Petition's analysis neglects to address many of the important issues (*e.g.*, motivation to combine, how the Energy Management System and the routines of the '978 Provisional would work with Cunningham's system, why or how the Device Adjustment Module of Cunningham would use the signals from the '978 Provisional's routines rather than generating its own) as noted by the Board. Appx30-31.

Indeed, most of the declaration from Petitioner's expert (Mr. Kinney) is a copy of the argument from the Petition" (Appx641), as shown by the table below.

| Paragraph Number from the Kinney declaration | Corresponding paragraph in Petition |
|---|---|
| 137 (Appx976) | copied from page 82, paragraph 2 (Appx180) |
| 147 (Appx980) | copied from page 85, last paragraph (Appx183) |

| | |
|---|---|
| 148 (Appx980) | copied from page 86, paragraph 1 (Appx184) |
| 149 (Appx980-981) | copied from page 86, paragraph 2 (Appx184) |
| 150 (Appx981) | copied from page 87, paragraph 1 (Appx185) |
| 155 (Appx983) | copied from page 89, paragraph 2 (Appx187) |
| 32 (Appx931) | copied from page 41, paragraph 2 (Appx139) |
| 33 (Appx932) | copied from page 41, paragraph 3 (Appx139) |
| 34 (Appx932-933) | copied from page 42, paragraph 1 (Appx140) |
| 35 (Appx933) | copied from page 42, paragraph 2 (Appx140) |
| 156 (Appx983) | copied from page 88, paragraph 2 (Appx187) |
| 157 (Appx983-984) | copied from page 88, paragraph 3 (Appx187) |
| 16 (Appx921) | copied from page 31, paragraph 1 (Appx129) |
| 17 (Appx921-922) | copied from page 31, paragraph 2 (Appx129) |
| 18 (Appx922) | copied from page 32, paragraph 1 (Appx130) |

Mr. Kinney's declaration, therefore, is entitled to little or no weight. *Wowza Wowza Media*, Paper 16 at p. 4. Emerson has not provided any excuse for why it failed to present a *prima facie* case of obviousness in its Petition accompanied by a legitimate, independent expert analysis in a supporting declaration.

Under these circumstances, the Board was not obligated to permit Emerson to submit another declaration from Mr. Kinney. *See Dell Inc. v. Acceleron, LLC,* 884 F.3d 1364, 1369 (Fed. Cir. 2018) (holding that the Board was required on remand to provide "an adequate opportunity to respond" but not to "admit new evidence."). The Board explained that *Dell*, which involved "a similar situation" as the issue on appeal, it was not required to admit new evidence after it cited "to a section of a prior art reference in a Final Written Decision." Appx607. Clearly, the Board is under no obligation to permit Emerson to compensate for its failure to file a legitimate, independent expert report with its Petition or its failure to set forth a *prima facie* case of obviousness in its Petition for Ground 2.

Emerson responds with reliance on *Anacor Pharm. V. Iancu*, 889 F.3d 1372, 1380-81 (Fed. Cir. 2018), for the proposition that a petitioner may introduce new evidence after the petition stage in an *inter partes* review. But *Anacor* is inapposite. In *Anacor*, new evidence was admitted because it was a "legitimate reply to evidence introduced by the patent owner." 889 F.3d at 1380-82. Here, Emerson has not even alleged that it sought to reply to evidence introduced by patent owner. Blue Br. 62-

64. It therefore does not conflict with *Dell*, as Emerson suggests. *Dell* (not *Anakor*) is similar to the situation at bar.

Nor does Emerson's citation to two other cases support its argument that it should have been permitted to introduce a new expert declaration. Blue Br. 63-63 *citing Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm.*, 825 F.3d 1360, 1366-67, 1369 (Fed. Cir. 2016); and *SAS Institute, Inv. V. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016). Neither case involved a request to admit new evidence to supplement a deficient petition and an expert declaration that was copied from the petition. Rather, as explained by the Board, "[t]he issue in *SAS* was that the Board construed a claim term one way in its Institution Decision and, in the Federal Circuit's view, unexpectedly, a different way in its Final Written Decision. Appx606, *citing SAS Institute*, 825 F.3d at 1351. As also explained by the Board, "*Genzyme* concerned whether the introduction of new evidence prejudiced Patent Owner, not whether the Board was required to allow Petitioner to introduce new evidence." Appx606, *citing Genzyme*, 825 F.3d at 1367.

The Board acted properly within its discretion in rejecting Emerson's request to file an additional expert declaration, particularly where Emerson's first expert declaration was copied from its Petition and where the Petition failed to set forth a *prima facie* case of obviousness on the ground at issue here.

### B. THE BOARD OVERLOOKED CRITICAL EVIDENCE IN ITS ANTICIPATION AND OBVIOUSNESS ANALYSIS OF THE GROUND 3 CLAIMS.

The Board's ruling that Emerson showed that claims 32, 34, 37-38, and 55-57 are unpatentable (Ground 3) should be reversed. SIPCO explained in detail with support from both expert witnesses that the transceivers of Cunningham's Data Collection Module are not "low-power," as claimed in the '692 patent and instead, are high-power, transmitting over an outdoor Metropolitan Network and National Backbone Network. Appx392-393. Indeed, Emerson's own expert witness Mr. Kinney testified that a Metropolitan network can span "10, 20 miles" or "a kilometer" Appx3337, 70:16-19. In contrast, the Federal Communication Commission has described low-power transmitters as having a transmission range of a few meters. Appx2485.

Yet the Board failed to address this undisputed evidence. It did not provide any separate analysis of the power of Cunningham's Data Collection Modules even though Emerson alleged that they meet the claim limitation of a "plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically." Appx186. The Board instead referred to its analysis of the power of Cunningham's sensor interface modules even though Emerson did not allege that they meet this claim limitation and even though the sensor interface modules are different devices than the Data Collection Modules. Appx46. Therefore, this

Court should at least remand the IPR to the Board with instructions to do a power analysis of Cunningham's Data Collection Modules.

Moreover, the Board used the wrong standard in construing the "low power" claim limitations. The Board should have used the standard set forth in Phillips v. AWH, 415 F.3d 1303 (Fed. Cir. 2005) because the '692 patent had expired before the Board issued the Final Written Decision. But the Board instead used the "broadest reasonable" standard. Appx10. Importantly, the Board's construction of the "low power" limitation is in conflict with and is inconsistent with this Court's construction of the ***same limitation*** in a patent have the ***same inventors*** and relating to the ***same subject matter***. Thus, the remand by this Court should also include instructions to apply the proper claim construction standard and this Court's construction of the "low power" limitation. Under the proper standard and this Court's construction, neither Cunningham's data collection modules nor its sensor interface modules are "low power."

SIPCO also explained with support from expert testimony that Cunningham's Data Collection Modules do not "deliver the encoded electrical signal and transmitter identification information to a computer on the WAN," as recited in independent claim 32 of the '692 patent. Yet the Board also failed to consider this evidence. Petitioner alleged that a "checksum" computed by a sensor interface module forms the claimed "encoded electrical signal" (Appx156) but

there is no evidence whatsoever that this checksum is delivered by Cunningham's data collection modules. *See* Appx1051.

By failing to consider these important issues and evidence, the Board failed to comply with the Administrative Procedure Act (APA). Under the APA and longstanding precedent, an agency must provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Board must address the "important aspect[s] of the problem" presented to it. *Id.* at 43. That requirement exists to facilitate judicial review and to ensure that agency decisions are not arbitrary and capricious. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). The need for specific explanation applies with particular force to obviousness determinations, for both substantive and procedural reasons. To avoid hindsight, an obviousness "analysis should be made explicit," and obviousness rulings "cannot be sustained by mere conclusory statements," as opposed to "articulated reasoning with some rational underpinning." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *Rovalma, S.A. v. Bohler-Edelstahl GmbH*, 856 F.3d 1019, 1025 (Fed. Cir. 2017) ("The Supreme Court has recognized the importance of clarity with respect to obviousness determinations.").

Clearly, the Board failed (i) to comply with the APA, (ii) to do a power analysis of Cunningham's Data Collection Modules, (iii) to apply the correct claim

construction standard, and (iv) to apply the proper construction of the "low power" limitations as set forth by this Court. Accordingly, the Board's decision on Ground 3 should be reversed or at a minimum, remanded so that the Board can properly consider these critical issues and evidence under the proper claim construction.

#### 1. THE BOARD OVERLOOKED UNDISPUTED RECORD EVIDENCE THAT CUNNINGHAM'S DATA COLLECTIONS MODULES ARE NOT LOW POWER.

Claim 55 recites, inter alia, "placing a plurality of relatively low-power radio-frequency (RF) transceivers dispersed geographically wherein the low-power RF signal is received and repeated as required to communicate the information signal to a gateway, the gateway providing access to a WAN." Appx83, 23:53-57. Emerson contended that this claim limitation is satisfied by Cunningham's disclosure of "a plurality of separately located (and hence, dispersed geographically) data collection modules." Appx186.

But as explained by SIPCO to the Board—with support from the record evidence—Emerson's data collection modules are not low-power. Cunningham's data collection modules 6236, 6328 and 6330 operate as radio transceivers of a high frequency 900MHz when interfacing with or acting as repeaters modules:

> FIG. **30** shows a simplified schematic layout of data repeater module which is generally designated by the numeral **2300**. The data collection module **2300** includes a housing **2302** which minimally contains a central processing unit **2306** and a spread spectrum receiver/radio **2308**. The spread spectrum receiver/radio **2308** is used to receive or transmit signals **2320** to sensor interface modules. The housing **2302** may optionally contain a spread spectrum radio **2304** with connected antenna to transmit and receive signals **2314** to and from repeater modules **2300**, data collection modules **110**, or a host module **122**. Another optional communication method may be implemented by a connected modem **2310** which is hardwired through connection **2316** to transmit and receive signals **2318** from the backbone system communication to a host module.
>
> FIG. **31** is a block diagram of the configuration of the data repeater module **2300**. When in the receive mode, the 900 Mhz transceiver will continuously scan a frequency band of 902 to 928 Mhz searching for a radio frequency signal. If a radio frequency signal is detected, the transceiver will lock on to this signal and demodulate it.

Appx1054, 20:4–24 (*emphasis added*), Appx1025-1026.

Moreover, a POSA would have understood that a 900Hz outdoor wireless link is of high power and is regarded as bio-hazard:

- **Bio-hazard** High-powered 900 Mhz links are a biohazard both due to the power and the frequency. Strive to install the active end of any 900 Mhz antenna so that its beam pattern is at least six feet above and 10 feet away from any area where humans can enter.

Appx3223. As explained by Dr. Almeroth, Cunningham's data collection modules have a transmission range much greater than the range of the claimed "low power radio frequency (RF) signal" of the '692 patent:

From Cunningham's Fig. 49 (reproduced below), it is apparent that

> the data collection modules and data repeater modules 6326, 6330, perform repeater functions over outdoor wireless links. These modules form part of the 'Metropolitan Network' and 'National Backbone Network' and thus would cover much longer distances than the limited range (e.g., several feet) of the low-power RF transmitters and transceivers claimed in the '692 patent.

Appx3223, ¶ 144; Appx1068, 48:1-4.



FIG. 49

Appx1044. Moreover, Petitioner's expert Mr. Kinney conceded that "the Metropolitan Network and National Backbone Network of Cunningham cover much longer distances than the limited range (e.g., several feet) of the low power RF transmitters and transceivers claimed in the '692 patent: 'Now, a metropolitan area network can be miles, 10, 20 miles. It might only, though, be like a kilometer or so.'" Appx365, *quoting* Appx3337, 70:16-19.

SIPCO highlighted this evidence to the Board and the Board did not dispute any of it. *See e.g.*, Appx34-35. The Board never addressed the evidence showing that Cunningham's data collection modules are high power. *Id.* Indeed, there is no mention of the power level of Cunningham's data collection modules anywhere in the Final Written Decision. ***The only mention of power level in Cunningham by the Board relates to a sensor interface module*** (Appx34-35), ***which is an entirely different device than the data collection module.*** Appx1003 (showing the sensor interface modules (SIMs) as 104 and 106, and the data collection modules (DCM) as 112 and 114).

The APA and black letter administrative law requires that agencies address "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43; *see also Rovalma*, 856 F.3d at 1025; *Power Integrations, Inc. v. Lee,* 797 F.3d 1318, 1326 (Fed. Cir. 2005). The power level of Cunningham's data collection module surely qualifies as an important aspect of the issue raised in this case, particularly because Petitioner alleged that these modules satisfy the "low-power RF transceivers" limitation of the claims. Appx186. Clearly, the Board needed to make a finding on this issue to support a conclusion that this claim limitation is disclosed by Cunningham. But the Board's decision made no such finding and there is no evidence in the record to support one. It was incumbent upon the Board to address this issue, which SIPCO emphasized in both its briefing and argument. The

Board's failure to do so renders its decision legally flawed and requires reversal or at a minimum, a remand so that the Board can make a finding on this critical issue. *See Intelligent Bio–Systems*, 821 F.3d at 1368; *see also Rovalma*, 856 F.3d at 1025; *Personal Web Techs., LLC v. Apple, Inc.,* 848 F.3d 987, 993-994 (Fed. Cir. 2017); *Ariosa Diagnostics v. Verinata Health, Inc.,* 805 F.3d 1359, 1364-1367 (Fed. Cir. 2015).

Moreover, when a claim limitation is wholly absent from the teachings of the prior art, documentary evidence is required to establish obviousness. *K/S HIMPP v. Hear-Wear Technologies, LLC,* 751 F.3d 1362, 1366 (Fed. Cir. 2014) ("an assessment of basic knowledge and common sense as a replacement for documentary evidence for core factual findings lacks substantial evidence support."). The Board and the Petitioner did not present the required documentary evidence showing that the "low power RF transceiver" limitation that is missing from Cunningham would have been obvious. Petitioner's expert, Mr. Kinney did not explain why a POSA would have been motivated to change Cunningham's data collection modules to be low power. Indeed, Petitioner does not have any meaningful expert support for this claim limitation. Rather, the portion of Kinney's declaration relating to this claim limitation was copied from the Petition, as indicated by the table below:

| Paragraph Number from the Kinney declaration | Corresponding paragraph of Petition |
|---|---|

| | |
|---|---|
| 155 (Appx983) | copied from page 88, paragraph 1 (Appx187) |
| 156 (Appx983) | copied from page 88, paragraph 2 (Appx187) |
| 157 (Appx983-984) | copied from page 88, paragraph 3 (Appx187) |
| 16 (Appx921) | copied from page 31, paragraph 1 (Appx129) |
| 17 (Appx921-922) | copied from page 31, paragraph 2 (Appx129) |
| 18 (Appx922) | copied from page 32, paragraph 1 (Appx130) |

Emerson's arguments on the "low power" claim limitations cannot possibly be supported by Mr. Kinney's declaration because parroted declarations are entitled to little or no weight. *Wowza Media*, Paper 16 at p. 4; *In re Geisler*, 116 F.3d 1465, 1471 (Fed. Cir. 1997) (mere attorney argument should be given little or no weight); *In re Schulze*, 346 F.2d 600, 602 (CCPA 1965).

For these reasons alone, the Board's final written decision must be reversed or at a minimum, vacated and remanded with instructions to consider SIPCO's evidence of the high power levels of Cunningham's data collection modules.

### 2. THE BOARD APPLIED THE WRONG CLAIM CONSTRUCTION STANDARD, ERRED IN ITS CLAIM CONSTRUCTION OF "LOW POWER RADIO FREQUENCY (RF) TRANSCEIVER," AND APPLIED ITS ERRONEOUS CLAIM CONSTRUCTION TO ITS PATENTABILITY ANALYSIS.

The Board should have applied the claim construction standard set forth in *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005) because the '692 patent had expired before the Board issued its Final Written Decision, but instead used the "broadest reasonable" standard.

The Board quoted the rule stating that a claim in a patent "'that will expire before a final written decision is issued shall be given the broadest reasonable construction.'" Appx10, *quoting* 37 C.F.R. §42.100(b) (2016). The Board also cited to two cases that applied the "broadest reasonable" standard: *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010) and *In re Translogic Tech.*, Inc., 504 F.3d 1249, 1257 (Fed. Cir. 2007). Appx10. Clearly, there can be no doubt that the Board applied the "broadest reasonable" standard.

The Board applied the "broadest reasonable" standard based on its belief that the '692 patent "claims priority to multiple related applications, the earliest of which was filed August 2, 1999." Appx4. The Board's belief is wrong. The earliest application to which the '692 patent claims priority was filed on June 22,

1998. Appx53.[4] The '692 patent, therefore, expired on June 22, 2018[5], before the date of the Final Written Decision (November 28, 2018).

The U.S. Patent & Trademark Office (PTO) expressly acknowledges that the principles set forth in *Phillips* will result in narrower claim constructions: "Once the patent expires, a narrow claim construction is applied." MPEP 2666.01, *citing* MPEP § 2258, subsection I.G. Clearly, the Board used a broader claim construction standard than it should have used.

This error led to the Board's error in rejecting SIPCO's proposed construction of the claimed "low power radio frequency (RF) signal" as having a limited transmission range. The Board failed to properly consider the evidence in the specification indicating that the low power signals have a limited transmission range. *Phillips v. AWH Corp.*, 415 F.3d at 1315 (The specification is the single best source for claim interpretation.). The Specification of the '692 patent clearly states that low-power transceivers operate at a power level corresponding to a limited transmission range:

---

[4] A certificate of correction was issued to show parallel priority claims to three applications instead of claims to a series of applications. Appx303. But the priority claims in both the issued '692 patent and the corrected patent identify the earliest priority date as June 22, 1998. *Id.*; Appx53.

[5] There is no indication of any adjustment to the term of the '692 patent either on the face of the patent (Appx53) or the file history.

> Control system 200 consists of one or more sensor/actuators 212, 214, 216, 222, and 224 each integrated with a transceiver. The transceivers are preferably RF (Radio Frequency) transceivers, that are relatively small in size and transmit a relatively low power RF signal. As a result, in some applications, the transmission range of a given transceiver may be relatively limited. As will be appreciated from the description that follows, this relatively limited transmission range of the transceivers is an advantageous and desirable characteristic of control system 200 (Appx74, 5:48-57);
>
> Preferably, stand-alone transceivers 211, 213, 215, and 221 may be dispersed sufficient that only one stand-alone transceiver will pick up a transmission from a given integrated transceiver 212, 214, 216, 222, and 224 (due in part to the low power transmission nature of each transmitter) (Appx74-75, 6:67 – 7:4).

Thus, the Specification indicates that "the claimed low-power radio frequency transmitter and transceiver have a short transmission range." Appx3207, ¶ 108.

Importantly, the Board's construction of the "low-power radio frequency (RF) signal" limitation is in conflict with and is inconsistent with this Court's construction of the ***same limitation*** in a patent having the ***same inventors*** and

relating to the ***same subject matter***. *SIPCO, LLC v. Emerson Elec. Co.*, 2019 LEXIS 28935, at *2. There, this Court held that "SIPCO's specification explicitly ties the low power transceiver to a limited transmission distance; accordingly, a skilled artisan would understand 'low-power' to mean that the transceiver operates at a power level corresponding to 'limited transmission range.'" Id. p. 11. Here, the Specification of the '692 patent explains that a low-power RF transmitter has a limited range, as explained above.

The Board's ruling that Cunningham's Data Collection Module (alleged by Emerson to be one of the claimed "relatively low-power radio-frequency (RF) transceivers") is not, in fact, "low power." The Data Collection Module transmits over an outdoor Metropolitan Network and National Backbone Network. Appx3223, ¶144. Emerson's own expert witness Mr. Kinney testified that a Metropolitan network can span "10, 20 miles" or "a kilometer." Appx3337, 70:16-19. These distances are much greater than the "limited transmission range" of the claimed "low power" transceivers.

Cunningham's sensor interface modules (SIMs) are also not "low power" under the construction set forth by this Court. *SIPCO, LLC v. Emerson Elec. Co.*, 2019 LEXIS 28935 at *2. The SIMs have a range of over 600 feet and up to 3 miles (Appx1053, 17:60-67), far in excess of the "limited transmission range" of this Court's claim construction. The SIMs are described as having a transmission

power of 100 mW. Appx1053, 18:57:67. This is far in excess of the 1 mW that the FCC generally identifies as low-power:

> Throughout this bulletin the terms "low-power transmitter," "low-power, non-licensed transmitter," and "Part 15 transmitter" all refer to the same thing: a low-power, non-licensed transmitter that complies with the regulations in Part 15 of the FCC rules. Part 15 transmitters use very little power, most of them ***less than a milliwatt***.

Appx2486 (*emphasis added*).

Accordingly, the Board's ruling on the Ground 3 claims should be reversed or at a minimum, vacated and remanded to the Board with instructions to use the proper claim construction standard and this Court's prior claim construction of "low power RF signal."

### 3. THERE IS NO EVIDENCE THAT CUNNINGHAM'S GATEWAY DELIVERS AN "ENCODED ELECTRICAL SIGNAL" TO A COMPUTER ON THE WAN.

Independent claim 32 recites, inter alia, "at least one gateway connected [to] a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." Appx82, 21:29-32. The Board found that Cunningham disclosed this limitation because "the 'most current cumulative reading'" is received "from the sensor." Appx37.

But claim 32 requires much more from the "gateway" than merely receiving and sending a cumulative reading from a sensor; it requires the gateway to "deliver

the encoded electrical signal." Appx82, 21:29-32. Because the definite article "the" appears before the claim term "encoded electrical signal" in the "gateway" limitation, the term refers to the electrical signal that was encoded by a wireless transmitter. *Id.* Moreover, claim 32 also requires the "gateway" to deliver "transmitter identification information to a computer on the WAN." *Id.* That is, claim 32 requires the gateway to deliver one data item that is encoded (*i.e.*, the encoded electrical signal) and (ii) a second data item that is not encoded (*i.e.*, transmitter identification information).

According to Emerson's Petition, Cunningham discloses the encoding limitation because it states that "the signal to be transmitted by a sensor interface module is encoded for a checksum value." Appx179. But there is no evidence in the record that any checksum value generated by the sensor identification module is delivered by Cunningham's Data Collection Modules (*i.e.*, the alleged "gateway"). "Cunningham's data collection module does not perform any express translation/protocol conversion of a signal that it receives from a sensor interface module into TCP/IP format. None of the signals received from sensor interface module by a data collection module is directly forwarded/routed in whole, crossing a network boundary from the sensor interface module format to the host module over WAN. Thus, there is no direct mapping of network address and protocols between the two distinct networks." Appx3211, ¶ 118.

Rather, Cunningham's data collection module decodes information from sensor interface modules, processes and accumulates this information over a period of time and then puts the processed/accumulated information in a packet to be transmitted to a host module. Appx3211-3222, ¶ 119, *quoting* Appx1060, 31:4-23. In particular, "the data collection module 110 concentrates the data collected from the sensor interface modules 102, and uploads the information to the hos[t] module on a periodic time bases, at a preset time, or in response to a demand from the host module." Appx1060, 32:31-35. As such, the data collection module "creates new TCP/IP packets with processed/accumulated information instead of performing protocol conversion/translation of each meter reading (electrical signal generated by a sensor and encoded by a transceiver), as recited in claim 32." Appx3212, ¶ 120.

Indeed, the Board recognized this deficiency in Cunningham of not transmitting the information that is claimed by a data collection module to a host computer with respect to another claim (claim 1):

> Although Petitioner's Cunningham argument accounts for some translation, it fails to account for translation of RF signal which comprises both "encoded electrical signal" and "transmitter identification information" recited in the challenged claims. Further, even assuming transmitter identification information is received and translated by Cunningham's data collection module, Petitioner has not shown that it is further transmitted to the host module (Appx274);

> Petitioner does not show how the asserted prior art renders obvious a "system for remote data collection, assembly, and storage comprising … at least one gateway connected to the wide area network configured to receive and translate the RF signal, said gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN."

Appx274-275.

For these reasons, Cunningham does not disclose "at least one gateway connected a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN," as recited in independent claim 32, and as also required by claims 34, 36, and 38 dependent therefrom.

Moreover, neither the Board nor the Petitioner presented the required documentary evidence showing that the claim limitation that is missing from Cunningham would have been obvious. *K/S HIMPP,* 751 F.3d at 1366. Petitioner's expert Mr. Kinney did not show that a POSA would have been motivated to alter Cunningham's data collection modules to deliver (i) an electrical signal accompanied by a checksum generated at a transmitter and (ii) transmitter identification information that was not encoded. Indeed, the portion of Mr. Kinney's declaration relating to this claim limitation (Appx976, ¶ 137) was copied from the Petition (Appx180, ¶ 2) and therefore, is entitled to little or no weight.

*Wowza Media*, Paper 16 at p. 4; *In re Geisler*, 116 F.3d 1465, 1471 (Fed. Cir. 1997); *In re Schulze*, 346 F.2d 600, 602 (CCPA 1965).

For these additional reasons, the Board's final written decision on Ground 3 must be reversed or at a minimum, vacated and remanded.

## VI. CONCLUSION

For the reasons expressed above, the Court should affirm the Board's Final Written Decision with respect to Grounds 1 and 2. This Court should reverse the Board's Final Written Decision with respect to Ground 3, or at a minimum, vacate and remand with instructions to use the proper claim construction standard and the proper claim construction of the "low-power" limitation and to consider SIPCO's argument that Cunningham's data collection module (DCM) is not lower power.

Respectfully submitted,

/s/ Gregory J. Gonsalves
GREGORY J. GONSALVES

DR. GREGORY J. GONSALVES
GONSALVES LAW FIRM
2216 Beacon Lane
Falls Church, VA 22043
571.419.7252
gonsalves@gonsalveslawfirm.com

*Counsel for Cross-Appellant*
*SIPCO, LLC*
October 18, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October, 2019, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: October 18, 2019.

/s/ Gregory J. Gonsalves
Dr. Gregory J. Gonsalves


**Law Firm:** The Gonsalves Law Firm
**Address:** 2216 Beacon Lane
**City, State, ZIP:** Falls Church, VA 22043
**Telephone:** 571.419.7252
**E-mail Address:** gonsalves@gonsalveslawfirm.com

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1.

   ☐ The brief contains 13,664 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

   ☐ The brief uses a monospaced typeface and contains **N/A** lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   ☐ The brief has been prepared in a proportionally spaced typeface using **Microsoft® Word for Windows** in **14-point Times New Roman**, or

   ☐ The brief has been prepared in a monospaced typeface using **N/A** with **N/A**.

/s/ Gregory J. Gonsalves
DR. GREGORY J. GONSALVES

*Counsel for Cross-Appellant*
*SIPCO, LLC*

October 18, 2019