No. 19-1301, 19-1490

# United States Court of Appeals
# for the Federal Circuit

EMERSON ELECTRIC CO.,

Appellant,

v.

SIPCO, LLC,

Cross-Appellant.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Proceeding No. IPR2017-00359

## RESPONSE AND REPLY BRIEF OF APPELLANT

James R. Batchelder
James L. Davis, Jr.
Daniel W. Richards
ROPES & GRAY LLP
1900 University Avenue
6th Floor
East Palo Alto, CA 94303-2284
Phone: (650) 617-4000

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

Steven Pepe
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone: (212) 596-9000

*Counsel for Emerson Electric Co.*

FORM 9. Certificate of Interest

Form 9
Rev. 10/17

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Emerson Electric Co. v. SIPCO, LLP

Case No. 19-1301

### CERTIFICATE OF INTEREST

Counsel for the:
☐ (petitioner) ■ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Emerson Electric Co.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| Emerson Electric Co. | Fisher-Rosemount Systems, Inc. | None |
| | Rosemount Inc. | |
| | Emerson Process Management LLLP | |
| | | |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

Kathryn Hong (former Ropes & Gray LLP)

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

See Attachment.

| 12/30/2019 | /s/ Douglas Hallward-Driemeier |
|---|---|
| Date | Signature of counsel |
| Please Note: All questions must be answered | Douglas Hallward-Driemeier |
| | Printed name of counsel |

cc: _____

**Reset Fields**

## Attachment to Certificate of Interest

**The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47. 4(a)(5) and 47.5(b). (The parties should attach continuation pages as necessary).**

*Emerson Electric Co. et al. v. SIPCO LLC et al.*, No. 1:15-cv-319 (N.D. Ga.) ("SIPCO I") involves U.S. Patent No. 6,437,692. Related litigation *Sipco, LLC et al. v. Emerson Electric Co. et al.*, No. 6:15-cv-907 (E.D. Tex.) was transferred to the Northern District of Georgia, opened as *SIPCO, LLC v. Emerson Electric Co.*, No. 1:16-cv-02690 (N.D. Ga.), and consolidated with SIPCO I.

The following cases may be affected by this court's decision:

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1364 (Fed. Cir.) (appealed from IPR2016-00984) involves related U.S. Patent No. 8,754,780 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1856 (Fed. Cir.) (appealed from IPR2016-01895) involves related U.S. Patent No. 7,697,492 and is currently before this Court.

*SIPCO, LLC v. Emerson Electric Co.*, Case No. 18-1986 (Fed. Cir.) (appealed from IPR2017-00001) involves related U.S. Patent No. 7,468,661 and is currently before this Court.

*Emerson Electric Co. v. SIPCO, LLC*, IPR2015-01973 (PTAB) involves related U.S. Patent No. 8,013,732 (on remand from Case No. 17-1866 (Fed. Cir.)).

*Certain Wireless Mesh Networking Products and Related Components Thereof*, Investigation No. 337-TA-1131 (USITC) involves related U.S. patent Nos. 7,103,511, 6,914,893, 8,964,708.

# TABLE OF CONTENTS

COUNTER-STATEMENT OF THE ISSUES ..........................................................1

STATEMENT OF THE CASE................................................................................1

    A.    The Ground 3 Prior Art: U.S. Patent No. 6,124,806 ("Cunningham").7

    B.    The Challenged '692 Patent .................................................9

    C.    Procedural History..........................................................11

        1.    The Board Found the "Low-power" Signal Limitations Should Have Their Plain and Ordinary Meaning..................................11

        2.    The Board Found Cunningham Anticipates or Renders Obvious the Ground 3 Claims ...............................................13

            (a)    The Board Found that Cunningham Discloses the Low-Power RF Signal Limitations...................................14

            (b)    The Board Found that Cunningham Discloses the Encoded Electrical Signal Limitation ......................15

SUMMARY OF THE ARGUMENT .....................................................16

    A.    The Board's Determination as to the Ground 2 Claims Should Be Reversed, or at Least Vacated and Remanded ...................16

    B.    The Board's Determination as to the Ground 3 Claims Should Be Affirmed ............................................................20

ARGUMENT ......................................................................24

I.    THE BOARD'S DETERMINATION AS TO THE GROUND 2 CLAIMS SHOULD BE REVERSED, OR AT MINIMUM VACATED AND REMANDED, AS ITS DETERMINATIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ITS DECISION TO BAR EMERSON FROM PRESENTING EVIDENCE AFTER INSTITUTION VIOLATED THE APA AND DUE PROCESS ................................................24

    A.    The Board's Conclusion that Cunningham Fails to Disclose the "Control Signal" Limitations in the Ground 2 Claims Is Not Supported by Substantial Evidence...................................24

        1.    The Board Made a Critical Error in Misreading Cunningham to Require the DAM—Not the Host Module—to Issue Control Signals .........................................................25

2.      The Board Improperly and Incorrectly Limited Cunningham's Disclosure of "Controlling Information" to "Varying Utility Prices" ....................................................................................29

3.      The Board's Errors Were Further Compounded by the Board's Disregard of the '978 Provisional Incorporated by Reference into Cunningham ....................................................................31

B.      The Board's Conclusion that Cunningham Fails to Disclose the "Translating" Limitations in the Ground 2 Claims Is Not Supported by Substantial Evidence ............................................................37

C.      The Board Violated the APA and Due Process By Prohibiting Emerson from Presenting Any Evidence as to the Ground 2 Claims at Trial After the Board's Initial Findings in its Institution Decision.....41

II.     THE BOARD'S DETERMINATION AS TO THE GROUND 3 CLAIMS SHOULD BE AFFIRMED AS ITS CLAIM CONSTRUCTIONS ARE CORRECT AS A MATTER OF LAW AND ITS FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE ........................................45

A.      The Board Correctly Assigned the "Low-power" Terms in the Ground 3 Claims Their Plain and Ordinary Meaning ......................................45

1.      The Board's Application of the Plain Meaning of the "Low-power" Terms Is Correct Under Phillips ...................................46

2.      SIPCO Places Mistaken Reliance on the this Court's Construction of a "Low Power" Term in a Different Patent, Which Relied Exclusively on Specification Disclosures That Do Not Appear in the '692 Patent .............................................51

B.      Substantial Evidence Supports the Board's Finding that Cunningham Discloses Relatively Low-power Transceivers in the Ground 3 Claims................................................................................................52

1.      Substantial Evidence Supports the Board's Findings that Cunningham's SIMs disclose Claim 32's "Low-Power Radio-Frequency (RF) Signal" and Claim 55's "Low-Power RF Signal"......................................................................................53

2.    Substantial Evidence Supports the Board's Finding that Cunningham's DCMs Meet Claim 55's Recitation of a "Plurality of Relatively Low-Power Radio-Frequency (RF) Transceivers" ........................................................................... 56

C.    Substantial Evidence Supports the Board's Finding that Cunningham Discloses the Claimed Encoded Electrical Signal in the Ground 3 Claims .................................................................................................. 62

CONCLUSION ...................................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anacor Pharm., Inc. v. Iancu,*
   889 F.3d 1372 (Fed. Cir. 2018) ........................................................42

*Belden Inc. v. Berk-Tek LLC,*
   805 F.3d 1064 (Fed. Cir. 2015) ........................................................43

*Chamberlain Grp., Inc. v. One World Techs., Inc.,*
   No. 18-2112, 2019 U.S. App. LEXIS 37224 (Fed. Cir. Dec. 17,
   2019) ..................................................................................................44

*In re CSB-System Int'l, Inc.,*
   832 F.3d 1335 (Fed. Cir. 2016) ........................................................47

*Dell Inc. v. Acceleron LLC,*
   884 F.3d 1364 (Fed. Cir. 2018) ..................................................44, 45

*Ericsson Inc. v. Intellectual Ventures I LLC,*
   890 F.3d 1336 (Fed. Cir. 2018) ...........................................19, 27, 28

*Ericsson Inc. v. Intellectual Ventures I LLC,*
   901 F.3d 1374 (Fed. Cir. 2018) ........................................................35

*In re Geisler,*
   116 F.3d 1465 (Fed. Cir. 1997) ........................................................58

*Grain Processing Corp. v. Am. Maize-prods. Co.,*
   840 F.2d 902 (Fed. Cir. 1988) ..........................................................28

*Intellectual Ventures I LLC v. EMC Corp.,*
   No. 2018-2289, 2018-2290, 2019 U.S. App. LEXIS 28933 (Fed.
   Cir. Sept. 25, 2019) ..........................................................................35

*Israel Bio-Engineering Project v. Amgen Inc.,*
   475 F.3d 1256 (Fed. Cir. 2007) ........................................................36

*K/S HIMPP v. Hear-Wear Techs, LLC.,*
   751 F.3d 1362 (Fed. Cir. 2014) ...........................................27, 28, 58, 66

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1343 (Fed. Cir. 2012) ........................................................28

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..........................................................................58

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,
  868 F.3d 1013 (Fed. Cir. 2017) ........................................................45

*Omega Eng'g, Inc., v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................50

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ........................................3, 21, 46, 47

*SAS Inst., Inc. v. ComplementSoft, LLC*,
  825 F.3d 1341 (Fed. Cir. 2016) ........................................................44

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)..........................................16, 20, 42, 43

*Schoenhaus v. Genesco, Inc.*,
  440 F.3d 1354 (Fed. Cir. 2006) ........................................................50

*In re Schulze*,
  346 F.2d 600 (C.C.P.A. 1965) ..........................................................58

*Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*,
  701 F. App'x 942 (Fed. Cir. 2017) ..............................................19, 41

*SIPCO, LLC v. Emerson Elec. Co.*,
  939 F.3d 1301 (Fed. Cir. 2019) ..................................................51, 52

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015).......................................................................49

*In re Translogic Tech., Inc.*,
  504 F.3d 1249 (Fed. Cir. 2007) ........................................................47

*In re Warsaw Orthopedic, Inc.*,
  832 F.3d 1327 (Fed. Cir. 2016) ........................................................30

*In re Watts,*
  354 F.3d 1362 (Fed. Cir. 2004) ...................................................................28, 46

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI),*
  777 F. App'x 495 (Fed. Cir. 2019) ...............................................................31, 33

*Wowza Media Sys., LLC v. Adobe Sys., Inc.,*
  IPR2013-00054, Paper 16 (PTAB July 13, 2013) .......................................28, 29

## Statutes

5 U.S.C. §554(c) .................................................................................................36

35 U.S.C. §102 .....................................................................................................1

35 U.S.C. §103 .....................................................................................................1

35 U.S.C. §314(a) ...............................................................................................42

35 U.S.C. §315(e) ...............................................................................................44

## Other Authorities

U.S. Patent and Trademark Office, Manual of Patent Examining
  Procedure §2141.02 .........................................................................................30

## COUNTER-STATEMENT OF THE ISSUES

Emerson's opening brief provided a concise statement of the issues in its appeal regarding U.S. Patent No. 6,437,692 ("'692 patent"). Emerson provides the following counter-statement of the issues in response to SIPCO's statement of the issues in its cross-appeal:

1. Whether the Board correctly construed the terms "low-power radio frequency (RF) signal" and "low-power RF signal" in claims 32 and 55, respectively, as having their plain and ordinary meaning.

2. Whether the Board correctly concluded that Emerson demonstrated by a preponderance of the evidence that the Ground 3 Claims are unpatentable under 35 U.S.C. §102 or §103 over Cunningham, where substantial evidence supports the Board's findings that Cunningham discloses the "low-power" and "encoded electrical signal" limitations under the proper interpretations of the Ground 3 Claims, and Cunningham further discloses that the limitations are met even under SIPCO's erroneous interpretations.

## STATEMENT OF THE CASE

Emerson's opening brief provided a recitation of the facts relevant to the issues raised in its appeal. Blue Br. 2-24. Set forth below are the additional facts from the Board's Final Written Decision relevant to the issues raised in SIPCO's cross-appeal.

1

The Board correctly held claims 32, 34, 37-38, 55-57, and 59 ("Ground 3 Claims") are anticipated by, or obvious over, Cunningham as set forth in Emerson's Ground 3. In its cross-appeal, SIPCO disputes the Board's construction of terms reciting "low-power" RF signals in claims 32 and 55, and the Board's findings that Cunningham discloses the "low-power" terms in independent claims 32 and 55 and the "encoded electrical signal" term in claim 32. The Board correctly assigned those "low-power" RF terms their plain and ordinary meaning and found that Cunningham expressly discloses devices communicating using "low-power" RF transceivers. SIPCO's attempts to distinguish these disclosures depend on its improper attempts to import an optional feature from a preferred embodiment into the claims, and to mischaracterize both the Board's findings and the evidence. And, even under SIPCO's erroneous interpretations, the evidence before the Board still demonstrates that the limitations are met by Cunningham. The Board's findings should be affirmed.

First, the Board correctly gave terms reciting a "low-power" RF signal their plain and ordinary meaning. On appeal, SIPCO relies on two passages from the '692 patent as support for construing "low-power" to mean the same thing as "short transmission range." *See* Red Br. 64 (citing Appx74-75). However, as the Board explained, neither these passages, the claims, nor the specification as a whole supports SIPCO's attempt to equate power and transmission range. *Id.* Instead, the

specification language SIPCO quotes states that "*in some applications*, the transmission range of a given transceiver *may* be relatively limited," and that the stand-alone transceiver "*may*" pick up transmission from a single integrated transceiver "*due in part*" to low-power transmission, but does not equate these two properties. Appx74(5:50-54), Appx74-75(6:67-7:4); *see* Appx13. The Board further found that there are multiple factors other than power that impact transmission range, and that SIPCO's construction of "radio frequency signals having a limited transmission range" would inject "non-specific, vague and unhelpful" language into the claim, particularly regarding how "limited" the range must be. Appx13-14. The Board found that a POSITA would have understood what was meant by a low-power RF signal, and also found that the '692 patent specification nether defines nor limits the term further. And, contrary to SIPCO's reliance on a prior decision of this Court construing a different patent, the '692 patent specification does not contain any of the disclosures that supported construing "low-power" to mean a "limited transmission range" in that patent.

SIPCO's argument (Br. 62-63) concerning the Board's claim construction standard is also misplaced.  As Emerson asserted below (Appx625 n.3), and SIPCO did not dispute, the construction of these terms does not change regardless of whether *Phillips* or the broadest reasonable interpretation ("BRI") standard is applied.  The Board likewise referenced both standards, Appx10 (quoting the

*Phillips* "ordinary and customary" standard) and ultimately adopted "the plain and ordinary meaning" for these "low-power" terms. Appx13-14. There was no error.

Second, the Board correctly found that Cunningham explicitly discloses "low-power" RF transmissions. The Board specifically relied on Cunningham's disclosures of two devices—a sensor interface module (SIM) and a data collection module (DCM)—communicating using "low-power, radio-frequency transmissions." Appx34-35 (quoting Appx(6:11-16)), Appx45-46. Specifically, the SIM transmits a "low-power" signal to a DCM, which then either sends the data over the Internet or repeats the low-power signal to another DCM, which is connected to the Internet. Appx1061(33:15-44). As the Board found, these disclosures meet the low-power RF transmissions required by claims 32 and 55. Appx34-36, Appx45-46. Indeed, the Board further found that even a Federal Communications Commission ("FCC") Bulletin that SIPCO cites confirms that each of Cunningham's transceivers are low-power, as Cunningham's transceivers each transmit at a power level that is one tenth of the level the FCC considers "low-power." Appx35. Substantial evidence therefore supports the Board's findings that Cunningham discloses the "low-power" limitations. Indeed, as Emerson observed to the Board, Cunningham's disclosure that both SIMs and DCMs use "short range" transceivers would still explicitly disclose this limitation, even under SIPCO's constructions of the "low-power" terms. Appx1016(Fig. 19), Appx1025(Fig. 30). SIPCO simply cannot escape the fact

that Cunningham discloses, in the same terms, the "low-power" terms of SIPCO's purported invention.

Finally, the Board also correctly found that Cunningham discloses claim 32's "encoded electrical signal" limitation, which recites "at least one gateway connected [to] a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." The Board explained that even under SIPCO's characterization of the claim, which imports a requirement that a signal is "directly" translated from an RF signal and "forwarded/routed in whole" over a WAN, Cunningham's disclosure of a DCM sending messages from a SIM to a host module discloses this term. Appx36-38. As shown in Figure 1 below, Cunningham discloses that a SIM transmits a sensor reading in an RF signal to a DCM, and the DCM will then take the latest single SIM sensor reading and transmit it, along with an identifier for the SIM, to a host module (HM) over the Internet. *Id.* (citing, *e.g.*, Appx1060(31:6-28), Appx1051(13:44-46), Appx1067(45:60-67), Appx1044(Fig. 49)).



Appx1003(Fig. 1) (color annotations added). As shown in Fig. 49 below, which is part of the same embodiment, a DCM that is not directly connected to the Internet will repeat the SIM's data and identifier to another DCM that is host connected.



6

Appx1044(Fig. 49) (color annotations added). SIPCO's appeal arguments merely copy and paste the same failed arguments that the Board rejected below.

The Board's constructions are correct as a matter of law and its findings that claims 32, 34, 37-38, 55-57, and 59 are anticipated by, or obvious over, Cunningham are amply supported by substantial record evidence and should be affirmed.

## A.    The Ground 3 Prior Art: U.S. Patent No. 6,124,806 ("Cunningham")

Emerson's Opening Brief provided an introduction to Cunningham's teachings relevant to Emerson's appeal. *See* Blue Br. 8-14. Below is a further discussion of certain additional Cunningham teachings germane to the Board's Ground 3 findings at issue in SIPCO's cross-appeal. *See, e.g.*, Appx17-18.

Cunningham discloses a "wide-area remote telemetry system which monitors and controls remote devices by means of a[n] information control system." Appx1002(Abstract). As shown above, Figure 1 of Cunningham depicts the architecture of Cunningham's system, which includes sensor interface modules ("SIMs") that communicate wirelessly with a data collection module ("DCM"), which communicates with a host module/computer ("HM"). The SIMs act as "data gathering equipment." Appx1047(6:9-11). The SIMs may be "two-way [SIMs]," which both send sensor data to a DCM and receive "controlling information" from the system through the DCM. Appx1067-1068(46:62-47:30). These communications between a SIM and a DCM occur using "low-power, radio-

7

frequency transmissions." Appx1047(6:14-17). After the DCM receives data from a SIM, it relays this information, along with a unique identifier associated with the SIM, to a host module. Appx1060(31:6-30). The communication from the DCM to a host module uses TCP/IP over the Internet. Appx1067(45:60–46:2), Appx1044(Fig. 49).

As shown in Fig. 49 above, if the DCM receiving data from a SIM is not directly connected to the Internet, it will instead operate as a "data repeater module" and repeat the message from the SIM through other DCMs until the message reaches a DCM connected to the Internet. Appx1061(33:15-44). When repeating messages, the DCMs "perform the repeater functions to get the information to a connected [DCM]." *Id.* at 33:38-44.

In addition to disclosing that DCMs and SIMs use low-power RF communications, Cunningham discloses that both SIMs and DCMs use short range RF transceivers. This is shown explicitly in Fig. 19 (Appx1016 (emphasis added)), which depicts a SIM (*see* Appx1047(5:24-25)), and Fig. 30 (Appx1025 (emphasis added)), which depicts a DCM (*see* Appx1047(5:41)) (*see also* Appx451-452):



## B.    The Challenged '692 Patent

Emerson's opening brief summarized the challenged '692 patent. *See* Blue Br. 17-19. Like the system taught by Cunningham, the '692 patent "generally relates to remotely operated systems, and more particularly to a computerized system for monitoring, reporting on, and controlling remote systems." Appx72(1:25-35). It does so "by transferring information signals through a wide area network (WAN) and using software applications hosted on a connected server to appropriately process the information." Appx72(1:28-31).

Figure 2 illustrates a block diagram of an embodiment of the alleged invention:



**FIG. 2**

Appx55(Fig. 2) (color annotations added). Figure 2 shows a plurality of sensors/actuators 212, 214, 216, 222, and 224 integrated with transceivers, which are preferably low-power radio frequency transceivers. Appx74(5:45-53). "As a result" of using such transceivers, "in some applications, the transmission range of a given transceiver may be relatively limited." Appx74(5:50-54).

Standalone transceivers 211, 213, 215, and 221 can repeat signals between the integrated transceivers and local gateways 210 and 220. Appx74(5:54-66). "Local

gateways 210 and 220 analyze the transmissions received, convert the transmissions into TCP/IP format and further communicate the remote data signal transmissions via WAN 230." Appx74(6:20-23).

### C. Procedural History

Emerson's Opening Brief set forth a succinct procedural history of the Petition, Institution Decision, and Final Written Decision. *See* Blue Br. 19-24. Below is additional detail regarding the Final Written Decision findings relevant to the Ground 3 Claims at issue in SIPCO's cross-appeal.

Ground 3 of the Petition challenged claim 32 (and dependent claims 34 and 36-38) and claim 55 (and dependent claims 56-57, and 59) as anticipated or rendered obvious over Cunningham. Appx33 (citing Appx178). The Board found all of these claims, with the exception of claim 36, are anticipated or rendered obvious by Cunningham.

#### 1. *The Board Found the "Low-power" Signal Limitations Should Have Their Plain and Ordinary Meaning*

In its Final Written Decision, the Board addressed the construction of "low-power radio frequency (RF) signal" and "low-power RF signal" in claims 32 and 55, respectively. Appx13. SIPCO proposed construing these terms to require a "limited transmission range." *Id.* (citing Appx363, Appx389). The Board found that the evidence SIPCO presented does not support its construction. *Id.* With respect to the claim language, the Board recognized that the claims "do not mention transmission

11

range." *Id.* With respect to the specification, the Board observed that SIPCO's cited specification disclosures "describe a relationship between power and transmission range," but do not "equate these two distinct transmission properties." *Id.* (citing Appx74-75(5:48-57, 6:67-7:4)).

The Board further observed that the specification describes only preferred embodiments where transmission range "*may* be relatively limited." *Id.* The Board found low power is not the only property that may impact transmission range, and that other factors, "such as frequency, hardware design, and environment," also impact transmission range. Appx13-14 (citing Appx447-448).

The Board also agreed that SIPCO's construction is "non-specific, vague and unhelpful." Appx14 (quoting Appx447). For example, SIPCO's construction does not identify what range qualifies as "limited," whether that range depends on "the particular system or application," and whether other factors should also be considered. Appx14. Based on its analysis of the specification and Emerson's arguments, the Board rejected SIPCO's proposed construction. *Id.*

The Board instead gave these low-power terms "their plain and ordinary meaning, which is to say that they are construed to encompass transmitters/transceivers that transmit low power signals." Appx14-15. The Board reasoned that the "evidence of record suggests a [POSITA] would have understood what was meant by a low power RF signal," and the specification neither defines nor

expressly limits the term low-power RF signal. Appx14. The Board even observed that Cunningham "*explicitly* discloses 'low power, radio frequency transmissions.'" Appx14. The Board thus construed the "low-power" terms to have their plain and ordinary meaning.

### 2. *The Board Found Cunningham Anticipates or Renders Obvious the Ground 3 Claims*

The Board found claims 32, 34, 37-38, 55-57 and 59 anticipated or at least obvious over Cunningham. Appx33-51. Among its other findings, the Board found that the "low-power" RF transmissions from Cunningham's SIMs to the DCMs disclose claim 32's recitation of a "low-power radio frequency (RF) signal" and claim 55's recitation of a "low-power RF signal," and Cunningham's DCM transceivers disclose the "relatively low-power radio-frequency (RF) transceivers" recited in claim 55. Appx34-36, Appx45-46. The Board further found that Cunningham's DCMs that receive the low-power signals and deliver the information to a host computer via the Internet disclose claim 32's recitation of "at least one gateway connected [to] a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." Appx36-38.

(a)    The Board Found that Cunningham Discloses the Low-Power RF Signal Limitations

The Board's Final Written Decision found that Cunningham discloses the "low-power" limitations recited in claims 32 and 55. For claim 32's "low-power radio-frequency (RF) signal," the Board relied on Cunningham's disclosure of SIMs communicating information to a DCM using "various types of known, low-power, radio-frequency transmissions." Appx34-35 (quoting Appx1047(6:11-16)). The Board rejected SIPCO's argument that Cunningham does not disclose a "limited range" signal because the claim does not recite this limitation and SIPCO's attempt to add the requirement through claim construction is improper. Appx35. The Board also found that a FCC Bulletin relied on by SIPCO further supports Cunningham's disclosure of this limitation. Appx35. The Board explained that Cunningham's transmitters are limited to only "one tenth the power of what the FCC considers to be low power." Appx35. When addressing claim 55's recitation of a "low-power RF signal," the Board referred back to these same findings. Appx45.

With respect to claim 55's recitation of "relatively low-power radio-frequency (RF) transceivers dispersed geographically wherein the low-power RF signal is received and repeated as required" to reach the gateway, the Board found that Cunningham's "multiple data collection modules" disclose this limitation. Appx45-46. The Board relied on Cunningham's teaching of DCMs with "signal repeating capabilities for use in remote areas." Appx45. The Board then pointed back to its

earlier rejection of SIPCO's construction of "low-power" and findings that DCMs and SIMs communicate using "low-power" transceivers as showing that the DCMs communicate using low-power RF transceivers. Appx45-46.

The Board thus made specific factual findings, based on Cunningham's explicit teachings, that Cunningham discloses each of these low-power limitations based on its teachings relating to SIMs and DCMs.

> (b)    The Board Found that Cunningham Discloses the Encoded Electrical Signal Limitation

The Board also found that Cunningham discloses claim 32's recitation of "at least one gateway connected [to] a wide area network (WAN) configured to receive and translate the RF signal, the gateway further configured to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." Appx36-38. The Board found that Cunningham's DCM is a gateway that "receives information from [SIMs] and sends it to a host module over the Internet." Appx36. The Board considered and rejected SIPCO's argument requiring that the signal from a SIM is "directly forwarded/routed in whole," explaining that this argument is "premised on reading a limitation into the claims, namely that the information encoded in the RF signal must be translated in real time." Appx37. The Board also found that, even considering SIPCO's incorrect reading of the claim, "Cunningham would meet the limitation" because Cunningham discloses sending individual signals from the sensor to the host computer on the WAN. Appx37

(quoting Appx437). The Board explained the most recent "cumulative" reading sent by the DCM over the WAN is the current absolute reading from the sensor at the SIM—thus disclosing the "encoded data signal" limitation even under SIPCO's flawed interpretation. Appx37. The Board thus fully considered, and rejected, SIPCO's arguments in finding that Cunningham discloses this limitation.

## SUMMARY OF THE ARGUMENT

### A.   *The Board's Determination as to the Ground 2 Claims Should Be Reversed, or at Least Vacated and Remanded*

With respect to Emerson's appeal, SIPCO's arguments hinge on its untenable contention that Cunningham's signal containing "controlling information" does not constitute a "control signal" as recited in the Ground 2 claims. *See also* Blue Br. 33-61. SIPCO's and the Board's false dichotomy between "control signals" that contain information and signals that contain "controlling information" illustrates the core flaw in the decision below. Having only belatedly instituted Ground 2 after the Supreme Court's *SAS* ruling, the Board was unwilling to change its initial impression of Cunningham in its first institution decision, which wrongly limited the "controlling information" disclosure to "utility prices"—contradicting the disclosures of Cunningham and completely ignoring the '978 Provisional incorporated into Cunningham.   Appx24; Appx275-277.   In its Final Written Decision, the Board perpetuated these errors by 1) contradicting Cunningham's express disclosures of the "control signal" limitations as further confirmed by

Cunningham's '978 Provisional that was incorporated by reference, 2) failing to consider or address additional references that were included in the ground for the "translating" limitations, and 3) refusing to allow Emerson to submit additional evidence concerning the ground after the belated institution.

First, neither SIPCO nor the Board is able to reconcile its interpretation of Cunningham's "controlling information" disclosure with Cunningham's other disclosures. Both Cunningham as well as its '978 Provisional, which is incorporated by reference, discuss examples of this controlling information that originate from a central host module and are sent to local device adjustment modules ("DAMs") that control a local device, such as "utility disconnect actions" that originate from a utility company and are sent to the local DAMs to disconnect the utility at a residence. *See* Appx1059-1060(29:63-31:2) (control signals are used for "control of lights, … utility disconnect actions, … or other control functions"). Indeed, SIPCO's only response to these disclosures is to assert that they are "in the section of Cunningham describing the Data Collection Module" (Br. 34)—which only serves to confirm that the host module passes these control signals through the Data Collection Module ("DCM") (the claimed gateway) to the DAM—not that the DAM itself generates the control signals, as the Board mistakenly found.

Without any substantive response to Cunningham's multiple examples of control signals, SIPCO instead doubles-down on the Board's mistaken interpretation

that this disclosure of "controlling information" is limited to an earlier reference to "utility prices" (*see* Br. 31-39, 42-43, 46-47)—erroneously misreading Cunningham and confusing the relationship between the usage and system information that the host module uses as inputs to then output the signal containing the controlling information through the DCM gateway to the DAMs.

SIPCO does not appear to dispute that the '978 Provisional expressly describes the system operating with a host module that gathers and processes information from the remote sensors and then sends out a signal that "*control[s]* HVAC and lighting *based on* defined cost parameters and energy usage *across the entire system*" (Appx1434-1435)—*i.e.*, to adjust the remote devices, precisely as the '692 patent later claimed. Instead, SIPCO perpetuates the straw-man argument that there was no motivation to combine Cunningham with its '978 Provisional. As made clear in Emerson's Petition, the '978 Provisional was relied on as "further evidence" to confirm the proper interpretation of Cunningham itself (Appx150-151)—it was error for the Board to fail to consider it for this purpose. The Board, operating from the premise of its misunderstanding of what Cunningham describes, disregarded the '978 Provisional's disclosures on the mistaken ground that they concerned a different embodiment for which Emerson had failed to offer a motivation to combine. *See* Appx29-33. However, the Board later in its decision relied affirmatively on the '978 Provisionals' disclosures in analyzing the same

18

Cunningham embodiment for Ground 3—confirming that the '978 Provisional is properly part of the same embodiment as Cunningham and that no motivation to combine is required. SIPCO simply ignores this inconsistency in the Board's analysis.

Just as in *Ericsson*, where this Court reversed because the prior art satisfied the recited "frequency hopping" limitation with a disclosure of "frequency hopping" in the prior art, the Court here should reverse in light of the prior art's express disclosure of a signal containing "controlling information" as satisfying the claimed "control signal" requirement. *See Ericsson Inc. v. Intellectual Ventures I LLC*, 890 F.3d 1336, 1345-46 (Fed. Cir. 2018).

Second, unable to explain the Board's failure to consider the express disclosures of Mason and McGowan regarding the "translating" limitations, SIPCO instead repeats its arguments regarding the "control signal" limitations directed toward Cunningham and attempts to hide the ball by asserting that Cunningham does not disclose these limitations—ignoring Mason and McGowan. As this Court has held, it is error for the Board to fail to consider Emerson's full obviousness combination. *See Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*, 701 F. App'x 942, 945-46 (Fed. Cir. 2017).

Finally, these mistaken interpretations by the Board would likely have been avoided had the Board allowed Emerson to submit additional expert testimony to

respond to the Board's statements in its Decision to Institute. However, despite Emerson's requests, the Board denied Emerson the ability to submit evidence concerning the Ground 2 Claims after the Board belatedly agreed to institute this ground after the Supreme Court's *SAS* decision. *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018). The Board's arbitrary and capricious decision to bar Emerson from submitting any evidence after institution as to Ground 2 violates the Administrative Procedures Act ("APA") and the Due Process Clause.

The Board's determination as to the Ground 2 Claims is not supported by substantial evidence and must be reversed or at minimum vacated and remanded.

### B. *The Board's Determination as to the Ground 3 Claims Should Be Affirmed*

In contrast to the Ground 2 Claims that were instituted only after the *SAS* decision, the Board originally instituted, and ultimately and correctly found that Cunningham anticipates or renders obvious, each of the Ground 3 Claims. On appeal, SIPCO disputes the Board's findings with respect to only two groups of limitations in the Ground 3 Claims: the "low-power" limitations (claims 32 and 55) and the "encoded electrical signal" limitation (claim 32). For each limitation, the Board properly rejected SIPCO's attempts to read limitations into the claims and found that Cunningham disclosed the limitations as properly construed. Moreover, the evidence before the Board also demonstrated that the "low-power" limitations were disclosed even under SIPCO's flawed construction—meaning the disputed

construction of the "low-power" RF signal terms is immaterial to the outcome of the appeal. The Board similarly found Cunningham disclosed the "encoded electrical signal" limitation even under SIPCO's flawed interpretation. Thus, the Board's findings that the Ground 3 claims are unpatentable should be affirmed.

Because the '692 patent expired during the pendency of the IPR, the *Phillips* standard applies. During the proceedings below, Emerson asserted, and SIPCO did not dispute, that application of the *Phillips* or BRI standard would not change the proper construction. The Board's decision stated that the Board will "generally give claim terms their ordinary and customary meaning"—the meaning assigned under *Phillips*—and ultimately gave the claims their plain and ordinary meaning, consistent with *Phillips*. *See* Appx10 (citing *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)). Nothing in the Final Written Decision suggests that the Board's construction depended on application of the BRI as opposed to *Phillips* standard, and SIPCO waived any argument otherwise.

The Board correctly found that SIPCO's construction is not supported by the intrinsic record and improperly attempts to equate the power and range of a signal. Appx14-15. The specification support that SIPCO cites confirms the opposite; it explains that a low-power transceiver's range "may" be short in "some" applications—demonstrating that the power of a signal is not the same as its range.

Appx14. The Board found that other factors in addition power level will affect the range of a transceiver, including the frequency, hardware design, and environment of the transceiver. Appx13-14. In addition, the Board rejected SIPCO's construction as "nonspecific, vague and unhelpful" because the intrinsic record provided no guidance for how "limited" the "limited transmission range" is supposed to be. Appx14. SIPCO's reliance on this Court's construction of "low power" in another patent is misplaced as that decision relied on intrinsic specification disclosures that do not appear in the specification of the '692 patent.

The Board relied on Cunningham's explicit disclosure of SIMs that communicate with DCMs using "low power" signals for claim 32's "low-power radio-frequency (RF) signal" and claim 55's "low-power RF signal." SIPCO does not dispute that Cunningham's SIMs disclose the "low-power" limitations under these low-power terms' plain meaning adopted by the Board, and instead argues only that the terms are not met under SIPCO's construction requiring "short transmission range" transceivers. *See* Red Br. 64-65. Yet, even under SIPCO's construction, the Board found that "Cunningham explicitly discloses that 'various types of known, low-power, radio-frequency transmissions may be utilized.'" Appx35 (citing Appx1047(6:13-17)). The Board then discusses the fact that the specific transmitter referenced in Cunningham is only "one tenth the power of what the FCC considers to be low power" and cites the discussion in Emerson's Reply at 19-20. Appx35.

Those pages specifically address Cunningham's explicit disclosure that SIMs use "short range" transceivers. Appx35 (citing Appx451 (discussing Appx1016(Fig. 19))). SIPCO simply cannot escape the fact that Cunningham explicitly discloses a "low power" transceiver with "short range."

The Board relied on Cunningham's DCMs for claim 55's recitation of "relatively low-power radio-frequency (RF) transceivers." The Board found that the same disclosure of SIMs and DCMs communicating bi-directionally using low-power RF transceivers discloses that DCMs also use low-power RF transceivers. Appx45. Additionally, even under SIPCO's construction, the Board relied on Cunningham's disclosures that explicitly state that DCMs' transceivers are "short range" transceivers. Appx1025(Fig. 30); Appx 45(citing same). The Board also concluded that the FCC Bulletin cited by SIPCO further confirms that Cunningham's low-power transceivers use one-tenth of the power that the FCC considers to be low-power. Appx35.

Substantial evidence also supports the Board's finding that Cunningham's DCMs meet claim 32's limitation requiring a gateway to "receive and translate the RF signal ... to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." Appx34-36. The Board found Cunningham's DCMs receive a signal from a SIM and relay that signal, along with identification information for the SIM, to a host over the Internet. Appx34-36.

SIPCO's response improperly reads into claim 32 a requirement that the "encoding" step must happen in real time and that the data is "directly" forwarded and encoded, and sent over a WAN, but as the Board found, the limitation merely requires the encoded electrical signal to be forwarded. Appx37. But, again as the Board found, even under SIPCO's incorrect interpretation, Cunningham discloses a DCM receiving a sensor data signal from the SIM and then sending that sensor data signal on to the host over TCP/IP. *Id.*

Accordingly, the Board's determination as to the Ground 3 Claims is based on claim constructions that are correct as a matter of law and factual determinations supported by substantial evidence, and should be affirmed.

## ARGUMENT

I.    **The Board's Determination as to the Ground 2 Claims Should Be Reversed, or at Minimum Vacated and Remanded, as Its Determinations Are Not Supported by Substantial Evidence and Its Decision to Bar Emerson from Presenting Evidence After Institution Violated the APA and Due Process**

A.    ***The Board's Conclusion that Cunningham Fails to Disclose the "Control Signal" Limitations in the Ground 2 Claims Is Not Supported by Substantial Evidence***

Cunningham's express disclosure of a host module sending "controlling information" to a device adjustment module ("DAM") to adjust a device satisfies the "control signal" limitations. SIPCO's arguments—like the Board's decision— mistake and disregard: 1) Cunningham's express disclosure of a signal containing "controlling information" sent from the host module to the DAM, 2) other

disclosures in Cunningham of "two-way transmission" applications that require remotely controlling the DAM such as "utility disconnect actions," and 3) Cunningham's '978 Provisional, which provides further examples of Cunningham's DAM embodiment where HVAC and lighting across an entire system are controlled remotely. By way of example, SIPCO's arguments (Br. 38-39) fail to substantively address Cunningham's disclosures of "utility disconnect actions" sent from a central computer (utility company) to the DAMs, and instead focus on the disclosures of "varying utility prices," "device consumption information," "defined cost parameters," and "energy usage across the system" that are inputs to the host computer upon which the "controlling information" that the DAM "receiv[es]" from the host computer can be based. Appx1059-1060(29:63-31:2), Appx1068(47:8-10); Appx1434-1435. Each of the three categories of teachings, both individually and collectively, demonstrate that the Board erred in misinterpreting Cunningham as requiring the DAM to generate its own control signals.

1.    *The Board Made a Critical Error in Misreading Cunningham to Require the DAM—Not the Host Module—to Issue Control Signals*

Cunningham expressly discloses that Cunningham's DAMs have "two-way communication"—they can communicate sensor data to the system and receive "*controlling information*" from the system/host computer, which allows them to act as DAMs—device *adjustment* modules. Appx144, Appx149-151, Appx943-

945(¶¶59, 62, 64). SIPCO fails to address the disclosure in Cunningham that the DAM is "used to" control, just as it is "used to" monitor. Appx1066(44:14-19). It is the host module that "use[s]" the DAM in those ways, which is why the DAM must send the monitored data to the host module over the system and receive back "controlling information" in the form of a "system update." Appx1068(47:8-10). Cunningham explains that the DAM "monitors the energy usage by the air conditioning and heating systems controlled by the thermostat and can adjust the operation usage to stay below increased billing increment costs for energy supply and usage." Appx1068(47:3-7). But Cunningham clarifies that the DAM does not make this determination itself, rather it "utilize[s]" "[a] two-way sensor interface module …. The device adjustment module transmits information to the system and *receives* *controlling* *information* from system update transmissions." Appx1067-1068(46:62-47:10). Thus, the usage information is sent by the DAM to the host system, and the host system then sends "controlling information" (control signals) back. This express disclosure of a host module sending "controlling information" to a DAM to adjust a device expressly meets the "control signal" limitations. The Board fundamentally misread this portion of the disclosure as indicating that the DAM itself *generates* the control signal. *See* Appx28-29. In light of these disclosures alone, the Board's interpretation cannot be supported by substantial evidence.

Cunningham further discloses example "two-way transmission" applications between the DAM/SIM and the host module through the DCM, including "monitoring and control of lights, … utility disconnect actions, … or other control functions," which also involve control signals generated by the central computer in response to data from at least one sensor. Appx1059-1060(29:63-31:2), Appx1068(47:8-10), Appx1067(45:64-68), Appx1046(4:58-62); Appx151; Appx656-657. In one-way applications, the DCM collects information from the SIM/DAM and sends it to the host module (Appx1059(29:55-61)), but in these "two-way transmissions," these control signals are sent back from the host module to the SIM/DAM through the DCM to implement the "control functions." Appx1059-1060(29:63-31:2). SIPCO's only response is that these disclosures are "in the section of Cunningham describing the Data Collection Module" (Br. 35), but this further demonstrates that the DAM itself does not generate the control signals—contrary to the Board's interpretation. Rather, these are control signals generated by the host module/system, as they are part of the "two-way transmission" between the SIM/DAM and the host system, which uses the DCM as a gateway.

Just as this Court reversed in *Ericsson* because the prior art expressly satisfied the recited "frequency hopping" limitation, the Court here should reverse in light of the prior art's disclosure of a signal containing "controlling information" to meet the "control signal" requirement. *See* 890 F.3d at 1345-46. SIPCO's reliance on *K/S*

*HIMPP* and argument that "the Board was not permitted to fill the gap" with "common sense" (Br. 34-37) is inapposite. *Cf. K/S HIMPP v. Hear-Wear Techs, LLC.*, 751 F.3d 1362, 1366 (Fed. Cir. 2014). Emerson has not argued that any "modification" of Cunningham was necessary for this limitation, as Cunningham's express disclosure of "controlling information" meets the "control signal" limitations. And, unlike in *Kinetic* and *Grain Processing*, no hindsight is required here—Cunningham discloses the limitation; the Board simply misread the reference just as it did in *Ericsson. Cf. Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1343, 1368 (Fed. Cir. 2012); *Grain Processing Corp. v. Am. Maize-prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988).

SIPCO's repeated attack on Mr. Kinney's testimony that pervades its arguments (Br. 25, 30, 32, 48-51) was not relied upon by the Board and mischaracterizes Mr. Kinney's declaration. *See In re Watts*, 354 F.3d 1362, 1367 (Fed. Cir. 2004) ("[I]t is important that the [appellee] in general be barred from raising new arguments on appeal to justify or support a decision of the Board."). Furthermore, SIPCO's reliance on the PTAB's unrelated non-precedential ruling in *Wowza* is inapposite and its allegations that Mr. Kinney's declaration was copied from the Petition, as opposed to, *e.g.*, being used to generate or being created with the Petition, have no support in the record. Unlike in *Wowza*, Mr. Kinney's declaration submitted with the Petition set forth how the specific teachings of

Cunningham in view of Mason and McGowan rendered the Ground 2 Claims obvious. *See* Appx941-950(¶¶56-73); *cf. Wowza Media Sys., LLC v. Adobe Sys., Inc.*, IPR2013-00054, Paper 16 at 4-5 (PTAB July 13, 2013). Furthermore, the Board did not find that Mr. Kinney's declaration is entitled to "little weight"—unlike in *Wowza*, IPR2013-00054, Paper 16 at 4-5. Indeed, the Board did the opposite here by relying on Mr. Kinney's testimony as part of its findings for Ground 3. *See* Appx35-38.

> 2. *The Board Improperly and Incorrectly Limited Cunningham's Disclosure of "Controlling Information" to "Varying Utility Prices"*

While SIPCO asserts that the Board "Did Not Limit Cunningham's 'controlling information' To 'varying utility prices'," SIPCO admits (Br. 37) the Board read Cunningham's disclosure of "controlling information" to "refer[] back to 'varying utility prices.'" *See* Appx24 (citing Appx1067(46:64-67), Appx1068(47:8-10)). The paragraph addressed by the Board demonstrates that such a reading is incorrect on its face:

> *Device adjustment modules* are *used to* monitor *and control the operation* of various devices and applications *according to varying utility prices and the device consumption information*. An example of a device control module is a module to control a Johnson Control™ thermostat by attaching a device control module with a power system, processor with associated firmware, and a radio. The module monitors the energy usage by the air conditioning and heating systems controlled by the thermostat and *can adjust the operation usage* to stay below increased billing increment costs for energy supply and usage. *A two-way sensor interface module would be utilized. The device adjustment*

> *module transmits information to the system and receives <u>controlling information</u> from system update transmissions.*

Appx1067-1068(46:64-47:10); Appx24.

As discussed in §I.A.1 above, the two-way transmissions travel between the SIM/DAM and the host module through the DCM, such that sensor information such as device consumption data can be sent to the host module and controlling information such as disconnect actions and other control functions can be sent back based on utility prices and device consumption information. Based on its flawed understanding of Cunningham—that the DAM generates the control signal rather than the host module—the Board erroneously found that "read in context"—*i.e.*, the context of the Board's incorrect understanding of where the control signal is generated—"Cunningham's use of the word 'controlling information' refers back to 'varying utility prices.'" Appx24, Appx28-29.

SIPCO's attempt to support the Board's improper interpretation of Cunningham's "controlling information" as limited to "utility prices" by arguing that "[n]o other type of 'controlling information' is mentioned in the portion of Cunningham relied upon by the Petitioner" (Br. 38) illustrates the flaws at the core of the Board's analysis. It is error as a matter of law to fail to read Cunningham's disclosures in the context of the entire reference. *See, e.g.*, U.S. Patent and Trademark Office, Manual of Patent Examining Procedure ("MPEP") §2141.02 (in determining obviousness, consider "the prior art references as a whole"); *In re*

*Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1332 (Fed. Cir. 2016) ("When the PTAB examines the scope and content of prior art … it must consider the prior art 'in its entirety, i.e., as a *whole*.'"); *Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*, 777 F. App'x 495, 499-501 (Fed. Cir. 2019) ("Having determined that the provisional application is part of Chen's nonprovisional disclosure, the Board was required to conclude that Chen, as a whole, teaches [the claim limitation]…."). Even if such a reading were supported by the above-quoted paragraph (it is not), the Board's erroneous interpretation is inconsistent with the reference as a whole for the reasons discussed in §I.A.1. Moreover, such an interpretation is also inconsistent with the '978 Provisional (discussed below), which is incorporated by reference.

As confirmed by these disclosures, the only supported reading of Cunningham's disclosure is that the varying utility prices (from across the system) is one of several inputs (including, *e.g.*, device consumption information) upon which the "controlling information" that the DAM "receiv[es]" from the host module can be based. *See* Blue Br. 46-48.

3.    *The Board's Errors Were Further Compounded by the Board's Disregard of the '978 Provisional Incorporated by Reference into Cunningham*

Contrary to SIPCO's argument that the Petition "fails to set forth a prima facie case of obviousness using the '978 provisional application" (Br. 32-33, 40-45), the '978 Provisional incorporated into Cunningham was cited in the Petition to

provide "further evidence" (Appx150-151) that the DAM embodiment discloses the "control signal" limitations in the Ground 2 Claims. As explained in Emerson's opening brief, the '978 Provisional provides an example implementation of Cunningham's DAM embodiment. *See* Appx1434-1435; Blue Br. 13, 40-42, 49-54. Emerson did not rely on the '978 Provisional as an additional obviousness ground.

Neither the Board nor SIPCO appears to dispute that the '978 Provisional demonstrates that the control signal is generated by the host module—not the DAM.[1] This alone illustrates that the Board's interpretation of the full Cunningham reference as only disclosing control signals generated by the DAM is erroneous and cannot be supported by substantial evidence. The '978 Provisional provides an example implementation of Cunningham's embodiment where the "Network Control Center" ("control center"/"NCC") (which corresponds to Cunningham's "host module") "*control[s]* HVAC and lighting based on defined cost parameters and energy usage *across the entire system*." Appx1434-1435. Thus, the control center/host module sends the control signals based on energy usage across the entire system to local Energy Control Modules ("ECMs") (which correspond to

---

[1] While the Board noted that "even if we to accept that the 'Williams Network Control Center' creates control signals as required by the claim[,] Petitioner has not explained how those signals are translated from network transfer protocol to RF signals and then translated to an analog signal that can be used at an actuator" (Appx30), the Board erroneously failed to consider Emerson's reliance on other portions of Cunningham, Mason and McGowan for the "translating" limitations as discussed in §I.B. *See also* Blue Br. 54-61.

Cunningham's DAMs). As explained in the Petition and supported by the testimony of Mr. Kinney, the disclosure in Cunningham's '978 Provisional is incorporated by reference into Cunningham (Appx1045(1:6-8)) and further confirms that the "controlling information" is generated by the host module in response to the sensor data and is sent from the host module through the gateway to the DAM to adjust the device. Appx150-151; Appx944-945(¶63); Appx1434-1435.

Based on the Board's erroneous finding that the DAM—not the host module—generated the control signal, the Board compounded this error by ignoring the disclosures of the '978 Provisional because they were directed to an allegedly different embodiment (Appx32-33) where the control signals are generated by the host module and not the DAM—*i.e.*, the structure recited in the Ground 2 Claims. This error is further confirmed by the Board's inconsistent analysis between Ground 2, where the Board discounted the disclosures of Cunningham's '978 Provisional, and Ground 3, where it relied on the '978 Provisional as part of what Cunningham "discloses." *Compare* Appx28-33 *with* Appx41. Given that these disclosures are thus part of the same embodiment, a motivation to combine is not required as this Court found in *Willis*. *See Willis*, 777 F. App'x at 499-501. Tellingly, SIPCO does not even attempt to reconcile this inconsistency. Instead, it merely repeats the same flawed arguments about Cunningham's disclosure of a "control signal" discussed in §§I.A.1-2.

Emerson's post-institution arguments with respect to the '978 Provisional were not "new" as SIPCO erroneously asserts (Br. 33, 39-40). As the Petition explains, the '978 Provisional offered "further evidence" of the host module's receipt of the HVAC energy usage information and responsive "control signal":

> For example, the '978 application discloses the use of Energy Management Services to control HVAC and lighting based on defined cost parameters and energy usage across the entire systems. [Appx1434]. The Energy Management Services are run by a processing center called the Williams Network Control Center (which corresponds to the claimed "computer"). [Appx1435].

Appx150-151.

SIPCO fails to address that, after the Supreme Court's decision in *SAS Institute*, the Board subsequently instituted Ground 2 and gave Emerson the opportunity to respond to the Board's Decision to Institute concerning the operation of Cunningham. Appx604-609. Emerson correctly pointed out that the Board's Decision to Institute failed to address Emerson's arguments and evidence concerning the disclosures of the '978 Provisional incorporated by reference into Cunningham, which provide further evidence that Cunningham discloses the "control signal" limitations. Appx621-625. Specifically, Emerson explained that just as in Cunningham, the '978 Provisional discloses "the use of Energy Management Services to control HVAC and lighting based on defined cost parameters and energy usage across the entire systems," which are run by a processing center called the Williams Network Control Center ("NCC"). Appx622 (citing Appx1434). Just as in

Cunningham, the '978's Provisional discloses that in response to data collected from sensors (*e.g.*, "energy usage across the entire system") the NCC (claimed "computer") is configured to generate "control" signals that alter the operation of the HVAC and lighting devices—again providing "further evidence" that Cunningham discloses the "control signal" limitations. Appx662 (citing Appx1434; Appx150-151; Appx943-945).

As is well settled under this Court's precedent and contrary to SIPCO's arguments, Emerson is entitled to present arguments to (1) respond to the Board's misinterpretation of Cunningham and the Board's failure to consider the '978 Provisional in its initial Decision to Institute, and (2) rebut arguments made by SIPCO in its Response to Emerson's Brief Regarding Newly-Instituted Grounds. Where, as here, Emerson's explanation of how the embodiment of the '978 Provisional cited in the Petition corresponds with the disclosure in Cunningham cited in the Petition, the explanation properly "expands the same argument made in [the] Petition." *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1380-81 (Fed. Cir. 2018) (vacating and remanding to consider Ericsson's argument in reply that "expands the same argument made in its Petition: that Reed discloses that its S-blocks (i.e., 'packets') are further encoded into packet blocks through interleaving"); *see also Intellectual Ventures I LLC v. EMC Corp.*, No. 2018-2289, 2018-2290, 2019 U.S. App. LEXIS 28933, at *25 (Fed. Cir. Sept. 25, 2019) (finding

petitioner's arguments in reply proper where "[t]hey helped explain why the argument in [petitioner's] petition was correct" and "did not abandon its previous theory of *prima facie* obviousness in favor of a new one, nor did it advance a new theory of invalidity using entirely different references"); 5 U.S.C. §554(c) (agency shall give opportunity for submission of facts, and arguments where time, the nature of the proceeding and the public interest permit).

Furthermore, SIPCO is incorrect in arguing (Br. 40-41, 45) that Emerson presented new argument on the '978 Provisional in its Opening Brief. Unlike in *Israel Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007), Emerson makes the same arguments to this Court as were presented in its Petition (Appx150-151) and supplemental briefing responding to the Board's and SIPCO's erroneous interpretations of Cunningham and the '978 Provisional (Appx621-625). Indeed, SIPCO identifies no argument presented to this Court that was not previously presented to the Board.

The Board erred in disregarding the disclosures in the '978 Provisional, as well as Emerson's arguments concerning the same that confirm the proper interpretation of Cunningham and illustrate the many flaws in SIPCO's arguments and the Board's findings.

**B.    The Board's Conclusion that Cunningham Fails to Disclose the
"Translating" Limitations in the Ground 2 Claims Is Not Supported
by Substantial Evidence**

SIPCO arguments (Br. 46-48) with respect to the "translating" limitations

simply repeat its flawed arguments regarding the "control signal" limitations and

then conclude that the "translating" limitations are not met because there is no

"control signal" to translate. As set forth in the Petition and supported by the

testimony of Mr. Kinney, Cunningham or Cunningham in view of Mason renders

obvious the limitation of "translating the control signal from a network transfer

protocol into a RF control signal" and Cunningham in view of McGowan renders

obvious the limitations of "translating the received RF control signal into an analog

signal; and applying the analog signal to an actuator to effect the desired system

response" (Appx149-156; Appx940-947(¶¶51-68)). SIPCO's arguments and the

Board's findings fail to consider or address Emerson's arguments and evidence

regarding the "translating" limitations.

With respect to the "translating the control signal from a network transfer

protocol into a RF control signal" limitation, SIPCO's brief does not dispute that

Cunningham's host module transmits signals to the DCM (the claimed "gateway")

over the Internet as an Internet protocol (TCP/IP signal). Appx1067(45:60-46:2);

Appx151-152; Appx945(¶64); *see* Blue Br. 55. SIPCO's brief also does not dispute

that, because Cunningham discloses the communication between the DCM and the

DAM/SIM is wireless (Appx1047(6:11-19), Appx1051(14:1-5)), a POSITA would have understood that the DCM translates the received signal from the host module (which is a TCP/IP signal) into a RF signal to be sent to the DAM/SIM. *See, e.g.*, Appx1067(45:60-67) ("The [DCM] will send and receiv[e] information to and from the host module as an Internet protocol (TCP/IP) signal"), Appx1025(Fig. 30); Appx945-946(¶65); Appx151-152; *see* Blue Br. 55. In addition, SIPCO's brief does not dispute that a POSITA would have been motivated to conduct a translation at the DCM, as Mr. Kinney testified, "because it is less costly to translate information at a centrally-located [DCM], than it is to enable TCP/IP communications at the [DAM/SIMs]." Appx946-947(¶67); Appx152; *see* Blue Br. 55-56. Further, SIPCO's brief does not dispute that "Mason discloses that a gateway (node 18) translates a control signal from a network transfer protocol (TCP/IP) into a RF control signal (CEBUS RF protocol signal), which is thereafter transmitted to the appropriate meter." Appx153; Appx993(5:32-41, 6:1-13), Appx990(Fig. 3); Appx947(¶68); *see* Blue Br. 56. SIPCO's brief also does not dispute that a POSITA would have been motivated to apply these teachings in implementing Cunningham because "it is less costly to translate information at a centrally-located [DCM], than it is to require TCP/IP communications at the [SIMs]," as Mr. Kinney testified. Appx945-947(¶¶65-68); Appx1211-1212; *see* Blue Br. 56-57.

With respect to the limitations of "translating the received RF control signal into an analog signal; and applying the analog signal to an actuator to effect the desired system response," SIPCO's brief does not dispute that that McGowan teaches a closed-loop system where a controller processes digital data and sends the digital data to a digital to analog converter, and thereafter an actuator can understand the analog signal and perform the desired response. Appx1171-1172, Appx1171(Fig. 10-3), Appx1172(Fig. 10-4), Appx1176; *see* Blue Br. 57-58. SIPCO's brief further does not dispute that a POSITA would have been motivated to apply McGowan's teaching of translating the received controlling information into an analog signal and applying that analog signal to an actuator to effect the desired response in implementing Cunningham's system. Appx154-156; Appx948-950(¶¶70-73); *see* Blue Br. 57-58. As Mr. Kinney explained, "Cunningham contemplates controlling actuators that are typically considered to be controlled using analog signals," for example a thermostat, and a POSITA would have "recognize[d] that in order to properly control an analog thermostat, digital-to-analog conversion is needed before a control signal can be applied to the thermostat." Appx945-947(¶¶65-68), 949(¶72); Appx155-156; Appx1067-1068(46:62-47:10); Appx1171-1172; *see* Blue Br. 58.

Rather than disputing any of the foregoing, SIPCO argues that Emerson relied on Mason and McGowan for "translating generally, not the translating of the particular types of data required by the claims." Red. Br. 48. However, the Petition,

supported by the testimony of Mr. Kinney, explained that, *e.g.*, "Mason discloses that a gateway (node 18) translates *a control signal* from a network transfer protocol (TCP/IP) into a RF control signal (CEBUS RF protocol signal), which is thereafter transmitted to the appropriate meter" and, as discussed above, a POSITA would have been motivated to apply these teachings in implementing Cunningham's system because "it is less costly to translate information at a centrally-located [DCM], than it is to require TCP/IP communication at the [SIMs]." Appx153-154; Appx993(5:32-41, 6:1-13), Appx990(Fig. 3); Appx947(¶¶65-68); Appx1211-1212 (stating the desirability of using gateways is that existing systems could be easily modified to allow communication). Similarly, the Petition explained that McGowan teaches a "digital signal is transmitted to a digital to analog converter" and "an actuator can understand the analog signal and perform the desired response." Appx155. The Petition explained that a POSITA would have been motivated to apply these teachings in implementing Cunningham's system because, as discussed above, "Cunningham contemplates controlling actuators that are typically considered to be controlled using analog signals," for example a thermostat (Appx1067-1068(46:62-47:10)), and a POSITA would have "recognize[d] that in order to properly control an analog thermostat, digital-to-analog conversion is needed before a control signal can be applied to the thermostat." Appx154-156; Appx949(¶¶70-73); Appx1171-1172, Appx1176.

Cognizant that the Board failed to consider or address Emerson's reliance on Mason and McGowan for the "translating" limitations in the Ground 2 Claims, SIPCO makes the unsupported argument (Br. 47) that the Board considered "the teachings of all the references in the combination." Tellingly, SIPCO fails to provide a single citation to where the Board addressed Mason's and McGowan's disclosures with respect to the Ground 2 Claims. Instead, SIPCO repeats the same flawed arguments concerning "control signal" limitations discussed in §I.A.

As in *Shinn Fu*, where this Court held that the Board erred by providing no analysis "with regard to the manner in which Shinn Fu proposed its key obviousness combination," it was error here for the Board to provide no analysis of Emerson's obviousness arguments as to these limitations based on Cunningham, Mason, and McGowan for Ground 2. *See Shinn Fu*, 701 F. App'x at 945-46.

The Board simply failed to take these arguments into consideration or address them in determining that the "translating" limitations were not met. Accordingly, the Board's findings are not supported by substantial evidence and the Board's conclusion that the Ground 2 Claims are not unpatentable should be reversed.

## C. *The Board Violated the APA and Due Process By Prohibiting Emerson from Presenting Any Evidence as to the Ground 2 Claims at Trial After the Board's Initial Findings in its Institution Decision*

SIPCO's response to Emerson's APA and Due Process argument—that Emerson was properly denied an opportunity to submit evidence post-institution

because the Board had correctly found the evidence submitted with the Petition insufficient, *see* Red Br. 49-52—amounts to an invitation for this Court to disregard the Supreme Court's finding in *SAS Institute*.  *SAS Institute* specifically held that, under 35 U.S.C. §314(a), the Board must hold a trial as to all challenged claims if it institutes review on "at least 1" claim. *SAS Inst.*, 138 S. Ct. at 1356.  But the "trial" on the additional claims must be a fair one that offers the petitioner a chance to respond to counter-arguments, it cannot deprive the petitioner of any opportunity to respond simply because the Board initially found the Petition wanting on the additional claims.  If that were so, *SAS Institute*'s holding would be an entirely empty formality.  Both the APA and Due Process demand more.

As SIPCO admits (Br. 51), the APA and Due Process demand that a Petitioner be permitted the opportunity to submit "reply" evidence post-institution. A Petitioner must, for example, be permitted to submit evidence "to document the knowledge that skilled artisans would bring to bear in reading the prior art." *See Anacor Pharm., Inc. v. Iancu*, 889 F.3d 1372, 1380-81 (Fed. Cir. 2018) (internal citation omitted). Yet, Emerson was prohibited from submitting precisely this type of rebuttal evidence with respect to the Ground 2 Claims.

As explained in Emerson's Opening Brief, the Board initially denied institution of the Ground 2 Claims, based on the same misreading of Cunningham and Cunningham's '978 Provisional discussed above. Appx275-277. On May 2,

2018, after the Supreme Court's decision in *SAS Institute*, 138 S. Ct. 1348, the Board properly issued a modified Decision to Institute granting institution on the Ground 2 Claims. Appx596-598. Subsequent to the modified Decision to Institute, the Board granted the parties briefing on the newly instituted grounds; but the Board denied Emerson's request to submit evidence with the additional briefing, in contravention of the established rule that a petitioner is permitted to submit reply evidence with its reply brief in the ordinary course of an IPR. Appx608.

SIPCO's arguments (Br. 24-25, 49-52) boil down to an assertion that the evidence Emerson requested to submit with its post-institution briefing must necessarily have been improper "new" evidence "necessary to make out a prima facie case," because the Board had initially declined to institute on those grounds. There is no authority for SIPCO's untenable position that the Board can foreclose post-institution rebuttal evidence as improper "new" evidence before it is even presented. It cannot categorically rule that any reply evidence regarding an initially uninstituted claim is necessarily "new." Rather, the Board has procedures for addressing improper "new" evidence if such evidence is submitted post-institution. *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1081-82 (Fed. Cir. 2015). Emerson should have been permitted to submit proper rebuttal evidence in response to the Decision to Institute's preliminary findings, the Preliminary Patent Owner

Response ("POPR") arguments adopted therein, and SIPCO's arguments in its post-institution brief. Appx238-239; Appx276-277; Appx629.

As this Court has recognized, "[p]arties are not barred from elaborating on their arguments on issues previously raised" and it is entirely proper for a party to clarify an earlier position. *See Chamberlain Grp., Inc. v. One World Techs., Inc.,* No. 18-2112, 2019 U.S. App. LEXIS 37224, at *11-13 (Fed. Cir. Dec. 17, 2019). Here, Emerson should have been permitted to submit evidence regarding Cunningham's disclosure of generating a control signal and the disclosure of the '978 Provisional, as these materials had already been discussed in the Petition and such rebuttal evidence from Emerson could have helped the Board understand the correct relationship between those parts of Cunningham. As this Court has recognized, Emerson bore the burden of proof and should have been permitted to fully respond, particularly given the "estoppel effects that trigger ... [when] the Board issues a final written decision." *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016); 35 U.S.C. §315(e).

Contrary to SIPCO (Br. 51), this case is distinguishable from *Dell Inc. v. Acceleron LLC*, where this Court addressed whether the Board needed to consider new evidence on remand. 884 F.3d 1364, 1369 (Fed. Cir. 2018). By contrast, in this case Emerson was denied the opportunity to present evidence at the beginning of trial on the Ground 2 Claims. *See also Chamberlain*, 2019 U.S. App. LEXIS 37224,

at *11-13 (distinguishing *Dell* from situation where arguments made in rebuttal "merely clarified [the party's] previous position").

The Board here abused its discretion in denying Emerson the opportunity to present evidence post-institution regarding the Ground 2 Claims. To the extent this Court is not able to reverse the Board's findings as to the Ground 2 Claims on the current record, Emerson requests the Court vacate and remand the Board's decision as to the Ground 2 Claims to allow Emerson to present evidence in response to the Institution Decision's preliminary findings, the POPR arguments adopted therein, and SIPCO's arguments in its post-institution brief.

## II. The Board's Determination as to the Ground 3 Claims Should Be Affirmed as Its Claim Constructions Are Correct as a Matter of Law and Its Findings Are Supported by Substantial Evidence

### A. *The Board Correctly Assigned the "Low-power" Terms in the Ground 3 Claims Their Plain and Ordinary Meaning*

As a threshold matter, while the Board's construction of the "low-power" terms—and rejection of SIPCO's attempts to limit the terms to require a "limited transmission range"—is well-supported by the intrinsic record and underlying findings of fact, the construction is also immaterial to the outcome of the case. As further discussed in §II.B, below, Cunningham discloses these limitations under both the terms' plain meaning and SIPCO's proposed constructions. This Court therefore need not address the correct construction of these terms. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e

need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy….'" (citation omitted)). Nevertheless, the Board properly gave the terms "low-power radio-frequency (RF) signal" (claim 32) and "a low-power RF signal" (claim 55) their plain and ordinary meaning.

### 1.    *The Board's Application of the Plain Meaning of the "Low-power" Terms Is Correct Under Phillips*

The Board correctly found that, based on the intrinsic record, the "low-power" terms should have their "plain and ordinary meaning, which is to say that they are construed to encompass transmitters/transceivers that transmit low power signals." Appx15. The specification "does not define the term low power RF signal, and does not expressly limit it," and the "evidence of record suggests a [POSITA] would have understood what was meant by a low power RF signal." Appx14-15.

Because the '692 patent expired during the IPR, the *Phillips* standard applied at Final Written Decision. During trial, Emerson argued that the proper construction is the same under both *Phillips* and BRI (Appx625 n.3); SIPCO never disputed this point—waiving the arguments that it now tries to raise on appeal concerning whether the Board applied the wrong claim construction standard. *See Watts*, 354 F.3d at 1368 (holding party waived an "argument regarding the scope of" the claims in a reference patent). In any event, the Board's opinion cites both the BRI and *Phillips* standards, and ultimately applies the standard articulated in *Phillips*.  Immediately after citing the *BRI* standard, which applied at the time of institution, the Board went

46

on to state that the Board "generally give[s] terms their ordinary and customary meaning." Appx10 (citing *Translogic*, 504 F.3d at 1257). Contrary to SIPCO's assertion (Br. 62), *Translogic* did not use that language to describe the BRI standard, but instead was explicitly quoting from *Phillips* as establishing the "ordinary and customary meaning" standard. *See Translogic*, 504 F.3d at 1257 (quoting *Phillips*, 415 F.3d at 1312). Thus, the Board made clear that generally the "ordinary and customary meaning" applies under both standards, just as this Court observed in *CSB-System*, noting that often "the claim construction will be the same under the *Phillips* and BRI standards." *In re CSB-System Int'l, Inc.*, 832 F.3d 1335, 1337-38, 1341 (Fed. Cir. 2016). And, in its operative holding, the Board again made clear that it was adopting the "plain and ordinary meaning" of the claim terms, which also applies under *Phillips*. Appx14-15. As in *CSB*, the Board here found there is "no support whatsoever" for SIPCO's proposed construction in the '692's specification, and there is no need for "embellishment" of the meaning of "low-power" transceivers "beyond its plain meaning." *CSB*, 832 F.3d at 1342. SIPCO's argument concerning the construction standard is thus a red herring, in addition to having been waived.

As the Board properly found, the intrinsic record does not support SIPCO's attempt to read in a limitation into the "low-power" terms, by also requiring the transceivers and signals have "limited transmission range." The Board fully

considered the intrinsic evidence identified by SIPCO and concluded that the claim language "does not mention transmission range," and the specification "does not equate" low-power and short range transceivers/signals. Appx13. SIPCO identifies as support only two specification disclosures (Br. 64), which state that if a transceiver uses a "relatively low power RF signal," the transceiver's range "*may be*" relatively limited in only "*some* applications"—*i.e.*, low-power signals are not always short range. Appx74(5:53-54); *see also* Appx74-75(6:67-7:6) (noting stand-alone transceivers "may be" able to pick up a signal from only one integrated transceiver but that "in certain circumstances" "two, or even more stand-alone transceivers" may receive the transmission). As the Board correctly explained, these passages do not support SIPCO's construction because they explain that the low-power transceivers' range "*may be*" limited and transceivers "may be dispersed so that only one transceiver will pick up a transmission from a given integrated transceiver 'due *in part* to the low power transmission nature of each transmitter'"— *i.e.*, other factors affect the range. Appx13 (quoting Appx74-75(5:50-54, 6:67-7:4)). As the Board explained, "the specification describes low power as a property that may impact transmission range, but the specification does not equate these properties." *Id.* The Board agreed with Emerson that the intrinsic evidence demonstrates that "a limited transmission range does not necessarily correlate with

low power, but instead may depend on multiple factors beyond power, such as frequency, hardware design, and environment." Appx13-14.

SIPCO does not articulate why the Board's analysis was deficient beyond merely asserting that the Board did not "properly consider" the evidence in its decision, even though the Board squarely addresses the only specification support SIPCO identifies in its brief, and SIPCO does not argue on appeal that any extrinsic evidence cited below supports its construction. *See* Red. Br. 63; Appx13.

Substantial evidence also supports the Board's underlying factual findings that SIPCO's construction is incorrect, which are entitled to deference on review. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) ("subsidiary factfinding" for purposes of claim construction "must be reviewed for clear error on appeal"). Citing Emerson's Reply, which sets forth Emerson's expert's testimony, the Board agreed that the range of a transceiver depends on multiple factors beyond power, including "frequency, hardware design, and environment." Appx13-14 (citing Appx447-448(Reply) (citing Appx3338(71:6-14); Appx2454-2455(¶18))).

The Board also correctly found that SIPCO's construction is "nonspecific, vague and unhelpful." Appx14. As the Board found, SIPCO's construction "fails to address questions its proposed construction raises, such as, what a 'limited' transmission range means and how 'limited' the range must be (i.e., what the range's distance should be), whether the transmission range depends on the particular system

49

or application, and whether other factors should be considered in determining whether the transmission range is limited." Appx14 (quoting Appx447); *see also* Appx2454(¶17). Indeed, while SIPCO and its expert baldly assert that the '692 patent's transceivers have a range of "e.g., several feet," *see* Red Br. 58 (citing Appx3223(¶144)), SIPCO has not identified any evidence—intrinsic or extrinsic—supporting this or any other quantification of a "limited" range. SIPCO's proposed construction is therefore also wrong because a construction that renders the claim nonspecific, vague and unhelpful and therefore indefinite "cannot be correct." *See Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006) (construction that renders a claim nonsensical "cannot be correct"); *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1336 (Fed. Cir. 2003) (rejecting claim construction that rendered claim indefinite).

SIPCO's arguments on appeal demonstrate the arbitrary nature of SIPCO's construction. In its brief, SIPCO argues, again without intrinsic support, that a SIM's 600 foot range is not a "limited transmission range." Red Br. 65. But that is merely *ipse dixit* offered in a transparent, belated effort to construe around the prior art. As discussed below, *infra* at 54-55, Cunningham explicitly states both that SIMs are "low-power" (Appx1047(6:14-19)) and use "short range" transceivers (Appx1016(Fig. 19)). Obviously, a term that can be given meaning only after knowing what the prior art already disclosed would be impermissibly indefinite.

2. *SIPCO Places Mistaken Reliance on the this Court's Construction of a "Low Power" Term in a Different Patent, Which Relied Exclusively on Specification Disclosures That Do Not Appear in the '692 Patent*

Contrary to SIPCO's assertions, this Court's decision addressing the construction of a "low-power" term in a different patent (US 8,908,842 ("'842 patent")) with a different specification does not support applying the Panel's construction of those terms to the '692 patent.

The '692 patent does not include any of the disclosures from the '842 patent's specification that the panel relied on in its decision. *See SIPCO, LLC v. Emerson Elec. Co.*, 939 F.3d 1301, 1308-09 (Fed. Cir. 2019). In those disclosures, the '842 patent contrasts a "low-power RF transmitter" from a "cellular transmitter" based on the "distance" to the nearest transceiver. *Id.* at 1308-09. Those disclosures also discuss an "extremely low-power operation," for which the panel held the "word 'extremely' specifies the *amount of distance* by which the transmission is limited— *e.g.*, 'several feet.'" *Id.* The panel concluded that the '842 specification's reference to limited transmission range of "several feet" was critical, because "[i]t is only if the signal transmission is limited in range that the problems of unwanted circumvention, contention, and unlawful interception" elsewhere identified in the specification could be alleviated. *Id.* at 1308. Based on these specific disclosures, the panel concluded that this intrinsic evidence was "sufficiently clear" to construe "low-power" in the '842 patent to require limited transmission range. *Id.* at 1309.

SIPCO admits (Br. 65; *SIPCO*, 939 F.3d at 1308-09) that the earlier panel's decision depended on disclosures in the '842 patent's specification, but fails to acknowledge that *none* of those cited disclosures—not the '842's reference to "several feet," nor its recitation of a purpose to avoid circumvention, contention, or interference— appear in the '692 patent's specification. Instead, as explained above, the '692 patent's disclosures expressly indicate that power is only one factor affecting the range of the claimed transceivers. Notably, the dissent in that case thought that even the '842 specification's disclosures were not sufficient to warrant importing a "range" limitation into the claim language. 939 F.3d at 1317 (Reyna, dissenting). That observation is even more apposite where, as here, the limitation does not even appear in the specification.

The Board's construction therefore should be affirmed.

### B.    *Substantial Evidence Supports the Board's Finding that Cunningham Discloses Relatively Low-power Transceivers in the Ground 3 Claims*

Substantial evidence supports the Board's findings that Cunningham discloses the "low-power" limitations in '692 claims 32 and 55. Cunningham discloses that sensor interface modules (SIMs) act as data gathering equipment attached to monitoring equipment such as gas, electric, and water meters. Appx1047(6:9-11), Appx1048(7:30-44); *see also* Appx17. SIMs are configured to communicate the gathered data with data collection modules (DCMs) through wireless

communications. Appx1047(6:12-14); *see also* Appx17-18. The DCM will then relay this data over the Internet to a host computer. Appx1067(45:60-67); *see also* Appx18, Appx36. If the DCM is not connected to the Internet because, *e.g.*, it is in a remote area, it will instead repeat the collected data to other DCMs to reach a DCM that is connected to the Internet. Appx1061(33:16-25), Appx1067(45:60-67); *see also* Appx18, Appx36.

The Board found that when SIMs communicate with DCMs, SIMs transmit a "low-power radio-frequency (RF) signal" (claim 32) (Appx34-36) and, similarly, that Cunningham's SIMs also convert an information signal "into a low-power RF signal" (claim 55) (Appx44-45). The Board also found that Cunningham's DCMs communicate using low-power transceivers that disclose "relatively low-power radio-frequency (RF) transceivers" (claim 55). Appx44-45. Substantial evidence supports these findings.

      1.     *Substantial Evidence Supports the Board's Findings that Cunningham's SIMs disclose Claim 32's "Low-Power Radio-Frequency (RF) Signal" and Claim 55's "Low-Power RF Signal"*

Cunningham expressly discloses SIMs "communicate with data collection modules 110 through ... *low-power, radio frequency transmissions*." Appx1047(6:13-17). SIPCO contends only that Cunningham's SIMs are not low-power "under the construction set forth" by SIPCO with respect to the '842 patent, *i.e.*, requiring a limited transmission range, and does not separately dispute that SIMs

meet this limitation under the plain meaning adopted by the Board. Red Br. 65. As explained above in §II.A, SIPCO's limited transmission range construction is incorrect.

Regardless, even under SIPCO's construction, if a POSITA would have understood a "low-power" RF signal to require a short range as SIPCO asserts, then a POSITA analyzing Cunningham's express disclosure of a "low-power" RF signal would have had that same understanding. As the Board found, "Cunningham explicitly discloses that 'various types of known, low-power, radio-frequency transmissions may be utilized'" (Appx35 (citing Appx1047(6:13-17)))—which would include any "short range" "low-power" transceivers. Indeed, Cunningham's transmitter is only a "tenth the power of what the FCC considers to be low power" and Cunningham specifies that other "known, low-power, radio-frequency transmission may be utilized," Appx35, and even singled out SIMs' use of "short range" transceivers.  While the Board does not expressly discuss Cunningham's Fig. 19, it cites Emerson's Reply addressing Cunningham's explicit disclosure that SIMs use "short range" transceivers, and concludes that Cunningham's transceivers are low-power.  Appx35 (citing Appx451 (discussing Appx1016(Fig. 19))).



FIG. 19

Pulse encoder — 1300

1307

CPU — 1302

SSR — 1304

1306

PAN connection to Telemetry Gateway via
short range spread spectrum transceiver
( Transmit only option )

Appx1016(Fig. 19) (emphasis added); *see also* Appx1047(5:23-24) (Fig. 19

"illustrates a ... [SIM]"); Appx451. Notably, SIPCO has never addressed Fig. 19,

either before the Board or in its opening appeal brief.

As the Board found, the FCC Bulletin that SIPCO relies on (Br. 66) actually

supports Emerson's arguments, and further confirms that Cunningham discloses

low-power RF signals. Appx35; *cf.* Red Br. 65-66. The FCC Bulletin defines a "low

power" transmitter as a transmitter that "complies with the regulations" set forth by

the FCC. Appx2486. In Cunningham's frequency range of 902-928 MHz, these

regulations limit a "low power" transceiver to a "maximum power output of 1

Watt"—ten times higher than the 100mW used by Cunningham's SIMs. Appx2491,

Appx2493, Appx2502; Appx1053(18:58-62); *see also* Appx35. The Board's finding

that Cunningham's transceivers, which transmit at a power level well below 1 Watt,

are low-power is therefore supported by the FCC Bulletin. Contrary to SIPCO's reading in response, the FCC Bulletin does not require low-power transceivers to use "less than a milliwatt" of power (*cf.* Red. Br. 66), and instead states only that "*most* of them [use] less than a milliwatt." Appx2486 (emphasis added). The FCC Bulletin also does not define low-power transceivers as having a range of "a few meters"—despite SIPCO's assertions otherwise (Br. 53). Rather, the Bulletin says that because of the large number of such devices in use, "most *people* are within a few meters" of devices using low-power transmitters. Appx2485 (emphasis added). The FCC Bulletin therefore provides further support for Cunningham's disclosure of low-power transceivers under both the Board's and SIPCO's constructions.

Substantial evidence supports the Board's findings that Cunningham's SIMs disclose the low-power RF signal limitations in claims 32 and 55.

> 2. *Substantial Evidence Supports the Board's Finding that Cunningham's DCMs Meet Claim 55's Recitation of a "Plurality of Relatively Low-Power Radio-Frequency (RF) Transceivers"*

Substantial evidence supports the Board's finding that Cunningham's DCMs disclose a "plurality of relatively low-power radio-frequency (RF) transceivers." As explained above in §II.B.1, Cunningham discloses that SIMs "*communicate with data collection modules 110* through ... *low-power, radio frequency transmissions*." Appx1047(6:11-17) (emphasis added); *see also* Appx45-46. Contrary to SIPCO's argument that this disclosure "relates to" only a SIM and not a DCM, the Board

correctly found that Cunningham discloses that DCMs are also low-power. *See* Appx45-46. As the Board explained, "low-power" transmissions can be used for communications between SIMs and DCMs. Appx35. Indeed, Cunningham explains that the communication between the two is bidirectional—the DCM transceiver is "used to receive *or transmit* signals" to SIMs. Appx1054(20:8-10); *see also* Appx45. The DCMs also use these transceivers to repeat messages to other DCMs when a DCM is too remote to be connected directly to the Internet—meaning the same low-power transceiver is used to communicate with the SIMs as well as other DCMs. Appx1061(33:15-44); *see also* Appx45. These DCM-to-DCM communications are therefore low-power, and meet this limitation's requirement that the "low-power RF signal is received and repeated as required to communicate the information signal to a gateway." This is substantial evidence supporting the Board's finding that DCMs meet this limitation under the term's plain meaning. *See* Appx45-46.

SIPCO's assertion that the Board's decision does not "mention the power level of" DCMs because its analysis instead focused on SIMs (Br. 53, 59) is incorrect because the Board specifically addressed SIPCO's contention, including the evidence SIPCO cites that DCMs are not low-power, and concluded that this limitation is met based on "[DCMs] with signal repeating capabilities for use in remote areas." Appx45. The Board correctly focused on the disclosure of "the multiple [DCMs]" taught by Cunningham. Appx45. Contrary to SIPCO's assertion,

in doing so, the Board addressed the arguments and evidence SIPCO relied on below (which SIPCO repeats in its opening brief) and rejected them, explaining that SIPCO's argument "is premised on [its] erroneous construction" of the low-power limitations. Appx45-46.

Nor is there any merit to SIPCO's assertion that the Board used common sense to fill in a missing limitation (Red. Br. 60), as the Board relied on explicit disclosures, not common sense. In light of the Board's findings based on these express disclosures, SIPCO's citation to *K/S HIMPP*, 751 F.3d at 1366 is thus inapposite. *See also* §I.A.1. Contrary to SIPCO's assertion, the Board's findings satisfy the Administrative Procedure Act (*cf.* Red Br. 55), because the Board did not rely on "mere conclusory statements," but rather, as explained above, set forth for each limitation SIPCO challenges an "articulated reasoning with some rational underpinning." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (internal citation omitted).

SIPCO's repeated arguments concerning Mr. Kinney's declaration (Br. 60-61) fail for the same reasons discussed in §I.A.1. Namely, SIPCO's case law addresses conclusory testimony, and does not state that an expert declaration is entitled to no weight merely because its language also appears in the petition. *Cf. In re Geisler,* 116 F.3d 1465, 1471 (Fed. Cir. 1997) (rejecting patent owner's "naked attorney argument" concerning secondary considerations); *In re Schulze*, 346 F.2d

600, 602 (C.C.P.A. 1965) (rejecting applicant's argument regarding limitations "lacking in patentable significance because [they are] well within the skill of the art"). Indeed, the Board actually relied on Mr. Kinney's testimony regarding Cunningham's teachings of "low-power" and "encoded electrical signal" limitations disputed by SIPCO in its appeal brief. *E.g.*, Appx35, Appx37-38. Substantial evidence thus supports the Board's finding that Cunningham discloses claim 55's recitation of "relatively low-power radio-frequency (RF) transceivers."

Even under SIPCO's erroneous construction, the Board rejected SIPCO's arguments that Cunningham's DCMs are not "low-power." Appx46. In reaching its decision, the Board considered Cunningham's Fig. 30, which depicts a DCM and states that the DCM's transceiver is "short range"—satisfying SIPCO's proposed construction:



FIG. 30

Connection to Repeaters and other Telemetry Gateways 2300

2314

Optional connection to Backbone System

2316

Spread spectrum radio

Modem

CPU

SSR

2304

2302

2306

2308

2318

2310

2320

Connection to Telemetry Interface Module via short range spread spectrum transceiver

Appx1025(Fig. 30) (emphasis added); Appx45; *see also* Appx1047(5:41) ("Fig. 30 is a block diagram of a [DCM]"). Cunningham therefore explicitly discloses this limitation even under SIPCO's construction.

SIPCO's argument (Br. 58) that DCMs are not short range because they can communicate across a "Metropolitan Network" and "National Backbone Network" also mischaracterizes Cunningham's teachings. SIPCO assumes that each DCM has a range spanning the length of the network as a whole, which conflates the network's size with the range of individual DCMs within the network. As explained above, Cunningham discloses that each DCM uses "short range" communications and, in fact, is expected to have a range of up to only 2,000 feet. Appx1053(17:62-65), Appx1025(Fig. 30); Appx1046-1047(¶42). DCMs relay information over longer

distances by acting as "data repeater modules" to repeat a message from its source across multiple intermediate DCMs to the message's destination. Appx1061(33:15-44); Appx45. These DCMs therefore can be used in a Metropolitan Network or a National Backbone Network and still have a short range by using intermediate DCMs operating as repeaters to communicate across the network. Appx1061(33:15-44).

SIPCO's brief also argues incorrectly that all 900MHz signals are high-powered based on a RadiusVision article describing a specific type of "high-powered 900 Mhz links" used in "industrial IP video and audio systems." *See* Red Br. 57 (citing Appx3158-3160). This article does not discuss 900MHz links generally, let alone the low-power RF links disclosed by Cunningham. Rather, the article instead describes a specific type of "high power" transceiver. Appx3223. Indeed, as explained above in §II.B.1, the FCC Bulletin shows that 900MHz transceivers using less than 1 Watt of power are low-powered transceivers. Appx2491, Appx2493, Appx2502.

Accordingly, under both the Board's and SIPCO's constructions, Cunningham's DCMs satisfy the "low-power" RF transceivers recited in claim 55.

**C.**    ***Substantial Evidence Supports the Board's Finding that Cunningham Discloses the Claimed Encoded Electrical Signal in the Ground 3 Claims***

Claim 32 recites that the gateway "receive[s] and translate[s] the RF signal ... to deliver the encoded electrical signal and transmitter identification information to a computer on the WAN." Substantial evidence supports the Board's finding that this limitation is disclosed by Cunningham's teaching of a DCM receiving information from a SIM via RF communications and then sending this information to a host module over the Internet. *See* Appx36-38. Specifically, Cunningham discloses that a DCM receives an encoded cumulative sensor reading, which is the "encoded electrical signal," from a SIM. Appx1048(7:19-21), Appx1059(29:63-30:65), Appx1067(45:60-67). The DCM then sends this reading, along with transmitter identification information identifying the SIM to the host computer. Appx1060(31:6-28). This transmission to the host computer uses TCP/IP to communicate over the Internet, which is a WAN. Appx1067(45:60-67), Appx1043(Fig. 47); *see also* Appx2464-2465(¶¶ 31-32); Appx36-37.

SIPCO mischaracterizes claim 32 by stating that the phrase "the encoded electrical signal" requires a packet to be "directly forwarded/routed in whole" to the host module. Red Br. 67. As the Board explained, SIPCO's position "is premised on reading a limitation into the claims, namely that the information encoded in the RF signal must be translated in real time." Appx37. Read properly, claim 32 recites that

the gateway must "deliver the encoded electrical signal and transmitter identification information" to a computer, but does not require a "direct" transmission of the encoded signal from the SIM. *Id.* Rather, the claim is met so long as the gateway is configured to "deliver the encoded electrical signal and transmitter identification information to a computer on the WAN," regardless of whether the recited electrical signal and identification information are transmitted in real-time, aggregated, or otherwise processed before transmission. Claim 32 also does not require that the transmitter identification information is "not encoded" as suggested by SIPCO. *Cf.* Red Br. 67.

But even applying SIPCO's understanding, substantial evidence supports the Board's finding that Cunningham discloses this limitation. Appx37-38. As the Board explained, Cunningham discloses that a SIM transmits its sensor reading as a "cumulative value" that is transmitted to a DCM. Appx1051(13:44-46); Appx37. The Board found that Cunningham's "cumulative" reading is an individual sensor value because "two cumulative readings can be used to 'interpolate' and 'recover' a missed reading (*i.e.*, a signal from the sensor)." Appx37-38 (quoting Appx438); Appx1051(13:44-56). Put differently, if the DCM receives two cumulative readings—a SIM's first absolute reading and the third absolute reading—but misses the second absolute reading, then the DCM can obtain a value of the second reading by interpolating (*e.g.*, taking the average of) the first and third reading. However, if

the DCM receives only an incremental or marginal reading, then the first and third

reading cannot be used to calculate the second reading, and any interpolation is likely

to result in an inaccurate measurement of the total amount of energy used at the time

of the third reading. Thus, as the Board found, these "cumulative" readings are each

actual absolute readings from the SIM.

Once these absolute sensor readings are received by the DCM, these

"individual signals from the sensor are identified by the gateway [*i.e.*, the DCM] and

this information is then transmitted (with transmitter identification information

[identifying the SIM]) to a computer on the WAN [*i.e.*, the host module]." Appx37

(citing Appx1060(31:6-28)). In asserting that Cunningham is limited to

"accumulat[ing]" information (Red Br. 68), SIPCO merely reargues the same point

the Board considered, and rejected, when it found that Cunningham's DCMs

transmit each individual sensor reading. Appx37-38. SIPCO's discussion of

"checksum" values referenced in the petition (Red Br. 67) is irrelevant, as the Board

did not rely on this alternative theory in rendering its decision. *See* Appx37-38.

As part of its argument, SIPCO reiterates the same mischaracterization of the

Board's Institution Decision, which significantly alters the Board's actual language,

to support the inaccurate assertion that the Board had previously "recognized this

deficiency in Cunningham." Red Br. 68-69. As it did below, SIPCO has edited the

Board's Institution Decision in an effort to make the Board's discussion of claim 1

look like it was a discussion of claim 32, which lacks the relevant limitations that were the focus of the Board's discussion of claim 1.  The following reveals SIPCO's alterations:

> Although Petitioner's Cunningham argument accounts for some translation, it fails to account for translation of ~~all three pieces of~~RF signal which comprises both "encoded electrical signal" and "transmitter identification" information" recited in the challenged claims. Further, even assuming ~~transceiver~~transmitter identification information is received and translated by Cunningham's data collection module, Petitioner has not shown that it is further transmitted to the host module. ~~*Id.* at 42. [. . .]~~ (Appx274): Petitioner does not show how the asserted prior art renders obvious a "system for remote data collection, assembly, and storage comprising ... at least one gateway connected to the wide area network configured to receive and translate the ~~select information, the transmitter identification information, and transceiver identification information~~RF signal, said gateway further configured to ~~farther transmit the translated~~deliver the encoded electrical signal and transmitter identification information to ~~the~~a computer ~~over~~on the WAN."

*Compare* Appx274-75 *with* Red Br. 68-69. As Emerson explained below, in the original passage from the Board's Institution Decision, the Board was addressing a claim limitation found in claim 1 that does not appear in claim 32. *See* Appx439-40; Appx274-75. That limitation requires the gateway to transmit three pieces of information, including "transceiver identification information" that is not recited in claim 32. *See* Appx439-40. The Board found with respect to '692 claim 1 that Cunningham did not disclose this additional limitation. But, it did not "recognize" any purported deficiency that is relevant to claim 32. SIPCO's alterations of the

Board's Institution Decision rewrite the Board's decision to obscure that the Board was actually commenting on limitations in claim 1 that are irrelevant to claim 32.

SIPCO's reference to *K/S HIMPP* (Br. 69) is again inapposite because, as explained above in §§II.B.2, I.A.1, the Board did not rely on common sense to supply a missing limitation, and instead pointed to teachings in Cunningham to show that Cunningham discloses this limitation. And, as explained above in §§II.B.2, I.A.1, the Board properly weighed Mr. Kinney's well-supported declaration (*cf.* Red Br. 69-70). Substantial evidence thus supports the Board's finding that Cunningham discloses this limitation.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Emerson respectfully requests that this Court affirm the decision of the Board finding the Ground 3 Claims unpatentable, and reverse or, at minimum, vacate and remand, the decision of the Board finding the Ground 2 Claims not unpatentable.

Respectfully submitted,

/s/ Douglas Hallward-Driemeier
Douglas Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

*Counsel for Emerson Electric Co.*

Dated: December 30, 2019

## CERTIFICATE OF SERVICE

On December 30, 2019, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Douglas Hallward-Driemeier
Douglas Hallward-Driemeier
*Counsel for Emerson Electric Co.*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,997 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

/s/ Douglas Hallward-Driemeier
Douglas Hallward-Driemeier
*Counsel for Emerson Electric Co.*